UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------- X

eShares, Inc. d/b/a Carta, Inc.,                    :

                *Plaintiff*,                       :

        v.                                    :

Jerry O. Talton, III,                               :

                *Defendant*.                      :

------------------------------------------------------- X

                      **COMPLAINT**

              **JURY TRIAL DEMANDED**

         Case No. ___22-cv-10987___

Plaintiff eShares, Inc., doing business as Carta, Inc. ("Carta" or the "Company"), for its complaint against Jerry O. Talton, III, seeking injunctive relief and recovery of substantial damages caused by his wrongful and illegal acts as an executive of Carta, alleges as follows:

## NATURE OF THE ACTION

1.      Carta is a privately held corporation that began by specializing in capitalization table management and valuation software and services, and has expanded into public market equity management, venture capital fund management, and broker-dealer business lines.  As part of its core operations, Carta digitizes paper stock certificates along with stock options, warrants, and derivatives to help companies, investors and employees manage their equity, while creating a real-time picture of company ownership.

2.      Carta is trusted by more than 30,000 companies, over 5,000 investment funds, and half a million employees of its customers for capitalization table management, compensation management, liquidity venture capital solutions, and more. Carta's liquidity solutions have returned $13 billion to shareholders in secondary transactions.  Carta has been included on the

Forbes Cloud 100 (World's Best Cloud Companies), Fast Company's Most Innovative list, and Inc.'s Fastest-Growing Private Companies.

3.      Talton served as Carta's Director of Engineering, Data and Machine Learning from August 18, 2018 until May 16, 2020 when he was promoted to Vice President of Research and Development Strategy.  Talton served as Carta's Chief Technology Officer ("CTO") from November 2020 until his termination for Cause on December 23, 2022.

4.      As Carta's CTO, Talton was responsible for overseeing Carta's entire information technology infrastructure and ensuring the security of more than $2.5 trillion in customer assets. He was well compensated for this important role, receiving hundreds of thousands of dollars in salary and benefits, and substantial equity awards.

5.      Unbeknownst to Carta, Talton repeatedly abused his position of trust and confidence as CTO to secretly record multiple Carta executives, Board members and others in an attempt to harm Carta, including by feeding such information to former employees who were threatening to assert claims against Carta (and/or who were already litigating against Carta), and to circumvent and undermine the very information technology infrastructure and security systems he was charged with safeguarding in order to conceal his own illicit conduct.

6.      As detailed below, Talton's conduct included, without limitation: (i) secretly recording multiple Carta-related and attorney-client privileged and confidential conversations with Carta's General Counsel, as well as Carta's Chief Executive Officer, members of Carta's Board of Directors, and other Carta employees; (ii) sharing those recordings and transcripts with unauthorized third parties in an effort to embarrass Carta and damage its reputation, to assist those individuals in pursuing  claims against Carta and/or to assist them in extracting substantial settlements from Carta; (iii) refusing to return Carta's privileged and confidential and/or

proprietary recordings, transcripts, and other information; (iv) intentionally circumventing Carta's information security systems, including by using an unauthorized remote server and through the use of at least one encrypted messaging application; (v) misappropriating a large volume of highly confidential and proprietary Carta documents, including "pillar" updates containing Carta's trade secrets; (vi) intentionally wiping work-issued laptops and deleting user accounts, thereby destroying documents and evidence subject to litigation holds and mandatory preservation requests; (vii)  sending and receiving sexually explicit, offensive, discriminatory and harassing messages with at least nine women including during work hours and on Carta's systems; and (viii) abusing his position as CTO by seeking and obtaining benefits and privileges to which he was not entitled, including without limitation,  misuse of his corporate credit card for personal matters, and repeated attempts to book travel outside of company policy.

7.      As a result of these breaches of his contractual and fiduciary duties and his theft of Carta's trade secrets and other property, Carta terminated Talton's employment for Cause.  To date, Talton has refused to return to Carta the surreptitiously made recordings and transcripts, as well as all other confidential and proprietary Carta trade secrets and other Carta property in his possession in further breach of his contractual obligations to Carta.

8.      The purpose of this action is to recover damages for Talton's breaches of his contractual and fiduciary duties, as well as his conversion of confidential and proprietary information and misappropriation of Carta's trade secrets, to prevent Talton from further using or disseminating Carta's attorney-client privileged, confidential and/or proprietary information, and to recover all Carta-related documents, information and materials that Talton stole from Carta, or has wrongfully retained, all of which is necessary to determine the full extent of the damage inflicted upon Carta.

9.     Carta's investigation into Talton's wrongdoing is ongoing.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332.  Carta is a citizen of California and Delaware.  On information and belief, Talton is a citizen of New York. The amount in controversy exceeds $75,000.

