IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------- X

eShares, Inc. d/b/a Carta, Inc.,  :

        *Plaintiff*,  :

    v.  :

Jerry O. Talton, III,  :

        *Defendant*.  :

--------------------------------------------------- X

 

**SECOND AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Civil Action No.: 1:22-cv-10987

Hon. Jessica G.L. Clarke

 

Plaintiff eShares, Inc., doing business as Carta, Inc. ("Carta" or the "Company"), for its Second Amended Complaint against Jerry O. Talton, III, seeking permanent injunctive relief and recovery of substantial damages caused by his wrongful and illegal acts as a Carta executive, alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.    Carta is a privately held corporation that began by specializing in capitalization table management and valuation software and services, and has expanded into public market equity management, venture capital fund management, and broker-dealer business lines. As part of its core operations, Carta digitizes paper stock certificates along with stock options, warrants, and derivatives to help companies, investors, and employees manage their equity, while creating a real-time picture of company ownership.

2.    Carta is trusted by more than 30,000 companies, over 5,000 investment funds, and half a million employees of its customers for capitalization table management, compensation management, liquidity venture capital solutions, and other complex financial technology business solutions. Carta's liquidity solutions have returned $13 billion to shareholders in

secondary transactions. Carta has been included on the Forbes Cloud 100 (World's Best Cloud Companies), Fast Company's Most Innovative list, and Inc.'s Fastest-Growing Private Companies.

3. Talton served as Carta's Director of Engineering, Data and Machine Learning from August 18, 2018 until May 16, 2020 when Carta promoted him to Vice President of Research and Development Strategy. Talton served as Carta's Chief Technology Officer ("CTO") from November 2020 until his termination for Cause on December 23, 2022.

4. As Carta's CTO, Talton was responsible for overseeing Carta's entire information technology infrastructure and ensuring the security of more than $2.5 trillion in customer assets. Carta generously compensated Talton for this important and business critical role. He received hundreds of thousands of dollars in salary and benefits annually, and substantial equity awards.

5. Unbeknownst to Carta, Talton repeatedly abused his position of trust and confidence as CTO to secretly record multiple Carta executives, Board members, and other Carta employees in an attempt to harm Carta. This included Talton feeding such information to former employees who were threatening to sue Carta (and/or who were already litigating against Carta) and circumventing and undermining the very information technology infrastructure and security systems he was charged with developing and safeguarding in order to conceal his own illicit conduct.

6. As detailed below, Talton's conduct included, without limitation: (i) secretly recording multiple Carta-related and attorney-client privileged and confidential conversations with Carta's General Counsel, Carta's Chief Executive Officer, members of Carta's Board of Directors, and other Carta employees; (ii) sharing those recordings and transcripts with unauthorized third parties in an effort to assist those individuals pursuing claims against Carta, to

assist them in extracting substantial settlements from Carta, and to embarrass Carta and damage its reputation; (iii) refusing to return Carta's privileged and confidential and/or proprietary recordings, transcripts, and other information; (iv) intentionally circumventing Carta's information security systems and policies, including by using an unauthorized remote desktop application and through the use of at least one unauthorized encrypted messaging application; (v) misappropriating a large volume of highly confidential and proprietary Carta documents, including "pillar" updates and other documents containing Carta's trade secrets; (vi) intentionally deleting local user accounts from his Carta-issued laptops, thereby deleting and destroying documents, and deleting evidence subject to litigation holds and mandatory preservation requests; (vii) sending and receiving sexually explicit messages with at least nine women including during work hours and on Carta's systems; and (viii) abusing his position as CTO by seeking and obtaining benefits and privileges to which he was not entitled, including without limitation, misuse of his corporate credit card for personal matters and repeated attempts to book travel outside of company policy.

7.    As a result of these breaches of his contractual and fiduciary duties and his theft of Carta's trade secrets and other property, Carta terminated Talton's employment for Cause. Despite at least five requests throughout November and December 2022, Talton continues to refuse to return to Carta the surreptitiously made recordings and transcripts, as well as all other confidential and proprietary Carta trade secrets and other Carta property in his possession in further breach of his contractual obligations to Carta.

8.      The purpose of this action is to recover all Carta-related documents, information, and materials that Talton stole from Carta, or has wrongfully retained; to prevent Talton from further using or disseminating Carta's attorney-client privileged, confidential, and/or propriety information; and to recover damages for Talton's breaches of his contractual and fiduciary duties, as well as his conversion of confidential and proprietary information and misappropriation of Carta's trade secrets.

9.      Carta's investigation into Talton's wrongdoing is ongoing.

## JURISDICTION AND VENUE

10.      This Court has subject-matter jurisdiction under 28 U.S.C. § 1332.  Carta is a citizen of California and Delaware.  On information and belief, Talton is a citizen of New York. The amount in controversy exceeds $75,000.

11.      This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331, because this action seeks to enforce rights and remedies secured under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, *et seq*.

12.      Venue is proper in the Southern District of New York because Talton resides in this District and worked in this District. *See* 28 U.S.C. § 1391(c)(1) and (2); 28 U.S.C. § 112(b) (The Southern District of New York encompasses New York County).

13.      Venue is also proper in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Carta's claims occurred in this District.

**THE PARTIES**

14.     Plaintiff Carta is a private corporation organized under the laws of Delaware. Its headquarters and principal place of business is 333 Bush Street, Floor 23, Suite 2300, San Francisco, California, 94104. Carta also maintains an office at One World Trade Center, 1st Floor, New York, New York 10007.

15.     Defendant Jerry O. Talton, III, is a natural person, who, on information and belief, is a citizen of the State of New York and has resided in New York, New York at all times relevant to this action. Talton began working for Carta in August 2018 and served as Carta's CTO from November 2020 until Carta terminated Talton's employment for Cause on December 23, 2022.

**FACTUAL ALLEGATIONS**

**A.  Talton's Employment with Carta**

16.     On or about August 14, 2018, Carta hired Talton as its Director of Engineering, Data and Machine Learning. In that capacity, Carta entrusted Talton with overseeing its data infrastructure, data science, business intelligence, and machine learning efforts. Talton was an at-will Carta employee.

