**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| eShares, Inc. d/b/a Carta, Inc., | ) | Civil Action No.:  1:22:cv-10987 |
| | ) | |
| Plaintiff, | ) | Hon. Jessica G. L. Clarke |
| | ) | |
| v. | ) | |
| | ) | |
| Jerry O. Talton III, | ) | |
| | ) | **JERRY O. TALTON III'S AMENDED** |
| Defendant. | ) | **COUNTERCLAIMS AGAINST ESHARES,** |
| | ) | **INC. D/B/A CARTA, INC. AND HENRY** |
| | ) | **WARD** |
| | | |
| Jerry O. Talton III, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| eShares, Inc. d/b/a Carta, Inc. and | ) | |
| Henry Ward, | ) | |
| | ) | |
| Counter-Defendants. | ) | |
| | ) | |
| | ) | |

Defendant and Counter-Plaintiff Jerry O. Talton III ("Talton"), by and through undersigned counsel of record, McAllister Olivarius, hereby submits his Counterclaims against Plaintiff and Counter-Defendants eShares, Inc. d/b/a Carta, Inc. ("Carta" or "Company") and Henry Ward ("Ward"), as follows:

## INTRODUCTION

1.    On October 7, 2022, after consulting with individual members of Carta's Board of Directors ("Board") about what he should do, Dr. Jerry Talton, a senior officer of Carta, wrote the Board to report his concerns that the Company's CEO, Ward, was engaging in questionable, rash

1

and illegal activities harmful to Carta ("Board Letter").  A true and correct copy of the Board Letter is attached hereto as **Exhibit A**.  The tsunami of retaliation from Ward that this sober letter provoked is why Talton must now come before this Court.

2.    Talton was a four-year veteran of Carta, its Chief Technology Officer and well-known to the Board for being a major contributor and a reliable person. Though anxious about reporting problems caused by his boss, he recognized that it was his duty to Carta and that Carta would handle his report in a measured, businesslike way.

3.    The previous week Ward had told Talton that he was "doing great" and that in the wake of Ward's firing of ███████████████████████████████, "I need you more now." But Ward is a volatile egotist and the Board Letter enraged him.

4.    Ward set out to destroy Talton. Talton, who had done nothing except write the Board about risks to the Company he had observed, was promptly placed on administrative leave. Ward hired two law firms to train their fire on Talton.  The first, Paul Weiss Rifkind Wharton and Garrison ("Paul Weiss"), did an "independent investigation" whose results flowed to Ward as a Board member, and extracted all they could about Ward's misdeeds.  Meanwhile the other firm, Dechert LLP ("Dechert"), was preparing the lawsuit now before the Court.  Dechert supervised a forensic exam of Talton's computers, searching, despite Talton's clear devotion to Carta and many contributions to its progress, for dirt that could justify firing him.

5.    Talton's interview with Paul Weiss on December 14, 2022, lasted eight hours. Talton is an earnest person and answered every question forthrightly.  At the end, he said how much he was looking forward to going back to work.  He explained that his work for Carta has been his life and his identity.  ████████████████ he told the lawyers.  ████████████

2

████████████████████████████████████████████████

██████████████████████████████████████

6.     At the end of his interview, Talton, through counsel, also offered to Paul Weiss to turn over all documents and tape recordings he had acquired in the course of his work for Carta. These backed up the statements in his Board Letter and interview.  Paul Weiss wasn't interested. ████████████████████████████████████ This surprised Talton.  Why wouldn't they want all the evidence?

7.     He was soon to find out.  Had they accepted his offer, that would have delayed or even prevented the ambush that was already afoot.

8.     A week later, on December 23, 2022, Carta fired Talton for cause, depriving him of tens of millions of dollars of stock options and other compensation.  [ECF No. 29-5, Second Amended Compl., Ex. E ("Termination Letter")].  The Termination Letter asked him to return his Carta documents.  He was shocked to be fired.

9.     But only seven days later, Dechert filed its obviously long-prepared, scorched-earth lawsuit against him ("Complaint") alleging disloyalty, theft of trade secrets, and other dark and false distortions of Talton' s upstanding conduct.  [ECF No. 1, Compl.].

10.     One false claim in the Complaint particularly likely to damage Talton's reputation with the Court was that he stole Carta information and refused to give it back.  Talton stole no Carta information, and he did not refuse to give anything back.

11.     Like other Carta employees, Talton acquired information in the course of his work. On December 14, two weeks before Carta sued him, he had already offered to return to Paul Weiss all documents and recordings he had concerning Carta.  Paul Weiss, despite representing the

3

Board, had refused them.  So Carta and Dechert knew when the Complaint was filed that it was a lie to allege that Talton had refused to return documents.

12.    Moreover, once Carta fired and sued Talton, the whole landscape concerning these materials changed and had to be re-examined in light of the litigation into which Carta had forced Talton.  The Carta documents in his possession had to be treated as subject to normal discovery rules.  They will become available to Carta in the course of discovery. Meanwhile they are being fully protected.  The Complaint's histrionics about Talton purloining documents and refusing to return them are manufactured, with the malicious purpose of destroying Talton's good reputation.

13.    Another knowingly false and libelous claim came in the Termination Letter, Exhibit D to the Complaint, which alleged that Talton was "hopped up on drugs" and "high" while serving as CTO.  [ECF No. 1, Compl., Ex. D].  In the Complaint's sea of falsity, this allegation is particularly disgraceful.  In fact, Talton had multiple osteotomies on both feet in September 2022 and was prescribed painkillers for several weeks of postoperative recovery. He fully disclosed the surgery and recovery period to Carta when arranging his sick leave, including to Ward personally, who expressed sympathy.  Knowing Talton was on sick leave and supposed to be resting, Ward still called Talton several times on Company business, and made no complaint about his mental acuity.  It is particularly vicious to twist a patient's normal brief recovery from surgery into an implied drug addiction.

14.    The most salacious of the Complaint's false allegations, which smeared Talton in publications around the world as Carta intended, was that he had violated Carta's internal sexual harassment and anti-discrimination policies by sending and receiving sexually explicit messages from Carta devices during Carta business hours. Carta, and its agent Dechert, had to know—or with cursory investigation would have known—that these private messages sent from Talton's

personal iCloud account did not involve Carta employees, contractors or customers. Carta has since withdrawn these allegations [ECF No. 29-8, Second Amended Compl., Ex. H at 20-21], but the damage Carta and Ward desired to visit upon Talton's reputation was already done.  Talton became ridiculed around the world. A good job offer was withdrawn.  He has not been able to get another.[1] [2]

15.    Moreover, just six weeks ago, Ward repeated the same defamation all over again in an essay he posted on Medium, which for good measure he reposted on social media and sent to all Carta employees and to all of Carta's customers.  Ward even linked to the withdrawn Complaint.  This became fodder for news stories by reputable business journals and a social media tempest.  Ward used the same lies withdrawn from the Complaint to smear Talton again.[3]

16.    Deliberately defaming your former employee in a mass mailing after your lawyers have sought to protect you by removing those same allegations from a federal complaint is unusual conduct for a CEO.

17.    But unusual is standard for Henry Ward, who combines the ego and volatility of an Elon Musk, the effortless dissembling of a George Santos, and the vindictiveness of Don Corleone. The Carta C-suite has been a carousel of terminations as Ward has serially expelled those who

---

[1] As with many senior Carta executives and employees, Talton's work computers contained a cache of some text messages from his personal Apple iMessage account linked to his personal cell phone number.  Ward often preferred to contact senior employees via text message for important or time-sensitive matters, bypassing the Company Slack account.  In its hostile forensic exam of Talton's work devices, Carta reconstructed some of these cached messages, sent and received between Talton and various romantic partners (most of whom predated his relationship with the Company by a decade or more). None of these people were connected with Carta.  Its sexual harassment policy was irrelevant to these exchanges, as Carta and Dechert knew. Talton's legal, consensual sex life has nothing to do with Carta, is none of Carta's business, and has no legitimate place in this lawsuit.  Carta's attempt to weaponize it is malicious and additional retaliation.

[2] Carta, like most Silicon Valley startups, recognizes and accepts that its employees use their personal devices for some work matters and work devices for some personal matters.  [ECF No. 29-1, Second Amended Compl., Ex. A, ¶ 8].  Carta regularly permits departing employees in good standing to keep their Carta-issued laptops when they leave; this would make no sense unless it were commonly understood that they were depending on their Carta laptops for personal business.  Carta's accusation that Talton behaved improperly with Carta systems is baseless.

[3] And Ward added some new even more shocking defamations.  He said that Talton "was inappropriate with women and abused his position" and even that he was "a misogynist and a racist."

question him, especially women. He shows contempt for tiresome restraints like law and regulation, ████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████ He once told Carta's compliance chief Suzanne Elovic that "the problem you and I are having is that you seem to think that your job is to protect the Company, and I think your job is to protect *me*…and sometimes you think your job is to protect the Company from me!  Suzanne, I *am* the Company!"

18.    The sole reason for Talton's vertiginous fall from well-respected, highly paid, top contributor at Carta to unemployment is Ward's fury that Talton blew the whistle on his misconduct.  Talton did nothing more than any responsible employee and company officer should do if faced with evidence of wrongdoing: after consulting with several Board members, he collected the evidence and reported it up the chain, to the Company's ultimate decisionmakers. Indeed that was his obligation as a company fiduciary.

19.    Talton did not leak the Board Letter to the press or to colleagues, or scheme for his own advancement.  He did not take the coward's way out and write anonymously, as ████ ████████████████████████████████████████.  He did his job and hoped that the senior figures responsible for Carta would take hold of the problems he had identified from his perch, and from their higher vantage, handle them properly; and that having done his duty to Carta in a difficult circumstance, the Company would recognize his motives as serious and treat him with respect.

20. That turned out to be wishful thinking to the point of laughability, except that the consequences for Talton's life have been so dire. Instead the Board followed the philosophy of its member Marc Andreessen, founder of Andreessen Horowitz, who says "we always want control to rest with the founder." The Board backed the co-founder, Ward, who got license to retaliate.

21. Talton was thus turned from high-flyer to roadkill, a path well-known to whistleblowers, sadly proving Emerson's adage that "if you strike the king you must kill him."

22. Talton seeks the Court's help in (1) reclaiming his life and career from Carta's and Ward's onslaught of retaliation and defamation, and (2) vindicating the rights of whistleblowers generally not to be pulverized with impunity. He thus brings this Counterclaim.

## PARTIES

23. Talton is a natural person and citizen of the State of Illinois. Talton was a citizen and resident of the State of New York during his employment with Carta from August 14, 2018, to December 23, 2022.

24. Carta is a private corporation organized under the laws of Delaware. Its headquarters and principal place of business is 333 Bush Street, Floor 23, Suite 2300, San Francisco, California 94104. Carta also maintains an office within the Southern District of New York at One World Trade Center, 1st Floor, New York, New York 10007.

25. Ward is a natural person and citizen of the State of California.

## JURISDICTION AND VENUE

26. This Court has subject matter jurisdiction under 28 U.S.C. § 1332 as Talton is a citizen of Illinois, Carta is a citizen of California and Delaware, and Ward is a citizen of California. The amount in controversy exceeds $75,000.

27.    This Court also has subject matter jurisdiction under 28 U.S.C. § 1331 because Talton brings this action pursuant to Title VII of the Civil Rights Act of 1964.  This Court has supplemental jurisdiction over Talton's state-law claims pursuant to 28 U.S.C. § 1367.

28.    Venue is appropriate in the Southern District of New York under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Talton's claims occurred in this District.

29.    Venue is also appropriate in the Southern District of New York under 28 U.S.C. § 1391(d) as Carta is subject to the Court's personal jurisdiction based on its presence and operation within the District.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

30.    On September 27, 2023, Talton filed a Charge of Discrimination and Particulars with the Equal Employment Opportunity Commission ("EEOC") detailing his retaliation claims against Carta as required by federal law.

31.    On September 27, 2023, the EEOC issued Talton a Notice of Right to Sue as to causes of action within its purview.  This Counterclaim is made within 90 days of the Notice of Right to Sue.  A true and correct copy of the Notice of Right to Sue is attached hereto as **Exhibit B**.

32.    Talton has exhausted all applicable administrative remedies, and all conditions precedent needed to file this Counterclaim.

## FACTS

I.    **Talton's Background, History at Carta and Compensation**

33.    Talton has had a passion for computer science since his teenage years.  He received bachelor's and master's degrees in computer science from the University of Illinois at Urbana-

8

Champaign, and a PhD in computer science from Stanford University.  He spent his pre-Carta career at respected tech companies including SAIC, Nvidia, Adobe, Intel, and Slack, and co-founded his own startup which raised venture capital from top VCs.  At Slack, Talton ran its Machine Learning Services team in New York City.

34.  Talton met Ward in November 2016.  Ward recruited him to join Carta, and Talton became increasingly intrigued by Carta as he came to know more about it.

35.  Talton was ultimately hired as Director of Engineering for Data & Machine Learning, starting work on September 17, 2018.  He was enthusiastic about Carta and threw himself into its work, scaling Carta's nascent data organization from a single analyst to a team of more than forty people during his first year.

36.  As a Carta employee, Talton participated in the Stock Plan which provided the following types of Stock Awards to eligible employees: Incentive Stock Options, Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock Awards, Restricted Stock Unit Awards, and Other Stock Awards.  [ECF No. 29-6, Second Amended Compl., Ex. F].[4]

37.  At all times material hereto, Carta's Board had the power to determine how each Stock Award was granted and provided, to interpret the Stock Plan, and to amend and revoke its rules and regulations.  It was required to make all determinations, interpretations, and constructions of the Stock Plan in good faith.  [ECF No. 29-6, Second Amended Compl., Ex. F, Sec. 2(b)].