11.     This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331, because this action seeks to enforce rights and remedies secured under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*.

12.     Venue is proper in the Southern District of New York because Talton resides in this District and worked in this District.  *See* 28 U.S.C. § 1391(c)(1) and (2); 28 U.S.C. § 112(b) (The Southern District of New York encompasses New York County).

13.     Venue is also proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because, as demonstrated below, a substantial part of the events giving rise to Carta's claims occurred in this District.

## THE PARTIES

14.     Plaintiff Carta is a private corporation organized under the laws of Delaware.  Its headquarters and principal place of business is 333 Bush Street, Floor 23, Suite 2300, San Francisco, California, 94104.  Carta also maintains an office at One World Trade Center, 1st Floor, New York, New York 10007.

15.     Defendant Jerry O. Talton, III, is a natural person, who on information and belief, is a citizen of the State of New York and has resided in New York, New York at all times relevant to this action.  Talton served as Carta's CTO from November 2020 until Carta terminated Talton's employment for Cause on December 23, 2022.

## FACTUAL ALLEGATIONS

**A.     Talton's Employment with Carta**

16.     On or about August 14, 2018, Carta hired Talton as its Director of Engineering, Data and Machine Learning.  In that capacity, Carta entrusted Talton with overseeing its data infrastructure, data science, business intelligence, and machine learning efforts. At all relevant times, Talton was an at-will employee of Carta.

17.     As a software and information-technology company, Carta's proprietary and confidential information and trade secrets are a critical business asset.  Additionally, Carta's customers entrust the Company to secure their confidential information.  As such, Carta invests heavily in its information security program.  Carta takes numerous steps to safeguard the confidentiality of its proprietary and confidential information and trade secrets, including but not limited to the implementation of data security policies for Carta devices, installation of security tools on Carta-issued devices that control the configuration of the devices, including user and administrator access to the devices, as well as a strong-password policy and two-factor authentication requirements to access all Carta systems and information.  Additionally, Carta requires all employees who will be granted access to confidential information concerning Carta or its customers, vendors, or other third parties in connection with the performance of their job duties to sign a confidentiality and proprietary rights agreement as a condition of their employment or continued employment with Carta.

18.     As a Carta executive entrusted with confidential information, and as part of his onboarding, on or about October 1, 2018, Talton entered into an "Employee Confidential Information and Invention Assignment Agreement" ("CIIAA") in consideration of his employment and compensation with Carta. The CIIAA is attached as Exhibit A.

19.     Under Section 1.1 of the CIAA, Recognition of Company's Rights;

Nondisclosure, Talton agreed:

> I understand and acknowledge that my employment by [Carta] creates a relationship of confidence and trust with respect to [Carta's] Confidential Information (as defined below) and that [Carta] has a protectable interest therein. **At all times during and after my employment, I will hold in confidence and will not disclose, use, lecture upon, or publish any of [Carta's] Confidential Information, except as such disclosure, use or publication may be required in connection with my work for [Carta], or unless an officer of [Carta] expressly authorizes such disclosure.** I will obtain [Carta's] written approval before publishing or submitting for publication any material (written, oral, or otherwise) that discloses and/or incorporates any Confidential Information. I hereby assign to [Carta] any rights I may have or acquire in such Confidential Information and recognize that all Confidential Information shall be the sole and exclusive property of [Carta] and its assigns. I will take all reasonable precautions to prevent the inadvertent accidental disclosure of Confidential Information. …

Ex. A at 1, ¶ 1.1 (emphasis added).

20.     "Confidential Information" is broadly defined to include, without limitation:

> (a) **trade secrets, inventions, mask works, ideas, processes, formulas, software … data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other and all Intellectual Property Rights (as defined below) therein (collectively, "*Inventions*");** (b) information regarding research, development, new products, marketing and selling, business plans, budgets … methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business …(c) information regarding customers and potential customers of Company…(d) information regarding any of the Company's business partners and their services … (e) **information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information which a competitor of [Carta] could use to the competitive disadvantage of [Carta]…"**

Ex. A at 1–2, ¶ 1.2 (emphasis added).

21.     Talton further acknowledged that the:

> Company **will exclusively own all work product that is made by me …within the scope of my employment, and I hereby irrevocably and unconditionally assign to the Company all right, title or interest in such work product**. I acknowledge that all original works of authorship which are made by me jointly…

6

within the scope of my employment and which are protectable by Copyright are "works made for hire" pursuant to United States Copyright Act (17 U.S.C. Section 101)…"

Ex. A at 4–5, ¶ 2.7 (emphasis added).