17.     As a software and information-technology company, Carta's proprietary and confidential information and trade secrets are a critical business asset. Additionally, Carta's customers entrust the Company to secure their confidential information. As such, Carta invests heavily in its information-security program. Carta takes numerous steps to safeguard its proprietary and confidential information and trade secrets, including, but not limited to, the implementation of data-security policies for Carta devices, installation of security tools on Carta-issued devices that control the configuration of the devices, including user and administrator access to the devices, as well as a strong-password policy and two-factor authentication

requirements to access all Carta systems and information.  Additionally, Carta requires all

employees who will be granted access to confidential information concerning Carta or its

customers, vendors, or other third parties in connection with the performance of their job duties

to sign a confidentiality and proprietary rights agreement as a condition of their employment, or

continued employment, with Carta.

18.     As a Carta executive entrusted with confidential information, and as part of his

onboarding, on or about October 1, 2018, Talton entered into an "Employee Confidential

Information and Invention Assignment Agreement" ("CIIAA") in consideration of his

employment and compensation with Carta. The CIIAA is attached as Exhibit A.

19.     Under Section 1.1 of the CIAA, Recognition of Company's Rights;

Nondisclosure, Talton agreed:

> I understand and acknowledge that my employment by [Carta] creates a
> relationship of confidence and trust with respect to [Carta's] Confidential
> Information (as defined below) and that [Carta] has a protectable interest therein.
> **At all times during and after my employment, I will hold in confidence and
> will not disclose, use, lecture upon, or publish any of [Carta's] Confidential
> Information, except as such disclosure, use or publication may be required in
> connection with my work for [Carta], or unless an officer of [Carta] expressly
> authorizes such disclosure.**  I will obtain [Carta's] written approval before
> publishing or submitting for publication any material (written, oral, or otherwise)
> that discloses and/or incorporates any Confidential Information.  I hereby assign to
> [Carta] any rights I may have or acquire in such Confidential Information and
> recognize that all Confidential Information shall be the sole and exclusive property
> of [Carta] and its assigns.  I will take all reasonable precautions to prevent the
> inadvertent accidental disclosure of Confidential Information . . . .

Ex. A at 1, ¶ 1.1 (emphasis added).

20.     "Confidential Information" is broadly defined to include, without limitation:

(a) **trade secrets, inventions, mask works, ideas, processes, formulas, software . . . data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other and all Intellectual Property Rights (as defined below) therein (collectively, "*Inventions*");** (b) information regarding research, development, new products, marketing and selling, business plans, budgets . . . methods of obtaining business, forecasts, future plans and potential strategies, financial projections and business strategies, operational plans, financing and capital raising plans, activities and agreements, internal services and operational manuals, methods of conducting Company business . . . (c) information regarding customers and potential customers of Company . . . (d) information regarding any of the Company's business partners and their services . . . (e) **information regarding personnel, employee lists, compensation, and employee skills; and (f) any other non-public information which a competitor of [Carta] could use to the competitive disadvantage of [Carta] . . . .**

Ex. A at 1–2, ¶ 1.2 (emphasis added).

21.     Talton further acknowledged that the:

Company **will exclusively own all work product that is made by me . . . within the scope of my employment, and I hereby irrevocably and unconditionally assign to the Company all right, title or interest in such work product.** I acknowledge that all original works of authorship which are made by me jointly…within the scope of my employment and which are protectable by Copyright are "works made for hire" pursuant to United States Copyright Act (17 U.S.C. Section 101) . . . .

Ex. A at 4–5, ¶ 2.7 (emphasis added).

22.     Talton also agreed "to keep and maintain adequate and current records . . . of all Confidential Information developed by me and all Company Inventions made by me during the period of my employment at Company, **which records will be available to and remain the sole property of Company at all times.**" Ex. A at 5, ¶ 3 (emphasis added).

23.     Upon termination of employment, the CIIAA required Talton to return Company property. Specifically, under Section 8, Talton agreed that:

> When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company. I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company. In addition, if I have used any personal computer, server, or e-mail system to receive, store, review, prepare or transmit any Company information, including but not limited to, Confidential Information, I agree to provide Company with a computer-useable copy of all such Confidential Information and then permanently delete and expunge such Confidential Information from those systems; and I agree to provide Company access to my system as reasonably requested to verify that the necessary copying and/or deletion is completed . . . .

Ex. A at 6–7, ¶ 8.

24.     Talton also agreed that his violation of the CIIAA would, by operation, harm the Company.  Specifically, in Section 9, Talton agreed that:

> [I]t may be impossible to assess the damages caused by my violation of this Agreement or any of its terms. I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to Company, and Company will have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that Company may have for a breach or threatened breach of this Agreement.

Ex. A at 7, ¶ 9.1.

25.     Carta promoted Talton to Vice President of Research and Development Strategy on or about May 16, 2020.  This position was a strategic role reporting directly to Carta's CEO Henry Ward.

26.     Carta promoted Talton to CTO on or about November 2, 2020. The CTO is critically important to Carta because the CTO is the top executive overseeing the Company's entire information-technology infrastructure, policies, and technological measures.  As CTO, Talton was responsible for integrating Carta's business needs and requirements into IT planning

and operations. Talton was a highly compensated Carta executive, and entrusted with, among other things, supervising Carta's Chief Information Security Officer, as well as managing, maintaining, and ensuring the integrity and security of Carta's extensive network security systems.

27.     During his employment at Carta, Talton had a history of interpersonal disputes with colleagues for which he received coaching and feedback. Talton's behavior and leadership worsened in late 2021 and continued to devolve through the time when Carta placed him on administrative leave in fall 2022. Over that time, Talton became less engaged in his job duties, increasingly withdrawn from the workplace, oppositional and combative, behaved erratically, and refused to collaborate with a new Chief Product Officer who leads the second part of the R&D organization in addition to Talton's Engineering group. As Carta later learned, Talton also largely stopped using his Carta-issued devices in and around July 2022 for no legitimate business reason. Instead, unbeknownst to Carta, Talton began relying primarily, and almost exclusively, on the use of his personal iPhone and iPad to access Carta's systems in lieu of his Carta-issued devices.