38.  Section 5(f) of the Stock Plan states:

**Termination for Cause.**  Except as explicitly provided otherwise in a Participant's Stock Award Agreement or other individual written agreement between [Carta] or any Affiliate and the Participant, if a Participant's Continuous Service is terminated for Cause, the Option or SAR will terminate immediately upon such Participant's termination of Continuous Service, and the Participant will be prohibited from exercising his or her Option or SAR from and after such termination of Continuous Services.

---

[4] Under the Stock Plan, the "new hire stock options" were either incentive stock options (ISO) or non-statutory stock options (NSO).

39.    Section 13(d) of the Stock Plan states:

**"Cause"** will have the meaning ascribed to such term in any written agreement between the Participant and the Company defining such term and, in the absence of such agreement, such term means, with respect to a Participant, the occurrence of any of the following events: (i) Such Participant's commission of a felony or any crime involving fraud, dishonesty or moral turpitude under the laws of the United States or any state thereof; (ii) such Participant's attempted commission of, or participation in, a fraud, or act of dishonesty against the Company; (iii) such Participant's intentional, material violation of any contract or agreement between the Participant and the Company or any statutory duty owed to the Company; (iv) such Participant's authorized disclosure of the Company's confidential information or trade secrets; or (v) such Participant's gross misconduct.  The determination that a termination of the Participant's Services either for Cause or without Cause will be made by the Company, in its sole discretion.  Any determination by the Company that the Continuous Service of a Participant was terminated with or without Cause for the purposes of outstanding Stock Awards held by such Participant will have no effect upon any determination of the rights or obligations of the Company or such Participant for any other purpose.

40.    Talton was promoted to Senior Director in September 2019.

41.    In February 2020, Ward promoted Talton again, to Vice President of Research and Development Strategy in the Office of the CEO.

42.    Talton's contributions in this job were so significant that a few months later, Ward encouraged him to pursue Carta's vacant CTO position, to which he was appointed in November 2020 at an annual salary of $402,000 plus an option grant determined by the Board pursuant to the Stock Plan.  A true and correct copy of the November 2, 2020 CTO offer is attached hereto as **Exhibit C**.

43.    On December 30, 2020, Talton was awarded 218,157 "promotion" stock options that vested over four years starting November 1, 2020 (1/48 of the grant vesting each month).  Talton was also awarded 87,254 "tenure" stock options which began vesting on September 17, 2022, over one year (1/12 of the grant vesting each month).  A true and correct copy of the December 30, 2020 equity award is attached hereto as **Exhibit D**.

10

44. On December 13, 2021, Talton's base salary for his CTO role increased to $623,000. Additionally, he was eligible to receive Restricted Stock Units (RSUs) pursuant to the terms of the Stock Plan in the value of $3,981,000 each year, vesting quarterly beginning October 1, 2023. A true and correct copy of the December 13, 2021 compensation update is attached hereto as **Exhibit E**.

45. Talton was awarded a total of 592,794 stock options and 98,784 RSUs during his tenure at Carta.

46. As CTO, Talton was responsible for the security of $2.5 trillion in customer assets and oversaw an engineering organization of more than 400 people with an annual budget topping $100M. During his four years at Carta he modernized its software development practices and infrastructure, co-authored Carta's first patents, launched Carta's engineering blog, and evangelized Carta's transition from a product company to a foundational financial platform.

47. Talton was widely praised as a manager. He taught three 12-week seminars on management and leadership that more than 100 Carta employees attended. He personally instigated and oversaw ███████████████████████████████████ ███████████████████████████████████ ██████ He was friendly, approachable, enthusiastic and fair, making him a popular boss and source of reassurance in a company often churned up by Ward's storms.

48. Talton redesigned the engineering hiring, leveling, and promotion process to increase transparency and reduce unconscious bias, and built a talented, diverse senior leadership team. He worked closely with Carta's Diversity, Equity, and Inclusion team to drive continuous improvements to his organization's recruiting practices as the Company grew. He held fortnightly one-on-one meetings with his direct reports, met annually with each skip-level employee,

11

encouraged his subordinates to tell him when he was wrong, and prioritized candid communication as the best antidote for conflict within teams.

49.     Talton strongly believed in Carta's mission: to help companies democratize ownership and equity.  He felt a strong sense of personal ownership in the success of the Company and the way it represented itself to its employees and the public.  He recruited hundreds of people and was often deployed to convince candidates to join because he so obviously loved Carta.  He invested almost all of his net worth into exercising Carta stock options.

50.     Ward admired Talton's contributions and zeal, saying Talton "bleeds Carta blue" (the color of its logo at that time) and praised his "technical brilliance" in his most recent, glowing performance review.

51.     Contrary to the allegations in the Complaints, Talton was never accused at any point during his tenure as CTO of seeking or obtaining benefits to which he was not entitled, or misusing his corporate credit card.  To the contrary, Talton was in regular contact with Carta's People team (the equivalent of Human Resources) and executive support staff to ensure that he was meticulously compliant, even as Carta's People practices were mercurial and poorly documented.

## II.     Carta and Henry Ward

### A.     Carta's Founding and Culture

52.     Co-founded in 2012 as eShares, Inc. by Ward and Manu Kumar, Carta digitizes paper stock certificates along with stock options, warrants, and derivatives to allow companies, investors, and employees to manage their equity and track company ownership.  As of August 2022, Carta managed the ownership records of $2.5 trillion in equity value for over 2 million stakeholders.  Carta also operates CartaX, a private stock exchange which allows employees and shareholders to trade private shares before an IPO or acquisition.

12

53.     Carta's culture is dominated by Ward, its charismatic but insecure and narcissistic founder.  Like many tech startup CEOs, he is a great salesman and self-believer, and over time, in his mind, he and the Company became fused.  Ward thus feels invincible and entitled to make decisions unilaterally, without consulting relevant executives; or to consult only those he knows who will agree with him; or to ignore well-founded objections, or the law, if they get in his way.

54.     Ward protected his favorites from complaints of harassment, retaliation and other misconduct, promoted personal friends and past relationships in conducting Carta business, and disregarded ethical guidance in handling various Carta transactions.  People who disagreed with him were summarily fired.  *See* Talton's Board Letter, **Exhibit A**.

55.     The politics were akin to a royal court, with everything flowing from the king's favor that was given and withdrawn unpredictably.  Executives needed to seek his favor, read his moods, trade intelligence about his latest impulses, lest they be the next one fired. Talton's technical role meant his performance could be objectively judged, which insulated him at least somewhat from the Politburo politics. But gossip, trading stories about Ward, analyzing his next moves with others, hearing that another executive had criticized you to Ward for his or her own advancement, was a natural consequence of Ward's making himself the Sun King around which all had to constantly find their way, and this included the General Counsel, April Lindauer ("Lindauer").  She regularly let off steam with Talton and other executives complaining indiscreetly about Ward's volatile moods, contempt for lawyers' advice and mean qualities.

56.     Ward cut corners. ████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████ He told a group of senior executives, including Talton, that in Carta's early years, the Company maintained two sets of books for Brazil. Acquisitions were made favoring his friends without proper due diligence. He directed Carta to use products made by companies he had personally invested in, even when they were inferior to, and more expensive than, standard vendors. Those in charge of compliance were constantly denigrated, often publicly, and shut out.

57.    Ward deceived current and prospective employees about the liquidity of their stock.



████████████████████████████ It acknowledged it could not control the price. But faced with a price he did not like, Ward simply cancelled the auctions. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████

58.    Ward routinely used Carta resources for personal benefit. He had abundant personal staff, including a dedicated executive assistant, personal assistant, chief of staff, and deputy chief of staff all on Carta's payroll. Ward sought to keep the existence of his personal assistant a secret from rank-and-file Carta employees. She did not work out of Carta's offices or appear on its organizational chart. Over dinner at one offsite, Ward's longtime executive assistant described to the table the personal support Ward required, detailing how she had managed his Tinder profile, scheduled his court appearances during his contentious divorce, and filled out his medical history for an elective operation.

59.     Double standards – one for Ward, another for everyone else – were rampant.  Ward began flying on private planes while other senior executives were refused permission to fly business class on long haul flights unless they were one of his favorites.  An episode of sexual misconduct prompted Carta to ban the consumption of hard alcohol at all work events and all social events where employees were present; shortly thereafter, Ward encouraged senior executives to order cocktails at an executive dinner.  Ward insisted on lavish locations for leadership offsites while the Company was discussing budget and staff cuts.  Ward wrote a Medium post championing the Company's "no-negotiation" compensation policy, yet privately continued to negotiate with senior hires.

60.     Ward proclaimed a "friction is failure" philosophy at Carta, a phrase he would regularly repeat during Company events.  By this, Ward meant that the Company's success depended on no one disagreeing with him or his favorite deputies, even if his diktats were erratic, wildly questionable, unethical, or illegal.  This choked off intelligent debate and enabled Ward to frame his mistreating or discriminating against people as their "friction" rather than his misconduct. "[5]

61.     By Ward's own admission, Carta has significant disparities between its male and female employees.  In 2018, only 30% of Carta's 400 employees were women.[6]  There was only one woman on Carta's executive team, and none on its Board.[7]  Ward made a promise to even the playing field, to promote women to Carta's executive team and appoint women to the Board, which became more pressing after Carta's marketing department saw a sales opportunity in strongly

---

[5] Ward presented a "Friction is Failure" seminar to 65 senior Carta leaders at a Company offsite event in August 2022. *See* **Exhibit A**.

[6] *See* Henry Ward.  Women on Cap Tables.  September 18, 2018, https://henrysward.medium.com/women-on-cap-tables-b99066222bdb [last accessed December 21, 2023].

[7] *Id.*

criticizing the gap between male and female ownership of private equity in Silicon Valley and opened up the Company to possible charges of hypocrisy.[8]

62.     While Ward made good on his promise to include women on Carta's executive team, experienced and intelligent women were repeatedly forced out, often replaced by his sycophants.  It took three years for Ward to fulfill his promise to appoint the first woman to the Board.  She remains the only woman.

**B.     Carta's Code of Conduct**

63.     Carta's 2018 Code of Conduct ("Code") delineates Carta's policies against sexual and other workplace harassment.  [ECF No. 29-3, Second Amended Compl., Ex. C at 7-10].

64.     Ward disregarded these policies, and many women in particular suffered the effects.

65.     The Code prohibits sexual harassment and harassment based on race, color, creed, gender, gender identity, gender expression, pregnancy, childbirth or related medical conditions, religion, veteran and military status, marital status, registered domestic partner status, age, national origin or ancestry, physical or mental disability, medical condition (including genetic information or characteristics), sex, sexual orientation, or other characteristic protected by federal, state, or local law.  [ECF No. 29-3, Second Amended Compl., Ex. C at 7-8].  It applies to "all persons involved in the operation of the Company and prohibits harassment by any employee of the Company."  [*Id.* at 9].  Prohibited conduct is not limited to obvious forms of harassment such as physical contact" but extends to conduct "even if it is not sexual in nature or motivated by sexual desire if such conduct is based on a person's sex (gender) and has the purpose of or effect of creating a hostile work environment."  [*Id.*].

---

[8] *Id.*

16

66.     The Code also prohibits retaliation against an individual who reports discrimination in good faith, assists another in making a report, cooperates in a harassment investigation, or files an administrative claim with a government agency. [*Id.* at 10]. Violators are subject to disciplinary action, including termination of employment. [*Id.*].

67.     Victims of harassment or retaliation are instructed to report such behavior to their supervisor, any other Company supervisor, or to the People Team as soon as possible. Supervisors are instructed to refer harassment complaints to the People Team or to Ward. [*Id.* at 9-10].

68.     The Code states that all reported complaints of harassment and discrimination will be promptly investigated. [*Id.* at 8.]

### C.      Carta's Whistleblower Policy

69.     Further acknowledging the importance of a safe work environment, Carta has a whistleblower policy ("Whistleblower Policy") seeking to "create security for the employee through structure and guidance" in the event they encounter illegal or unethical behavior.

70.     The Whistleblower Policy affirms that an ethical violation includes discrimination, sexual harassment, and retaliation, which are declared breaches of the Code. [ECF No. 29-3, Second Amended Compl., Ex. C at 25]

71.     The Whistleblower Policy makes all Carta employees mandatory reporters: employees must report all ethical violations they encounter to their manager, the People Team, or Legal and Compliance as long as they feel safe in doing so. [*Id.*]

72.     Those who do not feel safe may anonymously report through a system called Integrity Counts. [*Id.*] Those reports are triaged by one of several senior Carta employees, including ▮▮▮▮▮▮. They arrange for the reports to be investigated and resolved. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is frequently the designated investigator.

73.     In May 2019, Ward instructed Carta employees via his Slack channel to bypass the protections of the Whistleblower Policy (that said complaints had to be formally recorded) and instead come to him with any ethics concerns.  The Whistleblower Policy does not include him in triaging or investigating complaints, so it appeared Ward was trying to end-run the policy, either to discredit Integrity Counts as a mechanism or to figure out who wanted to make complaints.

74.     While the Whistleblower Policy's goal is to create a "safe workplace with the highest standard of integrity," the reality at Carta is starkly different. Ethical violations are not "promptly and thoroughly investigated."  To the contrary, complaints of abuse, harassment, discrimination, misuse of Company funds and retaliation are regularly downplayed and buried at the highest levels, as Talton's experience described below demonstrates.