22.     Talton also agreed "to keep and maintain adequate and current records … of all Confidential Information developed by me and all Company Inventions made by me during the period of my employment at Company, **which records will be available to and remain the sole property of Company at all times.**" Ex. A at 5, ¶ 3 (emphasis added).

23.     Upon termination, the CIIAA requires Talton to return company property. Specifically, under Section 8, Talton agreed that:

> When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed. …

Ex. A at 6–7, ¶ 8.

24.     The CIIAA is governed by California law.  See Ex. A at 8, ¶ 12.1 ("This Agreement will be governed by and construed according to the laws of the State of California as such laws are applied to agreements entered into and to be performed entirely within California by residents of California.").

25.     Carta promoted Talton to Vice President of Research and Development Strategy on or about May 16, 2020.  This position was a strategic role reporting directly to Carta's Chief Executive Officer, Henry Ward.

7

26.     Carta promoted Talton to CTO on or about November 2, 2020. The position of CTO is critically important to Carta because the CTO is the top executive overseeing the Company's entire information technology infrastructure.  As CTO, Talton was responsible for integrating Carta's business needs and requirements into IT planning and operations.  In his capacity as CTO, Talton was a highly compensated executive of Carta, and entrusted with, among other things, supervising Carta's Chief Information Security Officer, as well as managing, maintaining, and ensuring the integrity and security of Carta's extensive network security systems.

**B.     Talton Engages in Surreptitious Recording of Privileged & Confidential Conversations**

27.     On October 7, 2022, Talton submitted a letter to Carta's Board of Directors, purporting to allege various "problems" with the culture at Carta.[1]

28.     To facilitate an independent Board of Directors investigation, Carta placed Talton on a paid administrative leave on October 11, 2022.

29.     While Talton was on administrative leave from Carta, during a confidential mediation involving a female former Carta employee (a mediation to which Talton was not a party), on November 8, 2022, Carta's General Counsel April Lindauer was copied on an email from Talton to that former employee and her counsel, seemingly by mistake, stating "I think you should read the whole thing" and including a transcript of an audio recording between Talton and Lindauer from September 27, 2022.  The email also included an indication that the audio recording was uploaded to the file-sharing platform, DropBox.

---

[1] After Talton raised concerns, Carta's Board of Directors retained independent counsel who conducted and concluded an investigation related to Talton's claims.

30.     Ms. Lindauer had no prior knowledge that Talton had recorded the conversation, which was a regularly scheduled, one-on-one workplace video call to discuss Carta-related business.  On November 14, 2022, Ms. Lindauer wrote to Talton by email, including his counsel Dr. Ann Olivarius (the same attorney representing the female former employee threatening to assert claims against Carta), advising him that his "surreptitious recording and disclosure of a privileged and confidential work-related conversation constituted a flagrant breach of [his] contractual and fiduciary duties to Carta as well as a violation of Carta's policies and procedures."  The dialogue Talton had transcribed included attorney-client privileged communications, and in that conversation, Lindauer spoke to Talton in her capacity as an attorney for Carta regarding ongoing legal matters and related personnel issues involving legal advice and counsel.

31.     Not only did Talton surreptitiously record an attorney-client privileged conversation, by his own admission, he shared this conversation (and, upon information and belief, other clandestinely recorded conversations, documents and information) with at least one unauthorized third party, at that point a former employee threatening to assert claims against Carta.  Talton did so at least twice by his own admission—first, at a time when the individual was on garden leave from Carta pending her separation and again when she was no longer employed by Carta during a confidential mediation session to which Talton was not a party and in which the former employee was attempting to obtain a substantial monetary settlement from Carta.  On information and belief, Talton has also shared or intends to share such information with another former Carta employee who is pursuing claims against Carta in litigation.

32.     By letter dated November 20, 2022, Talton, through his counsel, refused to return the recordings or transcripts to Carta.

33.     On December 1, 9, and 13, 2022, Carta again demanded that Talton return all recordings and transcripts and other Carta property to it.  Further, Carta demanded that he provide copies of all recordings and transcripts to Company-authorized investigators.  Talton refused to comply with all of these requests in violation of his fiduciary and contractual obligations to Carta.

34.     Upon information and belief, Talton has also surreptitiously recorded at least two members of Carta's Board of Directors, as well as Carta's Founder and CEO, and other Carta executives and employees.

35.     These work-related recordings and any transcripts thereof constitute Carta's confidential and proprietary information under Sections 1.2 and 2.7 of the CIIAA.  They are also Carta's property pursuant to Carta's policies and procedures to which Talton was bound. Carta Handbook, Section VII.F ("All electronic and telephonic communications and information transmitted by, received from, or stored in our systems are the property of Carta . . . ."); VIII ("Information that pertains to Carta's business, which is not known to the general public, is strictly confidential and must not be given to people who are not employed by Carta.").  Carta's Handbook is attached as Exhibit B.