**B. Carta Places Talton on Administrative Leave**

28. On Friday, October 7, 2022, Talton submitted a letter to Carta's Board of Directors, purporting to allege various "problems" with Carta's culture.[1] On Sunday, October 10, 2022, Carta's General Counsel acknowledged receipt of Talton's letter to the Board by email, and on Tuesday, October 11, 2022, at 12:04 p.m. ET, Talton was sent a calendar invitation to meet with Human Resources and Carta's General Counsel at 12:15 p.m. ET that same day.

29. During the above-referenced October 11, 2022 meeting, Carta informed Talton he was being placed on a paid administrative leave to facilitate an independent Board investigation related to his allegations, that his system access would be suspended, and that he would be required to return his Carta-issued devices.

30. By email, sent at approximately 1:02 p.m. ET on October 11, 2022, Carta confirmed to Talton that he was being placed on paid administrative leave and reiterated that he was "required to adhere to all Carta policies, procedures, and contractual obligations you may have to Carta (including but not limited to the attached Carta's Employee Handbook and the Employee Confidential Information and Invention Assignment Agreement you executed on October 1, 2018), as well as any legal holds to which you may be subject."

31. Carta's email also reiterated to Talton that his "access to Carta's systems" was "suspended during your administrative leave."

32. Carta told Talton that no later than 5:00 p.m. ET (that is, less than four hours later), Carta would send a courier to Talton's residence to retrieve Talton's Carta-issued equipment, including his laptops.

---

[1] After Talton raised concerns, Carta's Board of Directors retained independent counsel who conducted and concluded an investigation related to Talton's claims.

33.    Unbeknownst to Carta, only a few hours before being placed on administrative leave on October 11, 2022, Talton viewed several highly confidential Carta documents, including the "pillar" updates and other materials (discussed in greater detail below).  Several minutes later, at approximately 9:39 a.m. ET, Talton bulk-downloaded over 100 of these highly confidential Carta documents from Google Drive to a Carta-issued laptop.

34.    Also unbeknownst to Carta, at 12:09 p.m. ET on October 11, 2022, mere minutes after being sent a calendar invite for the 12:15 p.m. ET meeting with Carta's Chief People Officer and Carta's General Counsel where he was to be placed on administrative leave, Talton connected, from the same Carta laptop to which he had bulk-downloaded Carta's confidential documents, to a device called "sugarbeaver" using a remote desktop application, thereby enabling Talton to export Carta's documents to that non-Carta device.

35.    Talton's mass download of files was unusual.  Carta teams, and particularly Carta's executive team, generally collaborate in dynamic cloud-hosted files using the Google Suite of cloud products so each executive can make additions and comments to the same version of a file to streamline collaboration.  Talton's download of large quantities of static files was both highly irregular and inconsistent with his past practice.  Moreover, connecting from his Carta-issued laptop to a non-Carta device ("sugarbeaver") using a remote desktop application constituted a violation of Carta security policies and procedures – the same policies and procedures Talton was charged with developing and enforcing.  *See, e.g.*, Carta Data Classification & How to Handle Data Policy, attached as Exhibit B ("Unless necessary for client services, do not send this data anywhere outside of Carta, even encrypted.").  Only minutes after he received the invitation to meet with HR, Talton, who had earlier that morning mass

downloaded Carta's confidential documents and trade secrets, connected to the "sugarbeaver" device. Talton thereby enabled himself to exfiltrate those Carta files outside of Carta.

## C. Talton Surreptitiously Records Privileged & Confidential Conversations

36. While Talton was on administrative leave, Carta was engaged in a confidential mediation with a female former employee who was attempting to extract a substantial monetary settlement from Carta. While attending that mediation (to which Talton was neither a party nor authorized by Carta to participate), on November 8, 2022, Carta's General Counsel, April Lindauer, was copied on an email from Talton to that former employee and her counsel, seemingly by mistake. In the email, Talton stated "I think you should read the whole thing" and included a transcript of an audio recording between Talton and Lindauer from September 27, 2022. The email also indicated the audio recording was uploaded to the file-sharing platform DropBox. Talton explained that this was "one more" recording the former employee might find interesting, strongly suggesting Talton has shared other recordings with unauthorized third parties. Ms. Lindauer had no prior knowledge that Talton had recorded the conversation, which was a regularly scheduled, one-on-one workplace video call to discuss attorney-client privileged Carta-related business. During the call, Ms. Lindauer was providing legal advice in her capacity as Carta's General Counsel regarding ongoing legal matters and related personnel issues. The dialogue Talton had transcribed and shared with third parties included attorney-client privileged communications.

37. On November 14, 2022, Ms. Lindauer wrote to Talton by email, including his counsel Dr. Ann Olivarius (the same attorney representing the former employee threatening to assert claims against Carta), advising him that his "surreptitious recording and disclosure of a privileged and confidential work-related conversation constituted a flagrant breach of [his]

12

contractual and fiduciary duties to Carta as well as a violation of Carta's policies and procedures."

38.     Not only did Talton surreptitiously record an attorney-client privileged conversation, by his own admission, he shared this conversation (and, on information and belief, other clandestinely recorded conversations, documents, and information) with at least one unauthorized third party, the former employee threatening to assert claims against Carta.  He did so both while she was on garden leave pending her separation (as confirmed to Carta by his counsel) and again during the November 8, 2022 mediation, seemingly intending to harm Carta.

39.     On information and belief, Talton also shared information with another former Carta employee who was actively litigating against Carta.  Talton did so despite receiving attorney-client privileged updates about that employee's litigation as a member of Carta's executive leadership team.  On information and belief, Talton later volunteered through his counsel to testify on that former employee's behalf against Carta in that litigation, despite having limited interaction with the former employee during his employment at Carta.