**III.     Talton Repeatedly Opposes Harassment and Discrimination at Carta**

75.     Because Talton was a senior member of the Executive Leadership Team, a reliable figure who was also considered honest and approachable by other employees, he received many informal reports from employees worried about various issues.

76.     On November 19, 2020, Talton messaged Suzy Walther ("Walther"), Carta's then-Chief People Officer, via Slack that several female employees were expressing concerns about ███████, a member of Carta's ███████████ team, who had been condescending and dismissive towards a job candidate who was a woman of color.  The employees were worried what would happen if they reported him.  Walther acknowledged that these employees likely feared retaliation if they escalated these concerns formally.

77.     In early 2021, Talton learned that ████████ was being significantly underpaid compared to her male counterparts.  Talton reported this to Ward verbally.  Ward was apathetic and noncommittal about addressing the disparity.

78.     In early 2022, █████████████ Carta's █████████████ ████████ sent Talton an email asking whether he could help her get fairly compensated. Once again, Talton raised the issue first with Ward and Charly Kevers ("Kevers"), Carta's Chief Financial Officer, before speaking with ███████████████████████████ ████████████. ████████ later told Talton that her compensation had been improved thanks to his intervention.

79.     Later that year, Talton became dismayed that a newly hired, male ████████ ███████████████████████████████████████ was given a higher salary than long-tenured ███████████████████, despite █████ running the Company's ██████████████████ ███████████████████ and the new hire never having held ███████████████. Talton took his concerns directly to Ward, who dismissed the gender pay disparity, and confirmed the male ██████████ generous compensation package. Talton repeated his concerns to Walther via Slack message, advising that Carta had a structural problem in paying women less than men.

80.     On October 26-27, 2021, Talton witnessed █████████████████████████ █████████, make offensive comments in front of two gay Carta executives during a Carta off-site in Chicago, Illinois. Talton reported ██████ conduct to a Carta Human Resources representative, but to Talton's knowledge, ██████ misconduct was not investigated or acted upon.

81.     In late 2021, Carta conducted its annual review of the compensation paid to Talton, ██████ and other executives. ██████████ equity grants were significantly lower than Talton's despite her significantly greater executive experience. Talton told Ward he was concerned that this could be perceived as gender-based and then used Carta's own compensation software product, built on data collected from Carta's customers, to assess compensation for ██████████ ██████ at companies similar to Carta. The data showed that ██████ was being seriously

underpaid. Talton sent these results to Kevers and explained them to Ward. Ward again was unconcerned, but ultimately Kevers increased ███████ equity compensation (though it was still less than Talton's).

82.    On February 3, 2022, Talton told Ward that a female colleague, ████████████ ████████, had resigned because ████████████████████████████████, treated her inappropriately and disrespectfully. Ward had recently promoted ██████ to ████████████ from ████████ outside normal channels and without input from ████████████████████████, contrary to normal procedure. Although ██████ did not report to ██████, ██████ reported that ██████ intentionally excluded her from meetings with Ward and other executives where ██████ decisions were made, failed to consult her when making business decisions for which she was a domain expert, and dismissed her contributions in meetings and in writing. Talton told Ward he was worried that another talented and hard-working senior woman at Carta had left due to mistreatment. Ward dismissed Talton, arguing that ████████████ and other women who had complained about ██████ were "out to get" him. The following day, Talton pressed Ward again via Slack message to do something about ████████ misbehavior, and Ward reacted more aggressively, suggesting that Talton's continued attempts to call attention to problems would not be "tolerated." In an impromptu meeting immediately after, Talton described his conversation with Ward to ██████ and ████████████████████████████████████████. On information and belief, ████████████████████████████████████████████ ██.

83.    ████████ discriminatory treatment was not limited to compensation. There was an altercation between ████████████████████ Carta's ████████████████████, and one of ██████ direct reports during a summer 2022 meeting to discuss Carta's ████████

20

██████████████. Afterward Ward berated ██████ in front of Talton, blaming her for the altercation while ignoring ████████ deep involvement. In a one-on-one meeting with Ward, Talton told Ward he was uncomfortable with how he treated ██████ compared to ████████, viewed by many as in Ward's inner circle. Ward became irate at Talton's suggestion that he had treated ██████ unfairly.

84.     In early July 2022, during a business trip to Rio de Janeiro, Talton saw ████████ ████████, Carta's ████████████████, use crude language to aggressively dress down a female subordinate, ██████████████████, leaving her in tears. At a subsequent dinner with several senior female employees, ████ talked about sucking the breasts of women in a vulgar way. Talton reported both episodes to ████████████, his Human Resources business partner. While ████ apologized to Talton for his tone towards ████████, he did not apologize to ████████, and, upon information and belief, received no admonition for his misconduct.

85.     Talton later reported ██████ behavior to Chief People Officer Bailey, who told Talton that it was not bad enough to need redressing or to report to Ward. Talton told Bailey that based on Ward's previous dismissal of Talton's complaints about ████████, he did not think Ward would do anything about ████.

86.     In approximately August 2022, Talton witnessed ████████████████████, ████ ██████████████████████, verbally assault and berate ████████████████████████ twice. ████████ was a highly coveted recruit hired to run Carta's ████████████████████ ████████. In one especially aggressive exchange, ██████ spoke to ████████ like a child, gas-lit and denigrated her and others, overstated his own accomplishments, and accused her of losing Carta money with no factual basis. Talton reported ██████ to both Ward and Maggie Middleton ("Middleton"), Talton's Human Resources business partner. Talton told Middleton that had an

21



HR representative attended the meeting, he believed ███ would have been fired on the spot, and described it as one of the most disgusting professional episodes he ever witnessed.

87.     Subsequently, Talton discussed ███ mistreatment of women with ███████ ██████, ███████████████████████, as Talton heard that she too was a victim of ███ misconduct. ███, ██████ subordinate, confirmed that he mistreated her regularly ██ ███████████████████████████████████ ███ said that ███ behavior was "toxic" and that everyone knew it, to the point where a former manager would physically put his body in front of her in meetings to protect her from ██████ abuse. ███ subsequently left the Company. Talton saw that ███ had no oversight and that Ward, the sole arbiter of ██████ conduct, approved of his grossly sexist behavior.

## IV.     Ward Unlawfully Terminates ██████

88.     Four days after a phone call that had displeased him, Ward fired ██████ on September 2, 2022. Before being fired, ██████ had reported at least 14 incidents of sexual harassment or inappropriate behavior towards female Carta employees to Ward and other executives.

89.     Ward spoke to Talton about firing ██████ on September 6, admitting that it had nothing to do with her performance, which was widely acknowledged to be excellent including by Ward. Talton expressed concern that Ward had fired ██████ without consulting other senior executives who relied on ██████ experience and expertise. During the call, Ward went out of his way to reassure Talton that his own performance as CTO was "great", that he had "no concerns" about Talton, and that with ██████ gone Ward would rely on him more.

90.     Talton also had several discussions with Bailey, the Chief People Officer. Talton told her that he was concerned that if Ward could fire a woman with ██████ excellent track

record and reputation so impulsively, no woman at the Company was safe.  Talton told Bailey he thought Ward had retaliated against ▮▮▮▮ in part for challenging Carta men who behaved badly and underperformed.  Talton also reported to her that Ward had admitted the firing was unrelated to ▮▮▮▮ performance, which they both knew to be consistently excellent.

91.    On September 8, 2022, Talton discussed ▮▮▮▮ termination with ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

92.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

93.    On September 23, 2022, Talton asked Middleton whether ▮▮▮▮ termination was illegal, reflecting discrimination and retaliation by Ward that he was trying to cover up. Again,

23

Talton expressed concern that Ward had fired ▮▮▮▮▮ without consulting other Carta leaders or lawyers, and described a pattern of competent female executives being fired because Ward took offense when women did not placate or flatter him.

94.    On September 27, 2022, Talton again spoke with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

95.    On September 30, 2022, Talton discussed with ▮▮▮▮▮ (who was employed by Carta until her termination became effective on ▮▮▮▮▮▮▮▮▮) the views of ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ that her termination was not based on performance and was discriminatory. Talton also relayed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮.

## V.    Talton Reports Unethical, Discriminatory, Abusive, Retaliatory and Illegal Conduct to Carta's Board of Directors

96.    After ▮▮▮▮▮ termination, Talton thought Ward's damaging behavior had reached a point of danger to Carta that only the Board could fix.  He decided to sound out ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Lindauer gave him ▮▮▮▮▮ contact information.

97.    On September 26, 2022, Talton and ████ discussed Ward's performance as CEO, including Ward's burying complaints of extensive misconduct and his unlawful termination of ██████. ████ acknowledged that other Board members, including ███████████████, ███████████████████████, had serious concerns about Ward's leadership and Carta's climate of sexual harassment. █████ said that Ward had a "problem with women" and that it was widely believed that he was unfit to be CEO. ███ described ████████ as "having Henry wrapped around her finger. She knows how to manipulate him, and he lets her."

98.    On September 29, 2022, Ward texted Talton that he knew about his meeting with ████. The next day, Ward told him that he should have gone directly to him, that reporting any problems to the Board was extreme, and threatened that Talton should never do anything at Carta without first making sure it was aligned with Ward's interests.

99.    On October 3, 2022, Talton met with Board member █████ at ████████ New York office. Talton said frankly that he believed ████████ termination was illegal discrimination and retaliation by Ward. He said he had previously raised concerns about Carta's misogynistic culture, including reporting misconduct by ██████ and ███ to Ward and others.

100.    Talton told ██████ that he had a list of four names and telephone numbers of senior Carta executives who would be willing to discuss Ward's illegalities and mismanagement so long as ██████ could protect them from Ward's retaliation. ███████ told Talton not to give him the names as he was unable to protect them.

101.    With ██████ and ██████ unable or unwilling to help directly, on October 7, 2022, Talton sent the Board Letter detailing serious problems at Carta, including Carta's failure to adequately investigate or act upon complaints of unethical, discriminatory, abusive, or illegal

behavior, including harassment and misconduct by ███████ and ███ and ████████ termination. *See* **Exhibit A**.

102.    The Board Letter was not limited to reports of sexual harassment, misconduct, discrimination, and retaliation.  It identified other systemic problems caused by Ward's volatile management: (1) Ward's failure to give goals or hold employees responsible for delivering results, leading to internal turmoil where promotions just went to Ward's favorites; 2) Carta's failure to act upon or investigate complaints of unethical, discriminatory, abusive, or illegal behavior; (3) Carta's failure to hold those responsible for such misconduct accountable; (4) Ward providing insiders and personal friends inappropriate access, excess compensation, protection despite poor performance and promotions into roles for which they were unqualified using irregular processes; (5) Ward's sidelining and denigrating compliance and due diligence; (6) Ward permitting favored employees to run their own businesses using Carta-confidential client data, presenting obvious conflicts of interest that contravened Company policy; (7) Carta and Ward's preventing experienced managers from overseeing acquisitions; (8) Ward's negotiation of deal terms to compensate his personal friends; and (9) Ward's routine misleading of Carta employees about Carta's compensation and liquidity practices.  Talton's Board Letter provided examples for each allegation asserted.

103.    On October 11, 2022, Carta placed Talton on paid administrative leave "[t]o facilitate an independent Board of Directors investigation" of the Board Letter. Neither Ward nor any other executives were placed on leave.

104.    Talton never disclosed the Board Letter's contents to anyone other than the Board of Directors and to ███████, when she was still a ███████████ at Carta and was writing her own letter to the Board at ██████ suggestion.

105.    On October 28, 2022, Talton's ████████████████████ wrote a letter resigning from Carta, on the grounds that Ward treated her as a second-class citizen. "I have no desire to join Emily [Kramer] or anyone else in legal action against Carta, but I can see why Emily and ███ and others have felt demeaned. I don't expect Henry or anyone to be perfect, but the pattern of humiliating certain women is clear." A full and correct copy of ███ resignation is attached as **Exhibit F**. On information and belief, Ward and Bailey worked hard to get ███ to rescind it, even going so far as to draft an "apology" email for her. She shortly left Carta to join █
███████████████████████

## VI.    Talton's Interview by Paul Weiss

106.    On December 14, 2022, Talton was interviewed by ████████████████
████████████████ of Paul Weiss for eight hours.

107.    Talton spoke forthrightly about the Board Letter and the conditions at Carta that had prompted him to write it, especially Ward's bullying, discriminatory and retaliatory behavior. Below are summaries of what he told them:

a.    ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████

b.    ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████

c.    ████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████



d.

e.

f.

g.

h.

i.

j.

k.



l.

m.

n.

o.

p.

q.

29

r.

s.

108.    As further proof of his loyal intentions, Talton, through counsel, offered to provide Paul Weiss with all Carta documents in his possession, and copies of tape recordings he had made of conversations with other Carta executives demonstrating the accuracy of his recollections.[9] These were refused. █████████████████████████████████

109.    Paul Weiss completed its investigation without consulting those papers or recordings and prepared a report detailing its findings, which Carta will not release.

**VI.    Talton Helps ████ with Her Discrimination and Retaliation Claims Against Carta**

110.    On November 8, 2022, the morning of ████ mediation with Carta, Talton sent her an email containing a transcript of a September 27 conversation he had with Lindauer, a friend and close colleague to both of them, part of the usual swirling discussions about Ward's latest moods and maneuvers that were commonplace among Carta executives.[10]  The transcript showed

---

[9] The taping was not contrary to Carta policy, and was a last resort to protect against Ward's constant lies and the lack of trust this engendered among subordinates.