36.     Further, under Section 1.1 of the CIIAA, Talton "assign[ed] to [Carta] any rights [he] may have or acquire in . . . Confidential Information and recognize[d] that all Confidential Information shall be the sole and exclusive property of [Carta] . . . .."  Ex. A at 1, ¶ 1.1.

**C.**         **Carta Discovers Additional Instances of Talton's Gross Misconduct**

37.      Upon discovering Talton's practice of surreptitiously recording its executives, Board members and employees and his blatant disregard for his obligations of confidentiality by virtue of the apparently inadvertent email to Carta's General Counsel on November 8, 2022, Carta, through outside counsel, retained Stroz Friedberg, a leading cybersecurity, digital forensics, and cyber incident-response company, to forensically review Talton's Carta-issued laptops.

38.      Stroz Friedberg found evidence that Talton circumvented Carta's information security policy and systems and committed multiple violations of Carta's information security and employment policies in breach of his fiduciary duties as Carta's CTO.

39.      Specifically, the forensic review revealed that Talton had "wiped" his Company-issued laptops and had deleted his local user accounts on three of his four Carta-issued laptops, thereby deleting all Carta emails and other documents on those devices when he was subject to multiple litigation holds and mandatory evidence preservation requirements.  By deleting his user accounts, Talton also effectively wiped logs of his user activity on the device, including but not limited to browser history, impacting Stroz Friedberg's ability to determine if and how Talton may have exfiltrated Carta's data.

40.      Further, the Stroz Friedberg review showed that Talton had actively concealed evidence of his ongoing, repeated misconduct in the workplace and had intentionally sought to evade detection by Carta's computer systems and network.

41.      For example, on October 11, 2022, the same day Talton was placed on administrative leave, he downloaded a large quantity of highly confidential Carta documents and information, including internal Carta business "pillar updates" containing trade secret and other highly confidential information regarding developments within Carta's information security

11

infrastructure, product planning and development initiatives, business and strategic planning, and research and development.  These "pillar" updates and related materials summarize each pillar (or business line's) performance in great detail, including issues the teams face, product road mapping over the next quarter and beyond, and key business metrics with highly confidential revenue numbers.  The updates also contain proprietary methodologies that Carta developed over a significant period of time through substantial effort and expense to maintain and enhance its position in the highly competitive software and information technology market.  They constitute trade secrets of Carta insofar as they contain information used in Carta's business that gives Carta an advantage over competitors who do not know this information or use it.    Under no circumstances should Talton have mass downloaded these, or any other confidential Carta files, and doing so constituted a violation of Carta's data security policies. *See* Carta Device Policy, attached as Exhibit C, at 3 ("Employees are not permitted to download files containing confidential information … to a device provided by Carta, iCloud (using @carta.com) or any other similar storage device provided by the Company without proper authorization.").  Further, later that day, Talton connected to a remote desktop titled "sugarbeaver," also in violation of Carta's security policies and procedures.  Given the proximity of events, Talton may have exported these and other highly confidential and proprietary documents containing Carta's trade secrets to that unauthorized remote desktop, likely stored on a home network.

42.    A review of Carta's Google Drive activity also indicates that Talton ceased using his work devices to access Carta's systems around July 2022, and instead primarily, and almost exclusively, used his personal iPhone and iPad to access Carta's document systems and network.

43.    The forensic review conducted by Stroz Friedberg also revealed that Talton had regularly engaged in highly inappropriate, and sexually harassing behavior, in violation of

Carta's anti-discrimination and anti-harassment policies and that he had attempted to evade detection by deleting his user accounts, wiping his laptops, and upon information and belief using at least one encrypted messaging application, Telegram.

44.     Specifically, Talton engaged in highly graphic sexting and sending and receiving sexually explicit, offensive, misogynistic, inappropriate, and discriminatory messages to and/or from at least nine women, including during work hours, and on Carta devices in violation of Carta's policies to which Talton was bound.  *See* Ex. B at 7–9, Section II.C(ii) (Equal Employment Opportunity and Fairness in the Workplace – Harassment and Discrimination at Carta are Prohibited).  These highly offensive, sexually explicit messages occurred over a substantial period of time and were recorded and stored on Carta's systems.  Significantly, as Carta's CTO in charge of information security at the Company, Talton clearly knew and understood that what he was doing was wrong, and a blatant violation of Carta's policies and procedures.  In an exchange with one of the women with whom he was exchanging sexually explicit messages, they discuss "Is Telegram the most secure option we can move to? I know there is also Signal and I've seen what Signal provides if they get subpoenaed and it's basically nothing."  That individual also cautioned Talton, "You should have a second work phone.  And I hope to god you do not use your Icloud account on any devices owned by your company."  Stroz Friedberg was able to confirm that Talton in fact used the Telegram application on his Carta-issued devices.