40.     By letter dated November 20, 2022, Talton, through his counsel, refused to return the recordings or transcripts to Carta.

41.     On December 1, 9, and 13, 2022, Carta again demanded that Talton return all recordings and transcripts and other Carta property to it.  Further, Carta demanded that he provide copies of all recordings and transcripts to Company-authorized investigators.  Talton refused to comply with every Carta request in violation of his fiduciary and contractual obligations to Carta.

42. On information and belief, Talton has also surreptitiously recorded at least two members of Carta's Board of Directors, as well as Carta's founder and CEO, and other Carta executives and employees.

43. These work-related recordings and any transcripts thereof constitute Carta's confidential and proprietary information under Sections 1.2 and 2.7 of the CIIAA. They are also Carta's property pursuant to Carta's policies and procedures to which Talton was bound. Carta Handbook, Section VII.F ("All electronic and telephonic communications and information transmitted by, received from, or stored in our systems are the property of Carta . . . ."); Section VIII ("Information that pertains to Carta's business, which is not known to the general public, is strictly confidential and must not be given to people who are not employed by Carta."). Carta's Handbook is attached as Exhibit C.[2]

44. Further, under Section 1.1 of the CIIAA, Talton "assign[ed] to [Carta] any rights [he] may have or acquire in . . . Confidential Information and recognize[d] that all Confidential Information shall be the sole and exclusive property of [Carta] . . . ." Ex. A at 1, ¶ 1.1.

45. These work-related recordings and any transcripts thereof are also privileged materials, and Talton's refusal to return them is placing Carta's ability to assert the attorney-client privilege over such communications at risk. Further, Talton has no authorization to waive this privilege, as the privilege belongs to Carta.

---

[2] Although Carta's Handbook does not create a binding contract between Carta and Talton, the Handbook's policies and procedures provide important context for Talton's numerous breaches of the CIIAA and his fiduciary duties.

### D. Carta Discovers Additional Instances of Talton's Gross Misconduct

#### The Stroz Friedberg Review Uncovers Talton's Multiple Violations of Carta's Information Security Policies

46.     Upon discovering Talton's practice of surreptitiously recording its executives, Board members, and employees, and his blatant disregard for his obligations of confidentiality by virtue of the apparently inadvertent email to Carta's General Counsel on November 8, 2022, Carta, through outside counsel, retained Stroz Friedberg, a leading cybersecurity, digital forensics, and cyber incident-response company, to forensically review Talton's four Carta-issued laptops.

47.     Stroz Friedberg found evidence that Talton circumvented Carta's information security policy and systems and committed multiple violations of Carta's information security and employment policies in breach of his fiduciary duties as Carta's CTO, and also in violation of litigation holds to which he was subject.

48.     The forensic review revealed that Talton "wiped" three of his four Company-issued laptops by circumventing Carta information security policies. Specifically, on July 13, 2022 Talton deleted his Company-assigned local user accounts on two of his Carta-issued laptops, and on October 7, 2022—the same day that he submitted his letter to Carta's Board of Directors—he deleted his Company-assigned local user account on a third laptop. Talton's deletion of those local user accounts deleted all locally stored information associated with those local user accounts on those devices,[3] at a time when he was subject to litigation holds and mandatory evidence-preservation requirements. Such activity is highly unusual and would effectively conceal the user's previous activity on the laptop, including, but not limited to,

---

[3] Stroz was able to access some artifacts left on the devices, but Talton's destruction of the local user data rendered a restoration of the deleted local user data impossible.

deletion and data exfiltration. On all four Company-issued laptops, Talton also created new "temporary" user accounts, without Carta's authorization or knowledge, which appeared to be relatively unused.

49. By taking the extraordinary step of deleting the Company-assigned local user accounts on his devices, Talton also effectively wiped logs of his user activity on the devices, including, but not limited to, his browser history, logs of files he accessed, as well as the actual files that would have been in his documents, downloads, and mail folders, thereby impeding Stroz Friedberg's ability to fully verify the extent of Talton's misconduct. Without access to Talton's remaining data, Stroz Friedberg cannot fully determine Talton's likely exfiltration of Carta's data, and what additional Carta data Talton accessed or downloaded (beyond the files identified below).

**Stroz Friedberg Review Revealed Evidence of Talton's Misappropriation
of Carta's Trade Secrets and Confidential Information**

50. The Stroz Friedberg review showed that Talton downloaded a large quantity of confidential Carta files, including those constituting Carta trade secrets, and intentionally sought to evade detection by the same computer systems and network he was charged with protecting.

51. As discussed above (and by example only), on October 11, 2022, the same day Talton was placed on administrative leave, he downloaded, to the one Carta laptop that he had not yet wiped, over 100 highly confidential Carta documents and information, including internal Carta business "pillar" updates and other documents containing trade secret and other highly confidential information regarding developments within Carta's information security infrastructure, product planning and development initiatives (including materials on Carta's product lines), financial reports, business and strategic planning, personnel matters, and research and development. These "pillar" updates and related materials included summaries of each of

Carta's "pillar" (or business lines) performance in great detail, including issues the teams face, product road mapping over the next quarter and beyond, and key business metrics with highly confidential, near real time, revenue numbers and business strategies to respond to market conditions and reallocate capital in R&D and other activities to increase revenue.

52.     These materials also contain proprietary methodologies that Carta developed over a significant period of time through substantial effort and expense to maintain and enhance its position in the highly competitive software and information technology market.  These include, but are not limited to, Carta's technological systems and processes for executing its business operations; identifying technological and product failures, proposed technological fixes, and after-action reports on technological testing; the specific investments in capital and resources Carta is making in research and development and product testing; user interface development documents; and extensive engineering updates on Carta's core products.  They constitute trade secrets insofar as they contain information used in Carta's business that gives Carta an advantage over competitors who do not know this information or use it.  This information could provide a short-cut to free-ride on substantial investment in market research, which is a massive investment accumulated over years.  Further, this information could provide a roadmap to Carta's competitors of paths to avoid that Carta, itself, discovered through time-consuming and costly trial and error.