[10] Talton had become disturbed at how frequently Ward would lie, denying positions he clearly had taken and trying to gaslight subordinates into thinking they were at fault when they were not.  He heard that other Carta executives had taped conversations with Ward and were glad because they found that the accurate record had protected them. To protect himself and the Company's interest against false accounts, Talton began taping some important conversations.

that ███████████████████████████████████████████ and duplicated information Talton had previously shared with ██████ on September 30, 2022, when she and Talton were both Carta employees and trying to convince Ward that he had been wrong to fire ██████. Talton copied Lindauer on his November 8 email.

111.   Lindauer acknowledged receipt of Talton's email on November 14, 2022.  She asserted that the September 27 transcript and recording were protected by attorney-client privilege because she had been speaking to Talton in her capacity as Chief Legal Officer of the Company about ongoing legal and related personnel matters. But senior executives including Lindauer talked all the time with each other about their interpretations of and frustrations with Ward, and her participation in these regular office intelligence-sharing grumpfests did not confer attorney client privilege upon them.  Lindauer also claimed that Talton had violated the terms of Carta's Employee Confidential Information and Invention Assignment Agreement.  Lindauer demanded that Talton not disclose any Carta communications and return any "confidential and proprietary information" to Carta.

112.   On November 18, 2022, Talton responded through counsel.  Talton asserted that his conversation with Lindauer was not protected by attorney-client privilege and that no breach of confidentiality occurred as ██████ was a senior Carta executive when he originally shared the information with her on September 30, 2022.  In subsequent exchanges, Talton explained that this recording did not involve Carta equipment, systems or records and thus was not covered by its policies; and that he had been driven to tape certain conversations because of repeated lying and misrepresentations by Ward.  He believed that being able to prove via tape that Ward was lying would protect himself, the Board, Lindauer and the Company.

113.    At no point did Talton improperly disseminate, share, or exchange allegedly privileged, confidential, or proprietary information to any third party, despite Carta's repeated false assertions to the contrary.

## VII.    Carta Terminates Talton and Sues Him Days Later, Defaming Him

114.    On December 23, 2022, Carta terminated Talton via correspondence sent by Bailey from Carta's San Francisco headquarters to Talton's New York residence.[11]   [ECF No. 29-5, Second Amended. Compl., Ex. E].   Upon information and belief, the unlawful decision to terminate Talton's employment was made by Ward in California.

115.    The Termination Letter cited predominantly Talton's "unauthorized use and/or disclosure of . . . information . . . to unauthorized third parties," referring to Talton's giving information to ████ and suspected (but actually nonexistent) help to Emily Kramer, discussed below, each with active discrimination claims against Carta.   The letter contains a patchwork of accusations evidently designed to build a pretext for mischaracterizing his actions as "gross misconduct"—the standard allowing Carta to rescind tens of millions of dollars in Company stock options and RSUs.   [ECF No. 29-5, Second Amended Compl., Ex. E].

116.    In bad faith and without justification, Carta declared Talton's termination was "for cause" as defined in the Stock Plan and Carta's 2021 Equity Incentive Plan.   [ECF No. 29-6, Second Amended Compl., Ex. F; ECF No. 29-7, Second Amended Compl., Ex. G]. This led to Carta's cancellation of 214,066 vested stock options, as well as 176,206 unvested stock options and 98,784 RSUs.   [ECF No. 29.5, Second Amended Compl., Ex. E]

117.    Carta fired Talton on December 23, two days before Christmas.   Though shocked and upset, he had begun to determine which documents in his possession he should return when

---

[11] Talton worked remotely from his New York residence and out of Carta's New York office.

Carta shocked him again with the Complaint seven days later, making them relevant to the litigation. [ECF No. 1, Compl.]. Since then the documents have been held securely and will be turned over as appropriate in discovery.

118.    The Complaint had clearly been long in gestation. It went out of its way to slur Talton by publicizing private messages he had sent to consenting sexual and romantic partners from his personal iCloud account but which were captured by Carta's systems. These were private and had nothing to do with Carta, but the Complaint included them anyway on the ostensible ground they showed Talton to have violated Carta's sexual harassment and anti-discrimination policies. [ECF No. 1, Compl., ¶¶ 6, 43-46]. Carta's sexual harassment and anti-discrimination policies are irrelevant to an employee's private consensual relationships with non-employees.

119.    At the time of Carta's December 30, 2022, publication of the false and defamatory statements about Talton, Carta and Dechert knew or should have known with the slightest investigation that Talton's private messages did not violate Carta's sexual harassment and anti-discrimination policies.

120.    Carta's false statements regarding Talton were republished in national and industry-wide publications such as TechCrunch, Business Insider and Fortune, subjecting Talton to public contempt, harassment, ridicule, and disgrace.[12]

121.    Carta's false statements about Talton were also republished in a lawsuit filed by a former Carta employee, Alexandra Rogers, in August of 2023, which alleges sexual harassment

---

[12] Connie Loizos. Carta, Previously Sued for Gender Discrimination, is Now Suing its Former CTO, TechCrunch, January 11, 2023, https://techcrunch.com/2023/01/10/carta-previously-sued-for-gender-discrimination-is-now-suing-its-former-cto/ [last accessed December 21, 2023]. *See also* Natasha Mascarenhas. Carta Lays Off 10% as CTO Lawsuit Looms, TechCrunch, January 11, 2023, https://techcrunch.com/2023/01/11/carta-lays-off-10-as-cto-lawsuit-looms/ [last accessed December 21, 2023].

by ███████████████████████ again subjecting Talton to public contempt, harassment, ridicule, and disgrace.[13]

122. The Complaint contains additional defamatory allegations, including that Talton had refused to return Company documents despite his explicit offer to Paul Weiss to do so two weeks before the Complaint was filed. The Complaint, through its incorporation of the Termination Letter, also falsely alleges that Talton was "hopped up on drugs" and "high" at work, aggressively implying that Talton used drugs during the course of his employment at Carta and/or that Talton was unable to fulfill his professional obligations and responsibilities at Carta because he was using drugs.

123. Carta's false statements hurt Talton's standing in his trade, profession, and community. Following the publication of Carta's Complaint, a potential employer withdrew a signed offer of employment for a CTO position.

124. Carta's baseless and harmful allegations have also been published on social media platforms such as Blind; and HackerNews, the message board of the startup accelerator Y Combinator.

125. On May 3, 2023, Carta filed its First Amended Complaint realleging the false and defamatory statements that Talton was a workplace sexual harasser, creator of a hostile work environment, and violator of Carta's anti-discrimination and anti-harassment policies. [ECF No. 20, First Amended Compl., ¶¶ 6, 57-61]. It also realleged false and defamatory statements that Talton refused to return Carta documents and abused drugs in the workplace. [ECF No. 20, First Amended Compl., Ex. E].

---

[13] *See* Rogers v. eShares, Inc. d/b/a Carta, Inc., Case No. CGC-23-608206, Superior Court of California, County of San Francisco, Compl. ¶¶ 5, 24.

126.    On July 25, 2023, Carta filed a Second Amended Complaint withdrawing the false and defamatory allegations that Talton was a workplace sexual harasser, creator of a hostile work environment, and violator of Carta's anti-discrimination and anti-harassment policies. [ECF No. 29-8, Second Amended Compl., Ex. H at 20-21]. However, Carta tripled down on the false and defamatory statements that Talton refused to return Carta documents and abused drugs in the workplace. [ECF No. 29, Second Amended Compl., Ex. E].

127.    Irreparable damage to Talton's reputation has clearly been done. Despite his stellar credentials and track record, the brilliant computer scientist Carta's own Complaint acknowledges "was responsible for overseeing Carta's entire information technology infrastructure and ensuring the security of more than $2.5 trillion in customer assets" remains unemployed despite assiduous searching.

128.    As a result of Carta's publication of these blatantly false allegations, Talton suffered and continues to suffer severe mental, emotional, and psychological injuries for which he has undergone treatment with medical professionals. Talton has been diagnosed with generalized anxiety disorder, adjustment disorder with anxiety, and prescribed medication for PTSD-induced night terrors and panic attacks.

## VIII.    Ward and Carta Continue to Retaliate Against Talton and Defame Him During the Pendency of this Action

129.    On October 20, 2023, Ward, in both his personal and corporate capacities, published an article on his personal Medium account entitled "What I Tell Employees About Negative Press." Acknowledging that Carta has gone through "a few bad press cycles," Ward published the article "in case it's helpful for other CEOs thinking through similar problems."

130.    Ward's Medium account has approximately 9,400 followers.[14] The article was made available to the general public, including Talton's friends, family and former co-workers, potential employers, business network, leaders in the tech sector, and reporters.

131.    Ward's article renewed his furious campaign of retaliation.  It claimed, without any foundation, that Talton was "inappropriate with women," "abused his position as CTO," and even that he was "a racist and misogynist," which would be laughable if it were not so scurrilous.

132.    It also incorporated via hyperlink Carta's original, unamended and superseded Complaint that falsely portrayed Talton as a workplace sexual harasser and creator of a hostile work environment, even though they had no factual support and the allegations were withdrawn.

133.    Ward shared his defamatory Medium article through his account on X (formerly Twitter) to his more than 10,000 followers on October 20, 2023.  Ward also retweeted posts containing links to his Medium article, including posts by Matt Murphy, a member of Carta's Board, and Mark Suster, an entrepreneur with approximately 333,600 followers including many notable public figures, journalists, and others in the Tech industry.  Ward's X account also contains a link to his Medium account which is accessible by the public.

134.    On October 25, 2023, Ward circulated his Medium article from his Carta e-mail address to all Carta employees and customers, virtually all of which are U.S.-based technology start-ups and comprise nearly the entire set of potential employers for Talton, who has previously worked at three early-stage startups.[15]

135.    Upon information and belief, Carta's sales team was also directed to circulate Ward's Medium article to their professional networks.

---

[14] Ward's Medium follower count as of December 25, 2023.
[15] *See* Eleanor Hawkins.  What Carta's CEO's Self-Inflicted PR Crisis Could Mean for the Company, Axios, October 26, 2023, https://www.axios.com/2023/10/26/carta-negative-press-email [last accessed December 24, 2023].

136.    Ward's October 25, 2023, emails became a topic of discussion on X.  One X user, in response to the Medium article, shared Carta's original Complaint that contained the attacks on Talton that had already been withdrawn from Carta's Second Amended Complaint.  The user tagged Talton's personal X handle and included a vomit-face emoji.  At least one other X user identified Talton in a post through his user handle.

137.    The hype surrounding Ward's Medium article and email to Carta customers spurred Tech Crunch to publish an article on October 25, 2023.[16]  The Tech Crunch article republished Ward's defamatory and salacious statements about Talton on October 25, 2023, and October 29, 2023.[17]

138.    Ward, maliciously, recklessly, and with knowledge that his statements about Talton were untrue, published and republished the Medium article as detailed above to encourage others to take actions that were harmful to Talton, expecting and intending that Talton would suffer loss of professional standing.  Ward took all these actions both personally and as Carta's CEO.

139.    As a result of Carta and Ward's conduct in publishing and distributing the defamatory Medium article, Talton suffered and continues to suffer severe mental, emotional, and psychological injuries for which he has undergone treatment with medical professionals.  Talton has been diagnosed with generalized anxiety disorder adjustment disorder with anxiety, and prescribed medication for and has been experiencing PTSD-induced night terrors and panic attacks.

## IX.    Talton's Post-Termination Protected Conduct

[16] *See* Mary Ann Azevedo and Connie Loizos.  Carta's CEO Reaches Out to Customers About Bad Press, Alerting them to Bad Press, TechCrunch, October 25, 2023, https://techcrunch.com/2023/10/25/cartas-ceo-reaches-out-to-customers-about-bad-press-alerting-them-to-bad-press/ [last accessed December 24, 2023].

[17] *See Id.*; Christine Hall and Mary Ann Azevedo.  A Look at How One CEO's PR Decision Backfired, TechCrunch, October 29, 2023, https://techcrunch.com/2023/10/29/a-look-at-how-one-fintech-ceos-pr-decision-backfired/ [last accessed December 24, 2023].

140.    On January 23, 2023, Talton appeared under subpoena for a deposition in Emily Kramer's gender discrimination and retaliation lawsuit against Carta.  During the deposition, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

141.    On August 2, 2023, Talton was interviewed by an investigator from the ████████ ██████████████████████ about ████████ discrimination and retaliation claims against Carta.

142.    On August 29, 2023, the ███████████████████████████████████ ██████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████ ██████████████████████████

143.    Carta has taken a similar scorched earth approach with ████████ as it has with Talton.  On August 18, 2023, while █████████████████████████████████████████████ ██████████, Carta filed a revenge lawsuit against her seeking damages and injunctive relief. Moreover, Carta's lawyers sent a copy of the suit to ████████ current employer, who has nothing to do with the dispute between ████████ and Carta, before she herself had been served.  The reasonable conclusion is that Ward remains furious at ████████ for sticking up for herself in the face of his groundless discriminatory termination and is retaliating against her by trying to smear her reputation with the people she now depends upon for a paycheck.

## X.    Further Examples of a Culture of Discrimination and Harassment at Carta

144.    The experiences of multiple female Carta employees confirm the widespread culture of sexual harassment and unequal treatment instigated and protected by Ward.

**A.    Emily Kramer**

145.    In April 2019, Emily Kramer ("Kramer"), former Vice President of Marketing at Carta, stated during an offsite event that she was concerned about the lack of gender and racial diversity on the Executive Team and at Carta generally.  Kramer, the sole female member of the Executive Team, brought up multiple issues including pay differences, promotions of underqualified men over more qualified women, and harassment and disrespect displayed towards women throughout the Company.