45.     Talton's abuse of Carta's network and information systems includes, but is not limited to, sending and receiving messages that are offensive, harassing, discriminatory and a violation of Carta's policies and procedures.  By way of example only, Talton sent or received messages that include the terms "jungle n*****s" and "gross lesbians," "butterfaces," "rape,"

"big rubber dog dick," "pathetically obsessed pussy slave," phrases such as "women don't experience pain the way humans do," "I'm never going to get to pin you down and fuck you again, am I…you know how hard I get when you humiliate me," "now i have to jerk off before my meetings start" in addition to sending links containing explicit and misogynistic pornography.

46.     In addition to the foregoing, Talton repeatedly abused his position as an executive and his role as CTO to obtain benefits and privileges to which he was not entitled. By way of example only, on July 12, 2022, Talton bragged to one of the multiple women with whom he was sexting, "LOL, yesterday I had to upgrade the OS on my laptops and it was a pain, so I just made them overnight me two brand new computers.  It's nice to be the CTO."  In addition, Talton repeatedly asked for a personal assistant on the company payroll in addition to his executive assistant, misused his corporate credit card for personal matters, and repeatedly attempted to book travel outside of company policy.

47.     Carta's investigation into Talton's misconduct remains ongoing.

**D.     Carta Terminates Talton's Employment for Cause and Demands That He Returns Its Confidential and Proprietary Documents and Trade Secrets and Submit to a Forensic Inspection of All of His Devices**

48.     As a result of the gross misconduct detailed above and Talton's repeated refusal to return confidential, attorney-client privileged and proprietary information, trade secrets, and other Carta property in breach of his contractual and fiduciary obligations, on December 23, 2022, Carta terminated Talton's employment for Cause. A copy of the termination letter is attached as Exhibit D.

49.     Under Section 13(d) of the Company's Amended and Restated Stock Plan, "Cause" means, in relevant part, Talton's (ii) "attempted commission of, or participation in, a fraud or act of dishonesty against the Company"; (iii) "intentional, material violation of any

contract or agreement between [Talton] and the Company or of any statutory duty owed to the Company"; (iv) "unauthorized use or disclosure of the Company's confidential information or trade secrets"; or (v)  "gross misconduct." A copy of the Amended and Restated Stock Plan is attached as Exhibit E.

50.    Similarly, under Talton's 2021 Equity Incentive Plan with Carta, at Section 14, Cause includes Talton's "(a) unauthorized misuse of the Company or a Parent or Subsidiary of the Company's trade secrets or proprietary information"; "(c) committing an act of fraud against the Company or a Parent or Subsidiary of the Company" or (d) "gross negligence or willful misconduct in the performance of [Talton's] duties that has had or will have a material adverse effect on the Company or Parent or Subsidiary of the Company's reputation or business." A copy of the 2021 Equity Incentive Plan is attached as Exhibit F.

51.    By letter, Carta notified Talton of his termination for Cause and instructed him to preserve any and all documents and information, whether in digital or print format, on any media or device in his possession, custody or control, including without limitation, on any cell phones, USB drive, external hard drive or other storage device computers, iPad, tablets or other devices.  *See* Ex. D.  Carta expressly directed Talton to preserve his Telegram account and any other accounts maintained on any other messaging or social media platform or through any other application, all iCloud accounts, cloud-based storage accounts such as DropBox or Box, remote desktops (including but not limited to a remote desktop titled "sugarbeaver"), his jerrytalton@gmail.com and any other personal email account. Carta further directed Talton to make arrangements for a forensic inspection of all of his devices by Stroz Friedberg to occur no later than December 28, 2022.

52.     To date, Talton has refused to comply with Carta's requests, in further breach of Section 8 of the CIIAA.

## COUNT I

### BREACH OF CONTRACT[2]

53.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

54.     The CIIAA is a binding agreement between Carta and Talton, entered into on or about October 1, 2018.

55.     Carta has performed its obligations under the CIIAA.

56.     Talton breached and continues to breach the CIIAA by, among other things, (i) using and disclosing confidential and/or attorney-client privileged Carta information he obtained through surreptitious recordings to third parties, including without limitation, to actual and potential litigants pursuing claims against Carta; (ii) downloading and accessing confidential and proprietary information and trade secrets from Google Drive and Carta systems and/or transferring that confidential and proprietary information and trade secrets to an unauthorized remote desktop, and (iii) refusing to return Carta's confidential and proprietary and/or attorney-client privileged information, trade secrets and other property.