53.     These files included, among many others, documents titled "Customer Success Engineering – April Updates"; "Quarterly Planning Guidance 2022 for Product.mp4"; "Data Products Q1-2022"; "R&D Ops 2022.01 Update"; "Platform Infrastructure Pillar Update – July 2022"; "Engineering Levels at Carta (2022)"; Eng Offsite Engineering Allocations"; "Equity Platform 2022.08 Pillar Update (POSTPONED)"; "Monthly Meeting Action Items/Pillar

Targets"; "Finance Automation 2022.04 Pillar Updates"; "Public & Tax Q1 Update"; "APIs & Dev Ecosystem Monthly Pillar Update"; "Engineering Compensation Analysis (Q1Y22)"; "Copy of Insights Team Monthly Recaps"; "Design ink 2022 Q2 update"; "R&D Org Changes (September 2022)"; and "Carta as a Platform (Shared Slides)".  As the names suggest, these documents and the others Talton bulk-downloaded, contain highly proprietary and confidential Carta information about R&D operations, the very infrastructure of Carta's platform, how Carta is allocating and compensating its personnel, and other information.  These documents would be critically damaging to Carta if provided to Carta's competitors.

54.     Carta classifies its proprietary and confidential processes related to current, future and proposed products and services, including the "pillar" updates and/or other files identified above, as "restricted data" that is "highly valuable, highly sensitive business information" with the potential for "significant damage to Carta's brand, reputation or financials."  *See* Ex. B at 3. Employees are specifically forbidden from sending or transferring "restricted  data" anywhere outside of Carta, even if such data is encrypted.  *Id.*  Under no circumstances should Talton have mass downloaded these "pillar" updates and other confidential Carta files and/or transferred them either to a non-Carta device or to unauthorized third parties.  *See* Carta Device Policy, attached as Exhibit D, at 3 ("Employees are not permitted to download files containing confidential information . . . to a device provided by Carta, iCloud (using @carta.com) or any other similar storage device provided by the Company without proper authorization.").  Additionally, Talton should not have retained any such information after his employment, and doing so constituted a violation of Carta's data security policies and the CIIAA.  *See* Ex. A at 6–7, ¶ 8 ("When I leave the employ of Company, I will deliver to Company any and all drawings, notes, memoranda, specifications, devices, formulas and documents, together with all copies

thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Confidential Information of Company.  I agree that I will not copy, delete, or alter any information contained upon my Company computer or Company equipment before I return it to Company.").

55.     Also on October 11, 2022, approximately four minutes after receiving the calendar invite for a meeting with Carta's Chief People Officer and Carta's General Counsel and approximately six minutes before being placed on administrative leave, Talton connected to a non-Carta device titled "sugarbeaver," through a remote desktop application from the Carta laptop Talton did not wipe, also in violation of Carta's security policies and procedures.  Given the closeness in time between the mass downloading of highly confidential Carta documents, the notice of the calendar invite for the HR meeting, and the connection of this device (which was expressly prohibited by the information security policies Talton was entrusted to execute and supervise), a strong inference can be drawn that Talton exported these and other highly confidential and proprietary documents containing Carta's trade secrets to that non-Carta device.

56.     A review of Carta's Google Drive activity logs also indicates that Talton ceased using his work devices to access Carta's systems around July 2022, and instead primarily, and almost exclusively, used his personal iPhone and iPad to access Carta's document systems and network, without any business justification for doing so, and without Carta's knowledge.

**The Stroz Friedberg Review Revealed Talton's Ongoing Violations
of Carta's Policies and Efforts to Conceal his Unlawful Behavior**

57.     The forensic review conducted by Stroz Friedberg also revealed that since at least 2017, and throughout his employment with Carta, Talton had regularly engaged in highly inappropriate behavior using his Carta devices, in violation of Carta's policies and that he attempted to evade detection by deleting his user accounts, wiping his laptops, and on information and belief using at least one unauthorized encrypted messaging application, Telegram.

58.     Specifically, Talton engaged in highly graphic sexting and sending and receiving hundreds of sexually explicit messages to and/or from at least nine women, including during work hours and during business travel on behalf of Carta, and on Carta devices.  These sexually explicit messages occurred over a substantial period of time (beginning, at least, in November 2017 and continuing throughout the duration of Talton's employment at Carta) and were stored on the Carta-issued laptops in Talton's possession.  Significantly, as Carta's CTO in charge of information security at the Company, Talton knew and understood that what he was doing was wrong and a blatant violation of Carta's policies and procedures.  In an exchange with one of the women with whom he was sexting, they discuss "Is Telegram the most secure option we can move to? I know there is also Signal and I've seen what Signal provides if they get subpoenaed and it's basically nothing."  That woman also cautioned Talton, "You should have a second work phone.  And I hope to god you do not use your Icloud account on any devices owned by your company."  Stroz Friedberg was able to confirm that Talton in fact used the Telegram application on certain of his Carta-issued devices.

59. Talton's abuse of Carta's network and information systems includes, but is not limited to, sending and receiving hundreds of messages in violation of Carta's policies and procedures. By way of example only, Talton sent or received messages that include the terms "jungle n*****s" and "gross lesbians," "butterfaces," "rape," "big rubber dog dick," "pathetically obsessed pussy slave," phrases such as "women don't experience pain the way humans do," "I'm never going to get to pin you down and fuck you again, am I . . . you know how hard I get when you humiliate me," "now i have to jerk off before my meetings start" in addition to sending links containing explicit pornography.

60. In addition to the foregoing, Talton repeatedly abused his position as an executive and his role as CTO to obtain benefits and privileges to which he was not entitled. By way of example only, on July 12, 2022, Talton bragged to one of the multiple women with whom he was sexting, "LOL, yesterday I had to upgrade the OS on my laptops and it was a pain, so I just made them overnight me two brand new computers. It's nice to be the CTO." Talton also repeatedly asked for a personal assistant on the Company payroll in addition to his executive assistant, misused his corporate credit card for personal matters, and repeatedly attempted to book travel outside of Company policy.