146.    On July 20, 2020, Kramer filed a lawsuit alleging gender discrimination and retaliation by Ward and others at Carta. Kramer alleged she was paid less than similarly situated males, given less equity than similarly situated males, and repeatedly passed over for promotion while less qualified men were promoted. She was regularly subjected to gendered criticism about her "style" and attitude.  She was a straight shooter, creative and energetic, not prone to flattering. Ward in particular targeted Kramer and told her that no one liked her, but that she'd gotten a free pass because she was a woman.

147.    During her time as the only senior female executive, Kramer was excluded from key meetings and decision making, including interviewing candidates for the new Chief Revenue Officer role and important meetings about product launches, for which marketing personnel were essential.  When she was included in Company meetings or events, male executives frequently interrupted her or took control of her presentations.  Despite Kramer noting this to Ward, he did nothing to intervene.

148.    When Kramer asked to be promoted to Chief Marketing Officer, a role she was already capably performing without the title or compensation, Ward told her that she had a long way to go before she would be ready because of her "style" and because she was not liked enough

by the other executives – all men.  She was not pliant, spoke her mind when she had something to say, and Ward disliked her presumption of equality.

149.    Ward's attack on Kramer culminated in a one-to-one meeting in which he berated her for close to an hour.  He told her that they had a problem -- that she violated their "no asshole" policy, referring to her unlikability, and that she was like an alcoholic who needed to admit her problem before she could stop being an asshole.  At the end of the meeting, Ward said that she should come back in a week and either declare that she was ready for "recovery" or leave the Company.  She did leave the Company and sued it for constructive discharge, a hostile work environment and retaliation.

150.    Carta settled Kramer's lawsuit in February 2023, a few days after Talton was deposed.

**B.      Suzanne Elovic Investigates ▮▮▮ and Protests ▮▮▮▮▮▮**

151.    Suzanne Elovic ("Elovic"), Carta's Chief Legal Officer and later Compliance Officer prior to Lindauer, and Walther received several complaints that ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ was harassing women, as well as various work-related misrepresentations he had made.  ▮▮▮▮ was considered untouchable to his involvement with ▮▮▮▮▮▮▮▮▮ ▮▮▮▮. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮  Ward took no action.

152.    In April 2021, Ward announced ▮▮▮▮ promotion to ▮▮▮▮▮▮▮▮▮▮. This came as a big surprise to Talton, who had been present in a meeting earlier that year with Ward and ▮▮▮▮▮▮ where they discussed impending plans to fire ▮▮▮. Elovic told Ward at a meeting attended by Talton that promoting ▮▮▮ would be badly received by women at Carta and send the wrong message, given that many women in his department had complained about sexual

harassment and unequal treatment by him and others.  Ward ignored Elovic's comment as if she had been on mute, not even responding.  Elovic had been planning to leave Carta in another month. After she criticized ████ promotion, Ward made Elovic leave the following day.

153.    ████ and Carta have since been publicly accused of sexual harassment, aiding and abetting sexual harassment, and retaliation in violation of the California Fair Housing and Employment Act in a lawsuit filed by Alexandra Rogers ("Rogers"), a former Carta employee, in California Superior Court.  Rogers alleges that she was sexually assaulted by ████ on at least two occasions between June and August 2022 at Carta-affiliated offsite events.  After reporting ████ sexual misconduct, Ward subjected Rogers to aggressive and demeaning treatment.  A colleague advised Rogers that Ward "does not like women with strong personalities" and suggested she reach out to Carta's HR department to report the mistreatment.

### C.    Other Examples of Discrimination and Retaliation

154.    Following Elovic's departure, Lisa Whittaker ("Whittaker"), a compliance attorney at Carta and the person responsible for developing Carta's whistleblower system, spoke to Talton about her experience of sexist and harassing behavior at Carta.  She sought Talton's guidance about how to work with various difficult Carta executives.  Talton reported Whittaker's concerns to Middleton, his Human Resources partner.

155.    In August 2020, following a *New York Times* story on a lawsuit against Carta filed by Emily Kramer, Carta's compliance team took steps to inform Carta employees about the Integrity Counts whistleblowing system Whittaker had implemented, a third-party software for collecting anonymous complaints. Upon information and belief, ████████████████

████████████████████████████

████████████████████████

41

████████████████████████████████████████████████████████████

████████████████████████████████████████

156.    Indeed, when Ward became aware of Whittaker's efforts, she and all the female members of her team were fired.[18]

157.    ████ harassment of women at Carta was not limited to the incident in Rio de Janeiro discussed above.  Upon information and belief, ████ regularly used abusive and toxic language against both subordinates and peers.  Even so, after ████ left Carta voluntarily, Ward invited him to rejoin.  ████ was again aggressive and abusive towards several women, including ██████, former █████████████.  Upon information and belief, Integrity Counts ██████████████████████████████████████████████████ ██████████.

158.    Upon information and belief, ████████████████████████████████████, was promoted over █████████████████████████████████ ██████ reported to Walther, the Chief People Officer, that men on the sales team were favored over women.  ██████ also had a well-known history of sexual harassment, including displaying his naked penis to coworkers and grabbing a female manager's bottom.  ██████ left Carta on his own accord; however, when female sales team members pressed Bailey on the outcome of HR's investigation into these incidents, Bailey refused to release it.  ████ and ██████████████ ██████, later retaliated against ███████ for her report to Walther.

---

[18] *See* Darius Rafieyan.  At Unicorn Startup Carta, A Culture of Absolute Fealty to an Erratic and Vindictive CEO, Employees Say, Business Insider, October 24, 2023, https://www.businessinsider.com/carta-startup-discrimination-harassment-boys-club-allegations-henry-ward-lawsuit-2023-10 [last accessed December 24, 2023].

## XI.    Conclusion

159.    Talton, an upstanding and careful man, did nothing more than his duty to Carta by making sure the Board knew that Ward was creating unusual problems for the Company.  If the Board were not acolytes of "always backing the founder," if Ward was not a narcissist enraged by criticism, Talton would be happily working away at Carta today.  Instead his career has been destroyed, through a defamatory campaign of which Carta's lie-filled lawsuit is an important part.  Talton seeks the Court's vindication against the organized malice Carta has trained on him, and its help in getting his life back.

**FIRST CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT**
**AS TO COUNTER-DEFENDANT CARTA**
**(PARTICIPATION IN A PROTECTED ACTIVITY)**

160.    Talton repeats every preceding allegation in all preceding paragraphs.

161.    At all times material hereto, Talton was an employee of Carta within the meaning of Title VII, 42 U.S.C. § 2000e(f) whose education, background, experience, and established employment history made him well-qualified for the position of Chief Technology Officer.

162.    At all times material hereto, Carta was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

163.    At all times material hereto, Talton participated in activities protected under Title VII.  Specifically, Talton has testified, assisted, and/or participated in an investigation, proceeding, or hearing under Title VII and/or intended on testifying, assisting, and/or participating in an investigation, proceeding, or hearing under Title VII.

164.    At all times relevant hereto, Carta, by and through its employees, agents, representatives, and/or designees, knew of Talton's participation in activities protected under Title VII.  Alternatively, Carta, by and through its employees, agents, representatives, and/or designees,

knew, anticipated, expected, and/or perceived or should have known, anticipated, expected, and/or perceived that Talton would participate in and assist with an investigation, proceeding, and/or hearing under Title VII.

165.    As a direct result of Talton's participation in activities protected under Title VII and/or anticipated, expected, and/or perceived participation in protected activities under Title VII, Carta subjected Talton to material adverse employment actions including, but not limited to (1) terminating Talton's employment at Carta; (2) designating Talton's termination as "for cause" to purposefully deprive him of vested and unvested stock options and RSUs, as well as COBRA medical coverage; (3) internally misrepresenting the circumstances surrounding Talton's termination from Carta; (4) initiating the instant lawsuit against Talton; and (5) publicly making false and defamatory statements about Talton.

166.    Carta's actions would deter a reasonable person from participating in a protected activity.

167.    As a result of Carta's retaliatory conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

## SECOND CAUSE OF ACTION
## RETALIATION IN VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT
## AS TO COUNTER-DEFENDANT CARTA
## (OPPOSITION TO UNLAWFUL EMPLOYMENT PRACTICE)

168.    Talton repeats every preceding allegation in all preceding paragraphs.

169.    At all times material hereto, Talton was an employee of Carta within the meaning of Title VII, 42 U.S.C. § 2000e(f) whose education, background, experience, and established employment history made him well-qualified for the position of Chief Technology Officer.

44

170.    At all times material hereto, Carta was an employer within the meaning of Title VII, 42 U.S.C. § 2000e(b).

171.    At all times material hereto, it was unlawful for Carta to retaliate against its employees, agents, contractors, and representatives for reporting discrimination, harassment, and/or retaliation on the basis of race, color, religion, sex, national origin, age, sexual orientation, and physical or mental disability.

172.    At all times material hereto, Talton opposed unlawful practices as defined by Title VII. Specifically, Talton, throughout the course and scope of his employment with Carta, repeatedly reported a culture of misogyny, abuse, discrimination, harassment, and retaliation on the basis of employees' sex and/or gender.

173.    At all times material hereto, Carta, by and through its employees, agents, representatives, designees, executives and/or board members, were aware of Talton's opposition to unlawful employment practices protected under Title VII.

174.    As a direct result of Talton's opposition to unlawful employment practices protected under Title VII, Carta subjected Talton to material adverse employment actions including, but not limited to, (1) terminating Talton's employment at Carta; (2) designating Talton's termination as "for cause" to purposefully deprive him of vested and unvested stock options and RSUs, as well as COBRA medical coverage; (3) internally misrepresenting the circumstances surrounding Talton's termination from Carta; (4) suing Talton; and (5) publicly making false and defamatory statements about Talton.

175.    Carta's actions would deter a reasonable person from opposing unlawful employment practices.

45

176. As a result of Carta's retaliatory conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

**THIRD CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND**
**HOUSING ACT**
**AS TO COUNTER-DEFENDANT CARTA**
**(OPPOSITION TO FORBIDDEN PRACTICES)**

177. Talton repeats every preceding allegation in all preceding paragraphs.

178. At all times material hereto, Talton was an employee of Carta within the meaning of FEHA, Gov. Code § 11008(c) whose education, background, experience, and established employment history made him well-qualified for the position of Chief Technology Officer.

179. At all times material hereto, Carta was an employer within the meaning of FEHA, Gov. Code § 11008(d).

180. At all times material hereto, it was unlawful for Carta to harass or discriminate against employees on the basis of race, religious creed, color, national origin, ancestry, physical or mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, and military and/or veteran status of any person under FEHA, Gov. Code § 12900 et seq.

181. At all times material hereto, it was unlawful for Carta to discharge, expel, or otherwise discriminate against any person because that person has opposed any practices forbidden under FEHA, including the reporting of discrimination and harassment of and retaliation against employees on the basis of their gender, sex, and/or gender expression.

182. At all times material hereto, Talton opposed practices forbidden under FEHA. Specifically, Talton, throughout the course of his employment with Carta, repeatedly reported a

46

culture of misogyny, abuse, discrimination, harassment, and retaliation on the basis of employees' sex and/or gender to Carta employees, agents, representatives, designees, executives and/or board members.

183.   At all times material hereto, Carta, by and through its employees, agents, representatives, designees, executives and/or board members, was aware of Talton's opposition to forbidden practices protected under FEHA.

184.   As a direct result of Talton's opposition to forbidden practices protected under FEHA, Carta subjected Talton to adverse employment actions including, but not limited to, (1) terminating Talton's employment at Carta; (2) designating Talton's termination as "for cause" to purposefully deprive him of vested and unvested stock options and RSUs, as well as COBRA medical coverage; (3) internally misrepresenting the circumstances surrounding Talton's termination from Carta; (4) suing Talton; and (5) publicly making false and defamatory statements about Talton.

185.   Carta's actions materially and adversely affected the terms, conditions, or privileges of Talton's employment.

186.   Carta's actions would deter a reasonable person from opposing forbidden employment practices.

187.   Some or all of Carta's adverse employment actions were devised and/or implemented from California.

188.   Talton's opposition to forbidden practices protected under FEHA was a substantial motivating reason for Carta's termination of Talton's employment.

189.   As a result of Carta's retaliatory conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress,

humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

190.    Carta's decision to terminate Talton was a substantial factor in causing Talton's injuries.

**FOURTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**
**AS TO COUNTER-DEFENDANT CARTA**
**(FILED COMPLAINT, TESTIFIED, OR ASSISTED IN PROCEEDING)**

191.    Talton repeats every preceding allegation in all preceding paragraphs.

192.    At all times material hereto, Talton was an employee of Carta within the meaning of FEHA, California Gov. Code § 11008(c) whose education, background, experience, and established employment history made him well-qualified for the position of Chief Technology Officer.

193.    At all times material hereto, Carta was an employer within the meaning of FEHA, Gov. Code § 11008(d).

194.    At all times material hereto, it was unlawful for Carta to harass or discriminate against employees on the basis of race, religious creed, color, national origin, ancestry, physical or mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, and military and/or veteran status of any person under FEHA, Gov. Code § 12900 et seq.

195.    At all times material hereto, it was unlawful for Carta to discharge, expel, or otherwise discriminate against any person because that person has filed a complaint, testified, or assisted in any proceeding brought pursuant to FEHA.