57.     As a result of Talton's breaches of the CIIAA, Carta has suffered and if further breaches are not enjoined, will suffer continuing and irreparable injury, as well as monetary damages.

58.     For these reasons, Carta has been damaged and is also entitled to judgment against Talton for damages in an amount to be determined at trial.

---

[2] California law governs Carta's breach of contract claim. *See* Ex. A at 8, ¶ 12.1.

## COUNT II

## BREACH OF FIDUCIARY DUTY[3]

59.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

60.     As an executive of Carta, Defendant Talton owed fiduciary duties to Carta, including the duty of care, loyalty, and good faith.

61.     As set forth above, Defendant Talton breached the duties of loyalty and due care when, among other acts, he:

    a.    Misused and shared Carta's confidential, attorney-client privileged and proprietary information and property with unauthorized third parties;

    b.    Failed to turn over to Carta confidential, attorney-client privileged and/or proprietary information and property, despite multiple reasonable requests;

    c.    Circumvented and abused Carta's information security and employment policies, including to engage in unauthorized sexting and to send and receive sexually explicit, offensive, discriminatory and harassing communications, including during work hours on Carta-issued devices;

    d.    Secretly recorded Carta employees, including attorney-client privileged and confidential conversations with Carta's General Counsel, Carta's CEO, Board Directors, C-level executives, and rank-and-file employees and disclosed same without authorization and in order to harm Carta;

---

[3] Delaware law governs Carta's breach of fiduciary duty claim because Carta is incorporated in Delaware. *See Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011) ("New York applies the internal affairs doctrine to claims for breach of fiduciary duty and, thus, applies the law of the state of incorporation to such claims.").

e.   Downloaded and wrongfully retained confidential and proprietary documents and information, including trade secrets, from Carta's systems and devices;

f.   Deleted data and documents on Carta-issued devices when he was subject to document preservation holds and mandatory evidence preservation requirements; and

g.   Abused his position as CTO by, among other things, seeking to obtain benefits and privileges to which he was not entitled, including without limitation, demanding that two laptops be shipped to him to avoid the inconvenience of updating his operating system, seeking to hire a personal assistant, misusing his corporate credit card for personal matters, and repeatedly attempting to book travel outside of company policy.

62.   As a result of Talton's extensive breaches of duty, Carta sustained substantial damages in an amount to be determined at trial.

63.   Talton's conduct was willful, wanton and outrageous, thereby justifying an award of punitive or exemplary damages.

## COUNT III

## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836, ET SEQ.

64.   Carta repeats each and every allegation contained above and below as if set forth fully herein.

65.   As set forth above, Carta owns various trade secrets within the meaning of the DTSA, 18 U.S.C. §1839(3), which are critical to the success of its business and operations, including without limitation, the pillar updates described in paragraph 41 above.

66.    Carta's trade secrets relate to Carta's provision of software and information technology services used in interstate and foreign commerce.

67.    Carta's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  Carta's trade secrets give it a competitive advantage over competitors who do not have access to that trade secret information.  Carta's trade secrets are valuable and critical to its business operations and competitive position as a software and information technology provider.   The trade secrets Talton has misappropriated are of significant potential value to Carta's competitors.  By way of example only, the pillar updates stolen by Talton would allow Talton and Carta's competitors to replicate many of Carta's proprietary methodologies and strategies for running its business as a leading software and information technology service provider.    Carta has taken several steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, implementing information security measures described in paragraph 17 above, and requiring adherence to Carta's device policies, as well as compliance with the CIIAA as a condition of employment, and continued employment with Carta.

68.    Talton's actions as described above constitute a misappropriation within the meaning of the DTSA, 18 U.S.C. §1839(5).

69.    Talton misappropriated Carta's trade secrets by acquiring them by improper means, mass downloading those files after being placed on administrative leave with no business need or right to access them, and in breach of his fiduciary and contractual duties to maintain the secrecy of Carta's trade secrets and confidential information.  In wrongfully acquiring Carta's

trade secrets, Talton not only violated multiple Carta policies, but also his contractual and fiduciary duties to Carta.

70.     Talton also misappropriated Carta's trade secrets by using or disclosing them without Carta's consent.  At the time Talton downloaded Carta's trade secrets and/or exported them to a remote unauthorized server, "sugarbeaver," or otherwise used or disclosed them, he knew or had reason to know that knowledge of those trade secrets was derived from his use of improper means to acquire those trade secrets and/or acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets.

71.     Talton's actions have caused and will continue to cause damage to Carta and unless, restrained will further damage Carta, the nature and extent of which may not be able to be proven with certainty, irreparably injuring Carta and leaving it without an adequate remedy at law.