61. Carta's investigation into Talton's misconduct remains ongoing. However, given Talton's unusual wiping activity that has effectively concealed his behavior and impeded any ability to undertake a complete forensic review on his Carta-issued devices to determine what Carta data may have been transferred and what data may still remain on Talton's personal devices, Stroz Friedberg needs access to those personal devices and accounts, including the "sugarbeaver" device, to preserve and analyze the data they contain.

**E. Carta Terminates Talton's Employment for Cause and Demands That He Returns Carta's Confidential and Proprietary Documents and Trade Secrets and Submit His Devices to a Forensic Inspection**

62. As a result of the gross misconduct detailed above and Talton's repeated refusal to return confidential, attorney-client privileged and proprietary information, trade secrets, and other Carta property in breach of his contractual and fiduciary obligations, on December 23, 2022, Carta terminated Talton's employment for Cause. A copy of the termination letter is attached as Exhibit E.

63. Under Section 13(d) of the Company's Amended and Restated Stock Plan, "Cause" means, in relevant part, Talton's (ii) "attempted commission of, or participation in, a fraud or act of dishonesty against the Company"; (iii) "intentional, material violation of any contract or agreement between [Talton] and the Company or of any statutory duty owed to the Company"; (iv) "unauthorized use or disclosure of the Company's confidential information or trade secrets"; or (v) "gross misconduct." A copy of the Amended and Restated Stock Plan is attached as Exhibit F.

64. Similarly, under Talton's 2021 Equity Incentive Plan with Carta, at Section 14, Cause includes Talton's "(a) unauthorized misuse of the Company or a Parent or Subsidiary of the Company's trade secrets or proprietary information"; "(c) committing an act of fraud against the Company or a Parent or Subsidiary of the Company"; or (d) "gross negligence or willful misconduct in the performance of [Talton's] duties that has had or will have a material adverse effect on the Company or Parent or Subsidiary of the Company's reputation or business." A copy of the 2021 Equity Incentive Plan is attached as Exhibit G.

65.     By letter, Carta notified Talton of his termination for Cause and instructed him to preserve any and all documents and information, whether in digital or print format, on any media or device in his possession, custody or control, including without limitation, on any cell phones, USB drive, external hard drive or other storage device computers, iPad, tablets or other devices. *See* Ex. E. Carta expressly directed Talton to preserve his Telegram account and any other accounts maintained on any other messaging or social media platform or through any other application, all iCloud accounts, cloud-based storage accounts such as DropBox or Box, non-Carta devices connected to Talton's Carta-issued laptop through a remote desktop application (including but not limited to the "sugarbeaver" device), his jerrytalton@gmail.com and any other personal email account. Carta further directed Talton to make arrangements for a forensic inspection of all of his devices by Stroz Friedberg to occur no later than December 28, 2022. *See id.*

66.     To date, Talton has refused to comply with Carta's requests, in further and ongoing breach of Section 8 of the CIIAA.

## COUNT I

## BREACH OF CONTRACT[4]

67.    Carta repeats each and every allegation contained above and below as if set forth fully herein.

68.    The CIIAA is a binding agreement between Carta and Talton, entered into on or about October 1, 2018.

69.    Carta has performed its obligations under the CIIAA.

70.    Talton breached and continues to breach the CIIAA by, among other things, (i) using and disclosing confidential and/or attorney-client privileged Carta information he obtained through surreptitious recordings to third parties, including without limitation, to actual and potential litigants pursuing claims against Carta; (ii) downloading and accessing confidential and proprietary information and trade secrets from Google Drive and Carta systems and/or transferring that confidential and proprietary information and trade secrets through an unauthorized remote desktop application; and (iii) refusing to return Carta's confidential and proprietary and/or attorney-client privileged information, trade secrets and other property.

71.    As a result of Talton's breaches of the CIIAA, and pursuant to Section 9.1 of the CIIAA, Carta has suffered and, if further breaches are not enjoined, will suffer continuing and irreparable injury, as well as monetary damages.

72.    For these reasons, Carta has been damaged and is also entitled to judgment against Talton for damages in an amount to be determined at trial.

---

[4] California law governs Carta's breach of contract claim.  *See* Ex. A at 8, ¶ 12.1.

## COUNT II

## BREACH OF FIDUCIARY DUTY[5]

73.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

74.     As a Carta executive, Talton owed fiduciary duties to Carta, including the duties of care, loyalty, and good faith.

75.     As set forth above, Talton breached the duties of loyalty and due care when, among other acts, he:

      a.     Misused and shared Carta's confidential, attorney-client privileged and proprietary information and property with unauthorized third parties;

      b.     Failed to turn over to Carta confidential, attorney-client privileged and/or proprietary information and property, despite multiple reasonable requests;

      c.     Circumvented and abused Carta's policies, including to engage in unauthorized sexting and to send and receive sexually explicit communications, including during work hours on Carta-issued devices;

      d.     Secretly recorded Carta employees, including attorney-client privileged and confidential conversations with Carta's General Counsel, Carta's CEO, Board Directors, C-level executives, and other Carta employees and disclosed same without authorization, for no business purpose, and in order to harm Carta;

---

[5] Delaware law governs Carta's breach of fiduciary duty claim because Carta is incorporated in Delaware. *See Marino v. Grupo Mundial Tenedora, S.A.*, 810 F. Supp. 2d 601, 607 (S.D.N.Y. 2011) ("New York applies the internal affairs doctrine to claims for breach of fiduciary duty and, thus, applies the law of the state of incorporation to such claims.").

e. Downloaded and wrongfully retained confidential and proprietary documents and information, including trade secrets, from Carta's systems and devices;

f. Deleted data and documents on Carta-issued devices when he was subject to document preservation holds and mandatory evidence preservation requirements; and

g. Abused his position as CTO by, among other things, seeking to obtain benefits and privileges to which he was not entitled, including without limitation, demanding that two laptops be shipped to him to avoid the inconvenience of updating his operating system, seeking to hire a personal assistant, misusing his corporate credit card for personal matters, and repeatedly attempting to book travel outside of Company policy.