196.    At all times material hereto, Talton testified and/or assisted in proceedings relating to Carta's alleged discrimination on the basis of sex and/or gender and retaliation in violation of

FEHA. Specifically, Talton testified and assisted in proceedings brought pursuant to FEHA or intended on testifying and assisting in proceedings brought pursuant to FEHA involving Carta's retaliation, harassment, and discrimination of employees on the basis sex and/or gender including, but not limited to, claims brought by ███████████ and Emily Kramer.

197. At all times material hereto, Carta, by and through its employees, agents, representatives, designees, executives and/or board members, was aware that Talton filed a complaint, testified, or assisted in any proceeding brought pursuant to FEHA relating to Carta's alleged retaliation, harassment, and discrimination on the basis of sex and/or gender in violation of FEHA. Alternatively, Carta knew, anticipated, expected, and/or perceived or should have known, anticipated, expected, and/or perceived that Talton would file a complaint, testify, or assist in a proceeding brought pursuant to FEHA.

198. As a direct result of Talton's assistance in a proceeding brought pursuant to FEHA and/or Talton's anticipated, expected, and/or perceived filing of a complaint, testimony, or assistance in a proceeding brought pursuant to FEHA, Carta subjected Talton to material adverse employment actions including, but not limited to, (1) terminating Talton's employment at Carta; (2) designating Talton's termination as "for cause" to purposefully deprive him of vested and unvested stock options and RSUs, as well as COBRA medical coverage; (3) internally misrepresenting the circumstances surrounding Talton's termination from Carta; (4) suing Talton; and (5) publicly making false and defamatory statements about Talton.

199. Carta's actions materially and adversely affected the terms, conditions, or privileges of Talton's employment.

200. Carta's actions would deter a reasonable person from participating in a protected activity.

201. Some or all of Carta's adverse employment actions were devised and/or implemented from California.

202. Talton's testimony and provision of assistance under FEHA and/or anticipatory testimony and provision of assistance under FEHA was a substantial motivating reason for Carta's termination of Talton's employment.

203. Carta's decision to terminate Talton was a substantial factor in causing Talton's injuries.

204. As a result of Carta's retaliatory conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

**FIFTH CAUSE OF ACTION**
**CALIFORNIA WRONGFUL DISCHARGE**
**AS TO COUNTER-DEFENDANT CARTA**
**(VIOLATION OF PUBLIC POLICY/*TAMENY* CLAIM)**

205. Talton repeats every preceding allegation in all preceding paragraphs.

206. At all times material hereto, Talton was an employee of Carta whose education, background, experience, and established employment history made him well-qualified for the position of Chief Technology Officer.

207. Carta was Talton's employer from August 14, 2018, to December 23, 2022.

208. Carta terminated Talton's employment on December 23, 2022.

209. Some or all of Carta's plan to terminate Talton was devised and/or implemented from California and/or involved Carta employees, agents, representatives, and/or executives based out of Carta's California office.

50

210. Under California law, wrongful termination cases typically (though not exclusively) arise when an employer retaliates against an employee for exercising a statutory right or reporting an alleged violation of public importance.

211. FEHA's prohibition of discrimination, harassment, and retaliation in employment is sufficiently substantial and fundamental to support a claim for wrongful termination in violation of public policy.

212. Carta's termination of Talton was substantially motivated by a fundamental and substantial violation of public policy supported by constitutional or statutory provisions that inure to the benefit of the public. Specifically, Carta wrongfully discharged Talton for participating in protected conduct and opposing illegal, unlawful, discriminatory, retaliatory, and harassing conduct in violation of Title VII, 42 U.S.C. § 2000e(f) and FEHA, Gov. Code § 12900 et seq.

213. As a result of Carta's termination of Talton in violation of public policy, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, lost wages, loss of future earning, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

**SIXTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS**
**LAW/EXECUTIVE LAW § 296**
**AS TO COUNTER-DEFENDANT CARTA**
**(OPPOSITION TO PROHIBITED PRACTICE)**

214. Talton repeats every preceding allegation in all preceding paragraphs.

215. At all times material hereto, Talton was an employee of Carta within the meaning of the New York State Human Rights Law, Executive Law §§ 290, et seq. ("NYSHRL").

216. At all times material hereto, Carta was an employer within the meaning of the NYSHRL.

51

217.    At all times material hereto, it was an unlawful discriminatory practice for Carta to refuse to hire or employ or to discharge from employment or to discriminate against individuals in compensation or in terms, conditions and privileges of employment because of an individual's age, race, creed, color, national origin, citizenship or immigration status, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or statute as a victim of domestic violence.

218.    At all times material hereto, it was an unlawful discriminatory practice to retaliate or discriminate against any person because he or she opposed any practice forbidden under the NYSHRL including, but not limited to, opposing harassment, discrimination, and retaliation on the basis of sex or gender.

219.    At all times material hereto, Talton opposed practices forbidden under the NYSHRL.  Specifically, Talton repeatedly reported a culture of misogyny, abuse, discrimination, harassment, and retaliation on the basis of Carta employees' sex and/or gender to Carta employees, agents, representatives, designees, executives and/or board members.

220.    Carta, by and through its employees, agents, representatives, designees, executives and/or Board members, was aware that Talton opposed practices forbidden by the NYSHRL.

221.    As a direct result of Talton's opposition to discrimination, retaliation, and harassment prohibited by the NYSHRL, Carta subjected Talton to adverse employment actions including (1) terminating his employment; (2) designating his termination as "for cause" to deprive him of vested and unvested stock options, RSUs and COBRA medical coverage; (3) misrepresenting the circumstances of his termination to other Carta employees; (4) suing him; and (5) making false and defamatory statements about him.

222.    These actions would deter a reasonable person from opposing a prohibited practice.

223. Talton was a resident of New York and working out of Carta's New York office or from his New York residence when Carta subjected Talton to the adverse employment actions.

224. As a result of Carta's retaliatory conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

225. Talton suffered and continues to suffer injuries in New York.

**SEVENTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF NEW YORK STATE HUMAN RIGHTS**
**LAW/EXECUTIVE LAW § 296**
**AS TO COUNTER-DEFENDANT CARTA**
**(ASSISTED IN A PROCEEDING)**

226. Talton repeats every preceding allegation in all preceding paragraphs.

227. At all times material hereto, Talton was an employee of Carta whose education, background, experience, and established employment history made him well-qualified for the position of Chief Technology Officer.

228. At all times material hereto, Talton was an employee of Carta within the meaning of the NYSHRL.

229. At all times material hereto, Carta was an employer within the meaning of the NYSHRL.

230. At all times material hereto, it was an unlawful discriminatory practice for Carta to refuse to hire or employ or to discharge from employment or to discriminate against individuals in compensation or in terms, conditions and privileges of employment because of an individual's age, race, creed, color, national origin, citizenship or immigration status, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or statute as a victim of domestic violence.

231.    At all times material hereto, it was an unlawful discriminatory practice to retaliate or discriminate against any person because he or she filed a complaint, testified, or assisted in any proceeding under the NYSHRL.

232.    Talton engaged in a protected activity by testifying and/or assisting in proceedings seeking to hold Carta liable for discrimination on the basis of sex and/or gender and retaliation in violation of the NYSHRL and/or intended on testifying and assisting in proceedings brought pursuant to the NYSHRL.  Specifically, Talton testified and/or assisted in proceedings brought by ███████████ and Emily Kramer that alleged retaliation, harassment, and discrimination of employees on the basis sex and/or gender by Carta, violating conduct prohibited by the NYSHRL.

233.    At all times material hereto, Carta, by and through its employees, agents, representatives, designees, executives and/or board members, were aware that Talton testified and assisted in proceedings relating to discrimination, retaliation, and harassment prohibited by the NYSHRL involving an employer subject to the NYSHRL and/or intended on testifying and assisting in proceedings brought pursuant to the NYSHRL.  Alternatively, Carta knew, anticipated, expected, and/or perceived or should have known, anticipated, expected, and/or perceived that Talton would file a complaint, testify, or assist in a proceeding under the NYSHRL.

234.    As a direct result of Talton's testimony and help in proceedings relating to discrimination, retaliation, and harassment prohibited by the NYSHRL and/or Talton's anticipated, expected, and/or perceived filing of a complaint, testifying, or assisting in a proceeding brought pursuant to New York Executive Law §§ 290, Carta subjected Talton to an adverse employment actions including, but not limited to (1) terminating Talton's employment at Carta; (2) designating Talton's termination as "for cause" to deprive him of vested and unvested stock options and RSUs, as well as COBRA medical coverage; (3) internally misrepresenting the

54

circumstances surrounding Talton's termination from Carta; (4) initiating the instant lawsuit against Talton; and (5) publicly making false and defamatory statements about Talton.

235.    Carta's actions would deter a reasonable person from assisting in a proceeding under the NYSHRL.

236.    At all times material hereto, Talton was a resident of New York and working out of Carta's New York office and/or working remotely from his New York residence when Carta subjected Talton to the adverse employment actions.

237.    As a result of Carta's retaliatory conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

238.    Talton suffered and continues to suffer injuries in New York.

**EIGHTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF NEW YORK CITY HUMAN RIGHTS LAW**
**AS TO COUNTER-DEFENDANT CARTA**
**(OPPOSITION TO UNLAWFUL EMPLOYMENT PRACTICE)**

239.    Talton repeats every preceding allegation in all preceding paragraphs.

240.    At all times material hereto, Talton was an employee of Carta within the meaning of the New York City Human Rights Law, New York City Executive Law §§ 8-107, et seq. ("NYCHRL").

241.    At all times material hereto, Carta was an employer within the meaning of the NYCHRL.

242.    At all times material hereto, under the NYCHRL, it was an unlawful discriminatory practice for Carta to refuse to hire or employ or to discharge from employment or to discriminate against individuals in compensation or in terms, conditions and privileges of employment because

55

of an individual's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or immigration or citizenship status.

243. At all times material hereto, it was an unlawful discriminatory practice for an employer to retaliate or discriminate in any manner against any person because such person has opposed any practice forbidden under the NYCHRL including harassment, discrimination, and retaliation on the basis of sex or gender.

244. At all times material hereto, Talton opposed practices forbidden under the NYCHRL. Specifically, Talton, throughout the course of his employment with Carta, repeatedly reported a culture of misogyny, abuse, discrimination, harassment, and retaliation on the basis of employees' sex and/or gender to Carta employees, agents, representatives, designees, executives and/or board members.

245. At all times material hereto, Carta, by and through its employees, agents, representatives, designees, executives and/or board members, were aware of Talton's opposition to forbidden practices protected under the NYCHRL.

246. As a direct result of Talton's opposition to discrimination, retaliation, and harassment prohibited by the NYCHRL, Carta took actions that disadvantaged Talton including, but not limited to, (1) terminating Talton's employment at Carta; (2) designating Talton's termination as "for cause" to purposefully deprive him of vested and unvested stock options and RSUs, as well as COBRA medical coverage; (3) internally misrepresenting the circumstances surrounding Talton's termination from Carta; (4) initiating the instant lawsuit against Talton; and (5) publicly making false and defamatory statements about Talton.

247. Carta's actions would deter a reasonable person from opposing an unlawful employment practice.

248. At all times material hereto, Talton was a resident of New York and working out of Carta's New York office and/or working remotely from his New York residence when Carta subjected Talton to the adverse employment actions.

249. As a result of Carta's retaliatory conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

250. Talton suffered and continues to suffer injuries in New York.

**NINTH CAUSE OF ACTION**
**RETALIATION IN VIOLATION OF**
**NEW YORK CITY HUMAN RIGHTS LAW**
**AS TO COUNTER-DEFENDANT CARTA**
**(PARTICIPATION IN A PROTECTED ACTIVITY)**

251. Talton repeats every preceding allegation in all preceding paragraphs.

252. At all times material hereto, Talton was an employee of Carta within the meaning of the NYCHRL.

253. At all times material hereto, Carta was an employer within the meaning of the NYCHRL.

254. At all times material hereto, under the NYCHRL, it was an unlawful discriminatory practice for Carta to refuse to hire or employ or to discharge from employment or to discriminate against individuals in compensation or in terms, conditions and privileges of employment because of an individual's actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or immigration or citizenship status.

255.    At all times material hereto, it was an unlawful discriminatory practice for an employer such as Carta to retaliate or discriminate in any manner against any person because such person filed a complaint, testified, or assisted in any proceeding under the NYCHRL including harassment, discrimination, and retaliation on the basis of sex or gender.

256.    At all times material hereto, Talton engaged in a protected activity by and through testifying and/or assisting in proceedings relating to Carta's alleged discrimination on the basis of sex and/or gender and retaliation in violation of the NYCHRL.  Specifically, Talton testified and assisted in proceedings relating to discrimination, retaliation, and harassment prohibited by the NYCHRL involving an employer subject to the NYCHRL and/or intended on testifying and assisting in proceedings brought pursuant to NYCHRL involving Carta's retaliation, harassment, and discrimination of employees on the basis sex and/or gender including, but not limited to, claims brought by ████████ and Emily Kramer.

257.    At all times material hereto, Carta, by and through its employees, agents, representatives, designees, executives and/or board members, were aware that Talton testified and assisted in proceedings relating to discrimination, retaliation, and harassment prohibited by the NYCHRL involving an employer subject to the NYCHRL and/or intended on testifying and assisting in proceedings brought pursuant to the NYCHRL.  Alternatively, Carta knew, anticipated, expected, and/or perceived or should have known, anticipated, expected, and/or perceived that Talton would file a complaint, testify, or assist in a proceeding under the NYCHRL.