72.     Carta is entitled to damages for actual losses caused by Talton's misappropriation of its trade secrets, and damages for any unjust enrichment caused by the misappropriation that is not addressed in computing its actual losses.  In the alternative, Carta is entitled to a reasonable royalty for Talton's misappropriation of its trade secrets.

73.     Talton's misappropriation of Carta's trade secrets was willful and malicious, entitling Carta to attorney's fees and exemplary damages.

74.     Preliminary and permanent injunctive relief is necessary to prevent irreparable harm and further disclosure of Carta's trade secrets.

## COUNT IV

**MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW**

75.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

76.     As set forth above, Carta owns various trade secrets critical to the success of its business, including, without limitation, the "pillar" updates described in paragraph 41 above, which constitute "trade secrets" under New York law.

77.     Carta's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Carta's trade secrets give it a competitive advantage over competitors who do not have access to that trade secret information. Carta's trade secrets are valuable and crucial to its business functions and competitive position. The trade secrets Talton has misappropriated are of enormous potential value to a competitor, and disclosure or use of Carta's trade secret information would risk destroying that competitive edge. For example, a competitor could use the detailed strategic, technical, and product related information contained in the pillar updates to understand Carta's product development roadmap for a competitive advantage, and could use them to differentiate their features from Carta's in a competitive posture.  Carta has taken several steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, designing and implementing the information security measures described in paragraph 17 above, and requiring adherence to its policies (including the CIIAA) as conditions of continued employment at the firm.

78.     By downloading, and possibly exporting, Carta's trade secrets to a remote unauthorized desktop, and engaging in other misconduct, Talton has used Carta's trade secrets in breach of an agreement, confidence, or duty, or as a result of discovery by improper means, including theft and breaches of duties to maintain the secrecy of Carta's trade secret information.

79.     Talton's actions have caused and will continue to cause damage to Carta and, unless restrained, will further damage Carta, the nature and extent of which may not be able to be proven with certainty, irreparably injuring Carta, leaving it without an adequate remedy at law. Carta is therefore entitled to preliminary and permanent injunctive relief to prevent such irreparable harm.

80.     Carta is entitled to damages as a result of Talton's misappropriation to the extent its actual losses are calculable.

## COUNT V

## CONVERSION[4]

81.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

82.     Under the CIIAA, "Confidential Information" includes "information regarding personnel, employee lists, compensation, and employee skills" and "any other non-public information which a competitor of [Carta] could use to the competitive disadvantage of Carta." Ex. A at 2, ¶ 1.2(e), (f).  "Confidential Information" also includes "trade secrets." Ex. A. at 2, ¶1.2 (a).

---

[4] New York law governs Carta's conversion claim.

83.     Talton "assign[ed] to [Carta] any rights [he] may have or acquire in . . .

Confidential Information and recognize[d] that all Confidential Information shall be the sole and

exclusive property of [Carta] and its assigns."  Ex. A at 1, ¶ 1.1.

84.     Talton also agreed that "all work product…made by" him "within the scope of his

employment" is exclusively owned by Carta, Ex. A at 2.7, and agreed "to keep and maintain"

records of "all Confidential Information" he developed, "which records will . . . remain the sole

property of [Carta] at all times."  Ex. A at 5, ¶ 3.

85.     Talton created Confidential Information when he surreptitiously recorded

confidential conversations with Carta's General Counsel, Carta's CEO, Board Directors, C-level

executives, and other employees.

86.     Those recordings are Carta's "sole and exclusive property."  Ex. A at 1, ¶¶ 1.1;

2.7.

87.     Talton also took Carta's Confidential Information, including trade secrets, when

he mass downloaded its confidential business information and files, including the pillar updates

referenced in paragraph 41 above.

88.     Carta repeatedly demanded Talton turn over Carta's privileged and confidential

information and trade secrets including, without limitation, the recordings and transcripts he

created.

89.     Talton intentionally retained and refused to return the recordings and transcripts

he created as well as the trade secrets and other Carta property he took.

90.     As a direct and proximate result of Talton's misconduct, Carta has been deprived

of access to and use of its Confidential Information and property.

91.     Talton's conduct outlined above was willful and malicious.

92.     Talton was aware that his conduct was contrary to the commonly accepted duties in the ordinary course of his relationship with Carta and would cause injury to Carta.

93.     Talton acted knowingly in depriving Carta of access to and use of the Confidential Information outlined above.

94.     Talton's acts were willful, wanton, malicious and oppressive and justify an award of punitive damages, in addition to the compensatory damages in an amount to be determined at trial, and in particular, by retaining the confidential information, Talton has frustrated Carta's attempts to determine the full extent of those damages.