76. As a result of Talton's extensive breaches of duty, Carta sustained substantial damages in an amount to be determined at trial.

## COUNT III

## VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C. §§ 1836, ET SEQ.

77.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

78.     As set forth above, Carta owns various trade secrets within the meaning of the DTSA, 18 U.S.C. § 1839(3), which are critical to its business and operational success, including without limitation, the "pillar" updates and other confidential materials described in paragraphs 51–54 above.

79.     Carta's trade secrets relate to Carta's provision of software and information technology services used in interstate and foreign commerce.

80.     Carta's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.  Carta's trade secrets give it a competitive advantage over competitors who do not have access to that trade secret information.  Carta's trade secrets are valuable and critical to its business operations and competitive position as a software and information technology provider.   The trade secrets Talton has misappropriated are of significant potential value to Carta's competitors.  By way of example only, the trade secrets stolen by Talton would allow Talton and Carta's competitors to replicate many of Carta's proprietary methodologies and strategies for running its business as a leading software and information technology service provider.  They would allow Talton and Carta's competitors to identify Carta's technological and product challenges.  They would allow Talton and Carta's competitors to undermine Carta's core business operations.  Carta has taken several steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, implementing information security measures

described in paragraph 17 above, and requiring adherence to Carta's device policies, as well as compliance with the CIIAA as a condition of employment, and continued employment, with Carta.

81.     Talton's actions as described above constitute a misappropriation within the meaning of the DTSA, 18 U.S.C. § 1839(5).

82.     Talton misappropriated Carta's trade secrets by acquiring them by improper means, mass downloading those files with no business need and in breach of his fiduciary and contractual duties to maintain the secrecy of Carta's trade secrets and confidential information. In wrongfully acquiring Carta's trade secrets, Talton not only violated multiple Carta policies, but also his contractual and fiduciary duties to Carta.

83.     At the time Talton downloaded Carta's trade secrets and/or likely exported them to an unauthorized device, "sugarbeaver," using a remote desktop application, or otherwise used or disclosed them, he knew or had reason to know that knowledge of those trade secrets was derived from his use of improper means to acquire those trade secrets and/or acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets.

84.     Additionally, Talton's access to and downloading of Carta's trade secrets for a non-business purpose, and likely exfiltration of the data to a non-Carta device through a remote desktop application, constituted misappropriation because he knew or had reason to know that knowledge of those trade secrets was derived from his use of improper means to acquire those trade secrets and/or acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets. Carta granted Talton access to restricted materials *only* to perform his job duties. Until Talton downloaded the restricted materials, he had not acquired them. By downloading those materials, Talton acquired Carta's trade secrets by improper means.

85.     Talton's actions have caused and will continue to cause damage to Carta and unless, restrained will further damage Carta, the nature and extent of which may not be able to be proven with certainty, irreparably injuring Carta and leaving it without an adequate remedy at law.

86.     Carta is entitled to damages for actual losses caused by Talton's misappropriation of its trade secrets, and damages for any unjust enrichment caused by the misappropriation that is not addressed in computing its actual losses. In the alternative, Carta is entitled to a reasonable royalty for Talton's misappropriation of its trade secrets. The nature and scope of those damages will be determined at trial.

87.     Talton's misappropriation of Carta's trade secrets was willful and malicious, entitling Carta to attorneys' fees and exemplary damages.

88.     Permanent injunctive relief is necessary to prevent irreparable harm and further disclosure of Carta's trade secrets.

## COUNT IV

**MISAPPROPRIATION OF TRADE SECRETS UNDER NEW YORK COMMON LAW**

89. Carta repeats each and every allegation contained above and below as if set forth fully herein.

90. As set forth above, Carta owns various trade secrets critical to the success of its business, including, without limitation, the "pillar" updates and/or other confidential and "restricted" materials described in paragraphs 51–54 above, which constitute "trade secrets" under New York law.

91. Carta's trade secrets derive independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information. Carta's trade secrets give it a competitive advantage over competitors who do not have access to that trade secret information. Carta's trade secrets are valuable and crucial to its business functions and competitive position. The trade secrets Talton has misappropriated are of enormous potential value to a competitor, and disclosure or use of Carta's trade secret information would risk destroying that competitive edge. For example, a competitor could use the detailed strategic, technical, and product related information contained in the "pillar" updates to understand Carta's product development roadmap for a competitive advantage, and could use them to differentiate their features from Carta's in a competitive posture. Carta has taken several steps and made efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets by, among other things, designing and implementing the information security measures described in paragraph 17 above, and requiring adherence to its policies (including the CIIAA) as conditions of continued employment at the firm.

92.     By downloading, and likely exporting, Carta's trade secrets through an unauthorized remote desktop application, and engaging in other misconduct, Talton has used Carta's trade secrets in breach of an agreement, confidence, or duty, or as a result of discovery by improper means, including theft and breaches of duties to maintain the secrecy of Carta's trade secret information.

93.     Talton's actions have caused and will continue to cause damage to Carta and, unless restrained, will further damage Carta, the nature and extent of which may not be able to be proven with certainty, irreparably injuring Carta, leaving it without an adequate remedy at law. Carta is therefore entitled to permanent injunctive relief to prevent such irreparable harm.

94.     Carta is entitled to damages as a result of Talton's misappropriation to the extent its actual losses are calculable.

## COUNT V

## CONVERSION[6]

95.     Carta repeats each and every allegation contained above and below as if set forth fully herein.

96.     Under the CIIAA, "Confidential Information" includes "information regarding personnel, employee lists, compensation, and employee skills" and "any other non-public information which a competitor of [Carta] could use to the competitive disadvantage of Carta." Ex. A at 2, ¶ 1.2(e), (f). "Confidential Information" also includes "trade secrets." Ex. A at 2, ¶1.2 (a).

---

[6] New York law governs Carta's conversion claim.