258.    As a direct result of Talton's testimony and provision of assistance in proceedings relating to discrimination, retaliation, and harassment prohibited by the NYCHRL and/or Talton's anticipated, expected, and/or perceived filing of a complaint, testifying, or assisting in a proceeding brought pursuant to the NYCHRL, Carta subjected Talton to an adverse employment actions

58

including, but not limited to, (1) terminating Talton's employment at Carta; (2) designating Talton's termination as "for cause" to purposefully deprive him of vested and unvested stock options and RSUs, as well as COBRA medical coverage; (3) internally misrepresenting the circumstances surrounding Talton's termination from Carta; (4) initiating the instant lawsuit against Talton; and (5) publicly making false and defamatory statements about Talton.

259.    Carta's actions would deter a reasonable person from participating in a protected activity.

260.    At all times material hereto, Talton was a resident of New York and working out of Carta's New York office and/or working remotely from his New York residence when Carta subjected Talton to the adverse employment actions.

261.    As a result of Carta's retaliatory conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

262.    Talton suffered and continues to suffer injuries in New York.

**TENTH CAUSE OF ACTION**
**DEFAMATION UNDER NEW YORK LAW**
**AS TO COUNTER-DEFENDANT CARTA**

263.    Talton repeats every preceding allegation in all preceding paragraphs.

264.    On December 30, 2022, Carta published false statements through the initiation of the underlying lawsuit which exposed Talton to public contempt, harassment, ridicule, aversion, and/or disgrace.   Specifically, Carta (1) asserted that Talton sent and received offensive, discriminatory, misogynistic and harassing messages in violation of Carta's sexual harassment and anti-discrimination policies; (2) published the Termination Letter which asserted that Talton was

"hopped up on drugs" and "high" at work following two medically necessary surgeries; and (3) asserted that Talton has refused to return Carta documents.  [ECF No. 1, Compl; ECF No. 1, Compl. Ex. D].

265.    Carta's statements are demonstrably false.

266.    Carta withdrew the allegations that Talton violated its sexual harassment and anti-discrimination policies through its Second Amended Complaint.  [ECF No. 29, Second Amended Compl., Ex. H at 20-21].

267.    Carta's false statements regarding Talton injured Talton's standing in his trade, business, and profession.

268.    Carta's false statements regarding Talton were defamatory *per se*.

269.    Carta's false statements regarding Talton are not protected by litigation privilege as they are irrelevant to Carta's claims against Talton and motivated by no other desire than to defame Talton.

270.    Carta's false and defamatory statements were republished in national media and, upon information and belief, social media and elsewhere on the internet.

271.    Carta made false and defamatory statements regarding Talton knowing that the statements were false and/or with reckless disregard for the statements' truth or falsity.

272.    Carta made false and defamatory statements with ill will and spite, and with wanton, reckless, and/or willful disregard for the injurious effects on Talton and Talton's rights.

273.    As a result of Carta's conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses and reputational and professional harm in amounts to be proven at trial.

60

274.    Talton suffered and continues to suffer injuries in New York.

**ELEVENTH CAUSE OF ACTION**
**IMPLIED DEFAMATION UNDER NEW YORK LAW**
**AS TO COUNTER-DEFENDANT CARTA**

275.    Talton repeats every preceding allegation in all preceding paragraphs.

276.    On December 30, 2022, Carta published the Termination Letter alleging that Talton "repeatedly told junior employees that [he] was 'hopped up on drugs' and 'high at work, while overseeing the Company's Information Security Officer and having access to Carta security systems….'" [ECF No. 1, Compl., Ex. D].

277.    At the time of the publication, Carta by and through its employees, executives, and agents, including Ward, knew that Talton, while serving as CTO, underwent multiple osteotomies on both feet in September 2022 and was prescribed painkillers for postoperative recovery.

278.    Carta intended to affirmatively suggest or imply that Talton used drugs during the course of his employment at Carta and/or that Talton was unable to fulfill his professional obligations and responsibilities at Carta because he was using drugs.

279.    Carta endorsed the implication that Talton used drugs during the course of his employment at Carta and/or that Talton was unable to fulfill his professional obligations and responsibilities at Carta because he was using drugs.

280.    Carta's false implication that Talton used drugs during the course of his employment at Carta and/or that Talton was unable to fulfill his professional obligations and responsibilities at Carta because he was using drugs is demonstrably false.

281.    Carta's false implication regarding Talton injured Talton's standing in his trade, business, and profession.

282.    Carta's false implication regarding Talton is defamatory *per se*.

283.    Carta's false implication regarding Talton is not protected by litigation privilege as it is irrelevant to Carta's claims against Talton and motivated by no other desire than to defame and harm Talton.

284.    Carta made the false implication regarding Talton knowing that the assertion and/or implication was false and/or with reckless disregard for the assertion's and/or implication's truth or falsity.

285.    Carta made false and defamatory implication with ill will and spite, and with wanton, reckless, and/or willful disregard for the injurious effects on Talton and Talton's rights.

286.    As a result of Carta's conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses and reputational and professional harm in amounts to be proven at trial.

287.    Talton suffered and continues to suffer injuries in New York.

## TWELFTH CAUSE OF ACTION
## DEFAMATION UNDER ILLINOIS LAW[19]
## AS TO COUNTER-DEFENDANTS CARTA AND WARD

288.    Talton repeats every preceding allegation in all preceding paragraphs.

289.    On May 3, 2023, Carta published false statements through filing of the First Amended Complaint which exposed Talton to public contempt, harassment, ridicule, aversion, and/or disgrace.    Specifically, Carta (1) asserted that Talton sent and received offensive, discriminatory, misogynistic and harassing messages in violation of Carta's sexual harassment and anti-discrimination policies; (2) published the Termination Letter which asserted that Talton was

---

[19] Talton brings this cause of action under Illinois law as (1) he was a citizen of Illinois at the time of publication; (2) he suffered the greatest injury in Illinois; and (3) the statements were broadcast in Illinois. *See generally Condit v. Dunne*, 317 F. Supp.2d 344 (S.D.N.Y. 2004). Alternatively, pursuant to Fed. R. Civ. P. 8(d)(2), Talton brings this cause of action under California law.

"hopped up on drugs" and "high" at work following two medically necessary surgeries; and (3) asserted that Talton has refused to return Carta documents. [ECF No. 20, First Amended Compl; ECF No. 29, First Amended Compl. Ex. E].

290. Carta withdrew the allegations that Talton violated its sexual harassment and anti-discrimination policies through its Second Amended Complaint. [ECF No. 29, Second Amended Compl., Ex. H at 20-21].

291. On July 25, 2023, Carta again republished false statements through filing the Second Amended Complaint which exposed Talton to public contempt, harassment, ridicule, aversion, and/or disgrace. Specifically, Carta (1) republished the Termination Letter which asserted that Talton was "hopped up on drugs" and "high" at work following two medically necessary surgeries; and (2) asserted that Talton has refused to return Carta documents. [ECF No. 29, Second Amended Compl.; 29-5, Second Amended Compl. Ex. E].

292. On October 20, 2023, Ward published false statements about Talton through his Medium article which exposed Talton to public contempt, harassment, ridicule, aversion, and/or disgrace. Specifically, Ward falsely portrayed Talton as a workplace sexual harasser and creator of a hostile work environment. He also falsely and maliciously asserted that Talton was inappropriate with women and abused his position as CTO.

293. Ward's Medium article also republished Carta's Complaint [ECF No. 1, Compl.] containing language about Talton that Carta had withdrawn from its Second Amended Complaint as unsupportable, specifically that Talton sent and received offensive, discriminatory, misogynistic and harassing messages in violation of Carta's anti-harassment and anti-discrimination policies.

294. In his capacity as Carta's CEO, agent, and public-facing representative, Ward republished the defamatory Medium article on his X account. Ward's Medium article was reshared

by several influential people, including a member of Carta's Board, and became a topic of discussion on social media.

295.   On October 25, 2023, Ward, in his capacity as Carta's CEO, agent, and public-facing representative, circulated the defamatory Medium article to all Carta employees, as well as current and former Carta customers, from his Carta email address.

296.   Upon information and belief, Ward instructed Carta employees to circulate the Medium article to their professional networks.

297.   Carta maliciously, recklessly, and with knowledge that statements contained in the First Amended Complaint, Second Amended Complaint, and Termination Letter about Talton were untrue, published and republished the false statements to encourage others to take actions that were harmful to Talton with the expectation and intention that Talton would suffer loss of professional standing.

298.   Carta and Ward maliciously, recklessly, and with knowledge that his statements about Talton were untrue, published and republished the Medium article to encourage others to take actions that were harmful to Talton with the expectation and intention that Talton would suffer loss of professional standing.

299.   Ward and Carta's false and defamatory statements were republished in national media and, upon information and belief, social media and elsewhere on the internet.

300.   Ward and Carta's false statements about Talton lower Talton in the eyes of the community and deter others from associating with him.

301.   Ward and Carta's false statements about Talton injure Talton's standing in his trade, business, and profession.

302.    Ward and Carta's false statements about Talton impute an inability to perform or want of integrity in the discharge of his employment.

303.    Ward and Carta's false statements about Talton are defamatory *per se*.

304.    Ward and Carta's false statements about Talton in the Complaint as shared in the Medium article are not protected by litigation privilege as (1) the statements are irrelevant to Carta's claims against Talton; (2) the statements are motivated by no other desire but to defame Talton; and (3) the litigation privilege does not extend to third-party communications unrelated to a lawsuit.

305.    Ward and Carta made false and defamatory statements about Talton knowing that the statements were false and/or with reckless disregard for the statements' truth or falsity.

306.    Ward and Carta made false and defamatory statements with ill will and spite, and with wanton, reckless, and/or willful disregard for the injurious effects on Talton and Talton's rights.

307.    As a result of Ward and Carta's conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses and reputational and professional harm in amounts to be proven at trial.

308.    Ward and Carta's false and defamatory statements were published within Illinois, as well as the Southern District of New York.

309.    Talton was a citizen of Illinois at the time of the publication of these defamatory statements.

310.    Talton sustained injuries in Illinois and New York as a result of Ward and Carta's defamatory statements.

65

**THIRTEENTH CAUSE OF ACTION**
**FALSE LIGHT UNDER ILLINOIS LAW[20]**
**AS TO COUNTER-DEFENDANTS CARTA AND WARD**

311.    Talton repeats every preceding allegation in all preceding paragraphs.

312.    On May 3, 2023, Carta published false statements which exposed Talton to public contempt, harassment, ridicule, aversion, and/or disgrace.  Specifically, Carta (1) republished the Termination Letter which asserted that Talton was "hopped up on drugs" and "high" at work following two medically necessary surgeries intentionally and wrongfully implying that Talton used drugs during the course of his employment at Carta and/or that Talton was unable to fulfill his professional obligations and responsibilities at Carta; and (2) asserted that Talton has refused to return Carta documents.  [ECF No. 20, First Amended Compl; ECF No. 20, First Amended Compl. Ex. E].

313.    On July 25, 2023, Carta published false statements about Talton through its Second Amended Complaint.  Specifically, Carta (1) republished the Termination Letter which asserted that Talton was "hopped up on drugs" and "high" at work following two medically necessary surgeries intentionally and wrongfully implying that Talton used drugs during the course of his employment at Carta and/or that Talton was unable to fulfill his professional obligations and responsibilities at Carta; and (2) asserted that Talton has refused to return Carta documents.  [ECF No. 29-5, Second Amended Compl.; ECF No. 29-5, Second Amended Compl., Ex. E]

314.    On October 20, 2023, Ward published false statements about Talton through his Medium article which exposed Talton to public contempt, harassment, ridicule, aversion, and/or disgrace.  Specifically, Ward falsely portrayed Talton as a workplace sexual harasser and creator

---

[20] Talton brings this cause of action under Illinois law as (1) he was a citizen of Illinois at the time of publication; (2) he suffered the greatest injury in Illinois; and (3) the statements were broadcast in Illinois.  *See generally Condit v. Dunne*, 317 F. Supp.2d 344 (S.D.N.Y. 2004).  Alternatively, pursuant to Fed. R. Civ. P. 8(d)(2), Talton brings this cause of action under California law.

of a hostile work environment. He also falsely and maliciously asserted that Talton was inappropriate with women and abused his position as CTO.

315.    Ward's October 20, 2023, Medium article also republished Carta's Complaint [ECF No. 1, Compl.] containing language about Talton that Carta had withdrawn from its Second Amended Complaint as factually and legally unsupportable, specifically that Talton sent and received offensive, discriminatory, misogynistic and harassing messages in violation of Carta's anti-harassment and anti-discrimination policies.

316.    In his capacity as Carta's CEO, agent, and public-facing representative, Ward republished the Medium article containing false statements on his X account. Ward's Medium article was reshared by several influential people, including a member of Carta's Board, and became a topic of discussion on social media.

317.    On October 25, 2023, Ward, in his capacity as Carta's CEO, agent, and public-facing representative, circulated the Medium article to all Carta employees, as well as current and former Carta customers, from his Carta email address.

318.    Upon information and belief, Ward instructed Carta employees to circulate the Medium article to their professional networks.

319.    Ward and Carta's actions explicitly identified Talton by name and former position at Carta.

320.    Ward and Carta knew that the false allegations contained in the First Amended Complaint, Second Amended Complaint, Termination Letter, and the Medium article would create a false impression about Talton.

321.    Talton was placed in a false light to the public as a direct result of Ward and Carta's actions.

322.    Ward and Carta's actions were highly offensive to a reasonable person.

323.    Ward and Carta acted with actual malice and with knowledge that their statements about Talton were untrue, published and republished the First Amended Complaint, Second Amended Complaint, Termination Letter, and the Medium article to encourage others to take actions that were harmful to Talton expecting and intending that Talton would suffer loss of professional standing.