## COUNT VI

## FAITHLESS SERVANT

95.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

96.     Talton owed Carta a duty of loyalty and good faith by virtue of the parties' employer-employee relationship.

97.     Talton violated this duty by acting contrary to Carta's interests, and in a manner detrimental to its business interests.  Talton's egregious violations of his duties as an executive of Carta and of his contractual obligations to Carta require him, under the faithless servant doctrine, to disgorge to Carta all compensation paid to him during the period of his disloyalty.

## COUNT VII

## PRELIMINARY AND PERMANENT INJUNCTION

98.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

99.     Talton materially breached and threats to continue to breach the CIIAA and his fiduciary duties to Carta.

100.    Talton's misconduct has caused and will cause irreparable harm to Carta, for which Carta has no adequate remedy at law.

101.    By reason of the foregoing, Carta is entitled to injunctive relief (a) enjoining Talton and anyone acting on his behalf from:

a)  Continuing to possess and not returning any and all recordings and documents in any form he acquired during and as a result of his employment with Carta; and

b)  In any way disclosing, disseminating, revealing, or continuing to disclose, disseminate, or reveal any information he acquired during and as a result of his employment with Carta; and

c)  Filing, or causing to be filed, on this Court's public docket any document that discloses, disseminates, or reveals information he acquired during and as a result of his employment with Carta; and

d)  Ordering Talton:

   i.   To provide an accounting of any and all recordings, documents, and/or other Carta property or information, or copies thereof, that he acquired during and as a result of his employment with Carta, including but not limited to any and all audio recordings and transcripts containing attorney-client privileged information, and any and all trade secrets including the pillars documents; and

   ii.  To return to Carta any and all documents, files, property, and/or data he acquired from Carta; and

    iii.    To provide access to Carta and its forensic expert to all electronic devices in his possession or control in order to permit a forensic inspection thereof, and to permit the permanent removal, deletion and destruction of all copies of Carta's information under the supervision of Carta's forensic expert so as to preserve as evidence all such files or information.

## **REQUEST FOR RELIEF**

Carta reserves its rights to pursue any and all available remedies against Talton, including damages, punitive damages, exemplary damages, statutory damages, attorneys' fees, and any equitable remedies including without limitation an order of seizure, a temporary restraining order, a preliminary injunction, and/or a permanent injunction;

WHEREFORE, Carta respectfully requests judgment against Talton as follows:

102.    Entering a preliminary and permanent injunction against Talton: (i) barring Talton and anyone acting in concert or participation with him from further misappropriating, exploiting, publishing, disseminating, copying, using or disclosing any of Carta's attorney-client privileged and/or confidential or proprietary information and trade secrets; (ii) restraining Talton and anyone acting in concert or participation with him from deleting, destroying, altering, transferring, downloading or copying any of Carta's privileged and/or confidential and proprietary information and trade secrets; and (iii) requiring Talton and anyone acting in concert or participation with him to permit the permanent removal, deletion and destruction of all copies of Carta's electronic files, recordings and information transmitted to Talton's computers, personal email accounts or personal devices or otherwise in his possession, subject to the supervision of Carta and its forensic expert, Stroz Friedberg, so as to preserve evidence of all such files or information;

103.    Awarding compensatory damages in favor of Carta as a result of Talton's conversion, misappropriation, breaches of fiduciary duties, and breaches of contract, in an amount to be proven at trial, plus interest;

104.    Ordering that Talton disgorge any and all compensation paid to him by Carta, including without limitation, all salary, benefits and equity awarded to him, during the period of his disloyalty, together with interest;

105.    Awarding punitive and exemplary damages in favor of Carta in an amount to be determined at trial;

106.    Awarding Carta its attorneys' fees and costs for this Action; and

107.    Granting Carta such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Carta demands a trial by jury for all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

Dated:  New York, New York                         DECHERT LLP
        December 30, 2022


                                                   By:  _/s/ Nicolle L. Jacoby_____

                                                   Andrew J. Levander
                                                   Nicolle L. Jacoby
                                                   Samantha DeRuvo
                                                   Three Bryant Park
                                                   1095 Avenue of the Americas
                                                   New York, NY 10036-6797
                                                   andrew.levander@dechert.com
                                                   nicolle.jacoby@dechert.com
                                                   samantha.deruvo@dechert.com
                                                   Telephone:    (212) 698-3500
                                                   Facsimile:    (212) 698-3599

Christopher J. Merken (NY Bar No. 5882204)
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
christopher.merken@dechert.com
Telephone:      (215) 994-4000
Facsimile:      (215) 994-2222

***Attorneys for Plaintiff Carta, Inc.***