97.    Talton "assign[ed] to [Carta] any rights [he] may have or acquire in . . . Confidential Information and recognize[d] that all Confidential Information shall be the sole and exclusive property of [Carta] and its assigns." *Id.* at 1, ¶ 1.1.

98.    Talton also agreed that "all work product . . . made by" him "within the scope of his employment" is exclusively owned by Carta, Ex. A at 2.7, and agreed "to keep and maintain" records of "all Confidential Information" he developed, "which records will . . . remain the sole property of [Carta] at all times." *Id.* at 5, ¶ 3.

99.    Talton created Confidential Information when he surreptitiously recorded confidential conversations with Carta's General Counsel, Carta's CEO, Board Directors, C-level executives, and other employees.

100.    Those recordings are Carta's "sole and exclusive property." *Id.* at 1, ¶¶ 1.1, 2.7.

101.    Talton also took Carta's Confidential Information, including trade secrets, when he mass downloaded its confidential business information and files, including the "pillar" updates and "restricted" materials referenced in paragraphs 51–54 above.

102.    Carta repeatedly demanded Talton turn over Carta's privileged and confidential information and trade secrets including, without limitation, the recordings and transcripts he created.

103.    Talton intentionally retained and refused to return the recordings and transcripts he created as well as the trade secrets and other Carta property he took.

104.    As a direct and proximate result of Talton's misconduct, Carta has been deprived of access to and use of its Confidential Information and property.

105.    Talton's conduct outlined above was willful and malicious.

106. Talton was aware that his conduct was contrary to the commonly accepted duties in the ordinary course of his relationship with Carta and would cause injury to Carta.

107. Talton acted knowingly in depriving Carta of access to and use of the Confidential Information outlined above.

108. Talton's acts were willful, wanton, malicious and oppressive and justify an award of punitive damages, in addition to the compensatory damages in an amount to be determined at trial, and in particular, by retaining the confidential information, Talton has frustrated Carta's attempts to determine the full extent of those damages.

109. Talton was under an independent, common-law duty not to steal Carta's property. This duty was separate and apart from his contractual obligations under the CIIAA to return Carta property. Talton violated that common-law duty by stealing Carta's property.

110. Although Carta may properly assert both a breach of contract claim for Talton's breach of the CIIAA and a separate conversion claim for Talton's theft of Carta property, to the extent necessary, Carta pleads its conversion claim in the alternative.

## COUNT VI

## FAITHLESS SERVANT[7]

111. Carta repeats each and every allegation contained above and below as if set forth fully herein.

112. Talton owed Carta duties of loyalty and good faith by virtue of the parties' employer-employee relationship and through his role as a Carta executive.

---

[7] Carta's Faithless Servant claim arises under Delaware law, which, in turn, looks to New York law. *See, e.g., Personal Touch Hldg. Corp. v. Glaubach*, 2019 WL 937180, at *26–27 (Del. Ch. Feb. 25, 2019) (Bouchard, C.) (Delaware Court of Chancery applying New York Faithless Servant Doctrine to breach of fiduciary duty claim brought under Delaware law).

113. Talton violated this duty by acting contrary to Carta's interests, and in a manner detrimental to its business interests. Talton's egregious violations of his duties as a Carta executive and of his contractual obligations to Carta require him, under the faithless servant doctrine, to disgorge to Carta all compensation paid to him during the period of his disloyalty.

## REQUEST FOR RELIEF

Carta reserves its rights to pursue any and all available remedies against Talton, including damages, punitive damages, exemplary damages, statutory damages, attorneys' fees, and any equitable remedies including without limitation an order of seizure, a temporary restraining order, and/or a permanent injunction;

WHEREFORE, Carta respectfully requests judgment against Talton as follows:

114. Entering a permanent injunction against Talton: (i) barring Talton and anyone acting in concert or participation with him from further misappropriating, exploiting, publishing, disseminating, copying, using or disclosing any of Carta's attorney-client privileged and/or confidential or proprietary information and trade secrets; (ii) restraining Talton and anyone acting in concert or participation with him from deleting, destroying, altering, transferring, downloading or copying any of Carta's privileged and/or confidential and proprietary information and trade secrets; and (iii) requiring Talton and anyone acting in concert or participation with him to permit the permanent removal, deletion and destruction of all copies of Carta's electronic files, recordings and information transmitted to Talton's computers, personal email accounts or personal devices or otherwise in his possession, subject to the supervision of Carta and its forensic expert, Stroz Friedberg, so as to preserve evidence of all such files or information;

115.     Awarding compensatory damages in favor of Carta as a result of Talton's conversion, misappropriation, breaches of fiduciary duties, and breaches of contract, in an amount to be proven at trial, plus interest;

116.     Ordering that Talton disgorge any and all compensation paid to him by Carta, including without limitation, all salary, benefits and equity awarded to him, during the period of his disloyalty, together with interest;

117.     Awarding punitive and exemplary damages in favor of Carta in an amount to be determined at trial;

118.     Awarding Carta its attorneys' fees and costs for this Action; and

119.     Granting Carta such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Carta demands a trial by jury for all issues so triable pursuant to Federal Rule of Civil

Procedure 38(b).[8]


Dated: New York, New York          DECHERT LLP
       July 25, 2023


By: _/s/ Nicolle L. Jacoby_

Andrew J. Levander
Nicolle L. Jacoby
Three Bryant Park
1095 Avenue of the Americas
New York, NY 10036-6797
andrew.levander@dechert.com
nicolle.jacoby@dechert.com
samantha.deruvo@dechert.com
Telephone:    (212) 698-3500
Facsimile:    (212) 698-3599

Christopher J. Merken
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
christopher.merken@dechert.com
Telephone:    (215) 994-4000
Facsimile:    (215) 994-2222

***Attorneys for Plaintiff Carta, Inc.***

---

[8] Consistent with Rule 1.e of the Court's Individual Rules and Practices in Civil Cases, Carta has attached a redline between its First Amended Complaint and its Second Amended Complaint, attached as Exhibit H.