324.    Ward and Carta's false statements were republished in national media and, upon information and belief, social media and elsewhere on the internet.

325.    Ward and Carta's false statements about Talton injured Talton's standing in his trade, business, and profession.

326.    Ward and Carta's false statements about Talton in the Complaint as shared in the Medium article are not protected by litigation privilege as (1) the statements are irrelevant to Carta's claims against Talton; (2) the statements are motivated by no other desire but to defame Talton; and (3) the litigation privilege does not extend to third-party communications unrelated to a lawsuit.

327.    Ward and Carta made false statements about Talton with malice, knowledge that the statements were false, and with reckless disregard for the statements' truth or falsity.

328.    Ward and Carta made false statements with ill will and spite, and with wanton, reckless, and/or willful disregard for the injurious effects on Talton and Talton's rights.

329.    As a result of Ward and Carta's conduct, Talton has suffered and will continue to suffer irreparable injury including, but not limited to, pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses and reputational and professional harm in amounts to be proven at trial.

68

330.    Ward and Carta's false statements were published within Illinois, as well as the Southern District of New York.

331.    Talton was a citizen of Illinois at the time of the publication of these statements.

332.    Talton sustained injuries in Illinois and New York as a result of Ward and Carta's statements.

### FOURTEENTH CAUSE OF ACTION
### PUBLICATION OF PRIVATE FACTS UNDER ILLINOIS LAW[21]
### AS TO COUNTER-DEFENDANTS CARTA AND WARD

333.    Talton repeats every preceding allegation in all preceding paragraphs.

334.    On October 20, 2023, Ward published, through his Medium article, portions of private, personal messages Talton sent to and received from consenting sexual and romantic partners from his personal iCloud account, with the intent to harass, humiliate, embarrass, and retaliate against Talton.

335.    In his capacity as Carta's CEO, agent, and public-facing representative, Ward republished the Medium article containing portions of Talton's private, personal messages on his X account.  Ward's Medium article was reshared by several influential people, including a member of Carta's Board, and became a topic of discussion on social media.

336.    On October 25, 2023, Ward, in his capacity as Carta's CEO, agent, and public-facing representative, circulated the Medium article containing portions of Talton's private, personal messages to all Carta employees from his Carta email address, as well as current and former Carta customers, from his Carta email address

---

[21] Talton brings this cause of action under Illinois law as (1) he was a citizen of Illinois at the time of publication; (2) he suffered the greatest injury in Illinois; and (3) the statements were broadcast in Illinois.  *See generally Condit v. Dunne*, 317 F. Supp.2d 344 (S.D.N.Y. 2004).  Alternatively, pursuant to Fed. R. Civ. P. 8(d)(2), Talton brings this cause of action under California law.

337.    Upon information and belief, Ward instructed Carta employees to circulate the Medium article to their professional networks.

338.    At all times material hereto, Talton was a private person residing in Illinois.

339.    At no point did Talton give verbal or written consent or otherwise give implicit or explicit consent to the publication of his private, personal messages.

340.    Carta and Ward's publication of Talton's private, personal messages was highly offensive to a reasonable person.

341.    The portions of private, personal messages published by Ward were not newsworthy or of any legitimate public concern.

342.    The portions of the private, personal messages published by Ward have no social value.

343.    Carta and Ward's publication of Talton's private, personal messages injured Talton's standing in his trade, business, and profession.

344.    Carta and Ward's publication of Talton's private, personal messages are not protected by litigation privilege as (1) the statements are irrelevant to Carta's claims against Talton; (2) the statements are motivated by no other desire but to defame Talton; and (3) the litigation privilege does not extend to third-party communications unrelated to a lawsuit.

345.    Carta and Ward publicized Talton's private, personal messages with ill will and spite, and with wanton, reckless, and/or willful disregard for the injurious effects on Talton and Talton's rights.

346.    Carta and Ward's conduct in publishing portions of Talton's private, personal messages was a substantial factor in causing Talton to suffer reputational, emotional, and professional harm.

347.    Carta and Ward's publication of Talton's private, personal messages resulted in their publication within the Southern District of New York, as well as throughout Illinois.

348.    Talton sustained injuries in Illinois and New York as a result of Carta and Ward's publication of Talton's private, personal messages.

**FIFTEENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**UNDER NEW YORK LAW**
**AS TO COUNTER-DEFENDANT CARTA**

349.    Talton repeats every preceding allegation in all preceding paragraphs.

350.    Carta engaged in outrageous conduct toward Talton intending to cause, or with reckless disregard for the probability of causing, Talton to suffer severe emotional distress.

351.    Carta's outrageous, malicious, and reckless conduct includes, but is not limited to, (1) making false and defamatory statements regarding Talton, his personal life, and his professional life with the intent to harass, humiliate, embarrass, and retaliate against Talton; (2) publishing private, personal messages Talton sent to and received from consenting sexual and romantic partners from his personal iCloud account; and (3) publishing the Termination Letter which falsely portrayed Talton as a user and abuser of drugs in the workplace, with the intent to harass, humiliate, embarrass, and retaliate against, while Talton was a resident of New York.

352.    As a proximate result of Carta's publication of defamatory, false, harassing, and misleading statements some of which Carta withdrew from the Second Amended Complaint in response to Talton's proposed motion threatening sanctions, Talton suffered and continues to suffer from pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

353.    Carta committed the acts alleged herein maliciously and oppressively with the wrongful intention of injuring Talton from an improper or evil motive amounting to malice and in

71

conscious disregard of Talton's rights, entitling Talton to recover punitive damages from Carta in such sums as a jury would find fair, just, and appropriate to deter Carta and others from future similar conduct.

354.    Talton suffered and continues to suffer injuries in New York.

### SIXTEENTH CAUSE OF ACTION
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### UNDER ILLINOIS LAW
### AS TO COUNTER-DEFENDANTS CARTA AND WARD

355.    Talton repeats every preceding allegation in all preceding paragraphs.

356.    Carta and Ward engaged in extreme and outrageous conduct toward Talton intending to cause, or with reckless disregard for the probability of causing, Talton to suffer severe emotional distress.

357.    Carta and Ward's outrageous, malicious, and reckless conduct includes, but is not limited to (1) making false and defamatory statements regarding Talton, his personal life, and his professional life through the publication and circulation of the Medium article with the intent to harass, humiliate, embarrass, and retaliate against Talton; (2) publishing private, personal messages Talton sent to and received from consenting sexual and romantic partners from his personal iCloud account through Ward's publication and circulation of the Medium article; and (3) publishing the Termination Letter which falsely portrayed Talton as a user and abuser of drugs in the workplace, with the intent to harass, humiliate, embarrass, and retaliate against, while Talton was a resident of Illinois.

358.    Ward had actual or apparent authority over Talton and/or the ability to affect and damage Talton's interest through his position Carta's CEO and his standing among technology startup companies where Talton has spent his career.

72

359. Carta and Ward's outrageous, malicious, and reckless conduct occurred within the Southern District of New York and Illinois.

360. As a proximate result of Carta and Ward's outrageous, malicious, and reckless conduct, Talton suffered and continues to suffer from pain and suffering, extreme mental distress, humiliation, mental anguish, and emotional and psychological injuries, as well as economic losses, in amounts to be proven at trial.

361. Carta and Ward committed the acts alleged herein maliciously and oppressively with the wrongful intention of injuring Talton from an improper or evil motive amounting to malice and in conscious disregard of Talton's rights, entitling Talton to recover punitive damages from Carta in such sums as a jury would find fair, just, and appropriate to deter Carta and others from future similar conduct.

362. Talton suffered and continues to suffer injuries in Illinois.

**SEVENTEENTH CAUSE OF ACTION**
**BREACH OF CONTRACT UNDER DELAWARE LAW**
**AS TO COUNTER-DEFENDANT CARTA**

363. Talton repeats every preceding allegation in all preceding paragraphs.

364. At all times material hereto, Talton was an employee of Carta whose education, background, experience, and established employment history made him well-qualified for the various positions he undertook.

365. At all times material hereto, Talton participated in Carta's Stock Plan which provides the following types of Stock Awards to eligible Carta Employees, Directors, and Consultants: Incentive Stock Options, Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock Awards, Restricted Stock Unit Awards, and Other Stock Awards. [Second Amended Compl., Ex. F, ECF No. 29-6].

366. Talton was awarded stock options and RSUs throughout the course of his employment with Carta pursuant to the terms of the Stock Plan.

367. Pursuant to the express and unambiguous terms of the Stock Plan, Carta and its Board had an obligation to act in good faith in making all determinations, interpretations, and constructions of the terms of the Stock Plan.

368. Carta materially breached the terms of the Stock Plan by unreasonably, unjustly, unfairly and in bad faith, terminating Talton for "cause," as defined by the Stock Plan and the 2021 Equity Plan, in retaliation for Talton's protected activities and opposition to illegal, discriminatory and sexist conduct at Carta under Title VII, FEHA, NYSHRL, and NYCHRL.

369. None of the grounds identified in Carta's termination letter to Talton rose to gross misconduct, as Carta's rationale is purely pretext for retaliation.

370. Carta's justifications for Talton's termination are purely speculative and unsupported by documentary or other evidence.

371. As a direct and proximate result of Carta's breach, Talton suffered extreme emotional and economic damages, including the loss of about 392,272 stock options and 98,784 RSUs.

372. Carta's conduct caused Talton's harm.

## EIGHTEENTH CAUSE OF ACTION
## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING UNDER DELAWARE LAW
## AS TO COUNTER-DEFENDANT CARTA

373. Talton repeats every preceding allegation in all preceding paragraphs.

374. At all times material hereto, Talton was an employee of Carta whose education, background, experience, and established employment history made him well-qualified for the various positions he undertook.

375.    At all times material hereto, Talton participated in Carta's Stock Plan which provides the following types of Stock Awards to eligible Carta Employees, Directors, and Consultants: Incentive Stock Options, Nonstatutory Stock Options, Stock Appreciation Rights, Restricted Stock Awards, Restricted Stock Unit Awards, and Other Stock Awards.  [Second Amended Comp., Ex. F, ECF No. 29-6].

376.    Talton was awarded stock options and RSUs throughout the course of his employment with Carta pursuant to the terms of the Stock Plan.

377.    At all times material hereto, Carta's Board of Directors and/or designated Committees, had the power to determine how each Stock Award was granted and the provision of the award, to construe and interpret the Stock Plan, and to amend and revoke rules and regulations of the Stock Plan.  [Second Amended Compl., Ex. F, ECF No. 29-6, Sec. 2(b)].

378.    In every contract there is an implied covenant of good faith and fair dealing.  The covenant of good faith and fair dealing presumes that when parties enter a contract, they do not expect to be treated arbitrarily or unreasonably.

379.    At all times material hereto, Talton had a reasonable expectation that Carta would act in good faith in fulfilling its obligations under the Stock Plan and/or in interpreting the terms of the Stock Plan.

380.    At all times material hereto, Talton had a reasonable expectation that Carta would not act in an arbitrary or unreasonable manner when fulfilling its obligations under the Stock Plan and/or in interpreting the terms of the Stock Plan.

381.    At all times material hereto, Talton had a reasonable expectation at the time of contracting that Carta would act in good faith when fulfilling its obligations under the terms of the

Stock Plan including, but not limited to, acting in good faith in determining whether an employee is terminated for "cause" as defined by the terms of the Stock Plan.

382.    Carta's conduct, including but not limited to, Carta's arbitrary and unreasonable termination of Talton for "cause" constitutes a breach of the implied covenant of good faith and fair dealing, which resulted in damages to Talton.

383.    Carta's conduct in designating Talton's termination from Carta as for "cause" was motivated by an improper purpose reflecting bad faith.

384.    As a direct and proximate result of Carta's breach, Talton suffered extreme emotional and economic damages, including the loss of 392,272 stock options and 98,784 RSUs.

385.    Carta's conduct caused Talton's harm.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Talton respectfully requests that the Court:

    i.    Award Talton compensatory damages in an amount to be determined at trial;

    ii.    Award Talton special damages in an amount to be determined at trial;

    iii.    Award Talton punitive and exemplary damages in an amount to be determined at trial; and

    iv.    Award Talton pre- and post-judgment interest, costs, and such other and further relief as this Court may deem just and proper.

<u>**DEMAND FOR JURY TRIAL**</u>

Defendant-Counter Plaintiff Jerry O. Talton III hereby demands a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: January 4, 2024

                              Respectfully submitted,

                              **McALLISTER OLIVARIUS**

/s/ *John F.O. McAllister*
John F.O. McAllister
Jason S. Sandler
641 Lexington Avenue
13th Floor
New York, NY 10022
Telephone: (212) 433-3456
jmcallister@mcolaw.com
jsandler@mcolaw.com

*Attorneys for Defendant-Counter Plaintiff*
*Jerry O. Talton III*

77

**CERTIFICATE OF SERVICE**

I certify that on January 4, 2024, a true and correct copy of Defendant/Counter-Plaintiff's Counterclaim was delivered via electronic mail pursuant to the Court's December 14, 2023 Order [ECF No. 46] to the following:

Andrew Levander (andrew.levander@dechert.com)

Nicolle Jacoby (nicole.jacoby@dechert.com)

Samantha DeRuvo (samantha.deruvo@dechert.com)

Christopher Merken (christopher.merken@dechert.com)

Dated: January 4, 2024

/s/ *Jason S. Sandler*
Jason S. Sandler

78