UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| eSHARES, INC. d/b/a CARTA, INC., | |
| Plaintiff, | |
| -against- | |
| JERRY O. TALTON, III, | |
| Defendant. | |

| | |
|---|---|
| JERRY O. TALTON, III., | |
| Counter-Plaintiff, | 22-CV-10987 (JGLC) |
| -against- | **OPINION AND ORDER** |
| eSHARES, INC. d/b/a CARTA, INC. and HENRY WARD, | |
| Counter-Defendants. | |

JESSICA G. L. CLARKE, United States District Judge:

Counter-Plaintiff Jerry O. Talton, III ("Talton") was the former Chief Technology Officer for Counter-Defendants eShares, Inc., doing business as Carta, Inc. ("Carta"), and its CEO Henry Ward. According to Talton, in December 2022, he was terminated by Carta and Ward for opposing Carta and Ward's discrimination toward women and opposing the retaliatory firing of Chief Product Officer Heidi Johnson. One week after Talton's termination, Carta initiated a lawsuit against Talton for, among other things, breach of fiduciary duty and misappropriation of trade secrets. Several months after Talton's termination, Ward published and circulated an article on Medium casting Talton as "inappropriate toward women" and a "misogynist and racist." As a result, Talton alleges that he has suffered extreme emotional distress and significant economic losses, including the cancellation of considerable stock options and the denial of career opportunities.

Talton now files counterclaims for defamation, false light, publication of private fact, intentional infliction of emotional distress, breach of contract, breach of the implied covenant of good faith, and retaliation under federal law, California state law, Delaware state law, New York state law, and New York City law. Carta and Ward move to dismiss all claims, to strike certain allegations, to redact particular filings, and to compel production of: (1) communications over which Talton asserts privilege and (2) communications that Talton asserts are irrelevant. Carta and Ward also request leave to file its Third Amended Complaint based on information disclosed during discovery.

For the reasons stated herein, the motion to dismiss is DENIED, except with respect to the publication of private fact claim. The motion to redact is GRANTED IN PART. The motion to strike is DENIED. The first motion to compel is GRANTED IN PART, and the second motion is DENIED. The motion for leave to file a Third Amended Complaint is GRANTED.

## BACKGROUND

The following facts are, unless otherwise noted, taken from the Second Amended Counterclaim and presumed to be true for the purposes of this motion. *See Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y. 2021).

## I.    Carta's Culture and Policies Under CEO Ward

Plaintiff and Counter-Defendant eShares, Inc., doing business as Carta, Inc. ("Carta" or "Company"), is a company that digitizes paper stock certificates along with stock options, warrants, and derivatives to allow companies, investors, and employees to manage their equity and track company ownership. ECF No. 88 ("Second Amended Counterclaim" or "Counterclaim" or "SACC") ¶ 52.

Carta was co-founded in 2021 by Manu Kumar and Counter-Defendant Henry Ward. *Id.* ¶ 52. According to Defendant and Counter-Plaintiff Jerry O. Talton, III ("Talton"), Carta's culture is dictated by Ward, who makes unilateral decisions involving firing and the consequences of workplace misconduct. *Id.* ¶¶ 53–55. Talton alleges that Ward used his power to "protect[] his favorites from complaints of harassment, retaliation and other misconduct, promote[] personal friends and past relationships in conducting Carta business, [] disregard[] ethical guidance in handling various Carta transactions," and fire those who disagreed with him. *Id.* ¶ 54. Talton further alleges that Ward enforced double standards, imposing Carta conduct rules on some employees but not on himself or those he favored. *Id.* ¶ 59. Ward also promoted a philosophy that Carta's success depended on no one disagreeing with him or those he favored—the idea that "friction is failure." *Id.* ¶ 60. As a result, Carta's culture was one where Ward could "frame his mistreating or discriminating against people as their 'friction' rather than his misconduct." *Id.*

Talton alleges that one kind of misconduct was pervasive under Ward's leadership: gender discrimination and harassment. *Id.* ¶ 62. Women employees were substantially outnumbered by men, with only one woman appointed to Carta's Board. *Id.* ¶ 62. According to Talton, women were also being significantly underpaid compared to their male counterparts. *Id.* ¶ 78. Women were disrespected, excluded from decision-making, berated, verbally abused, sexualized, and otherwise mistreated, often without consequences to the offenders. *Id.* ¶¶ 83–88.

Carta's 2018 Code of Conduct (the "Code") prohibits discrimination and harassment. *Id.* ¶¶ 64, 66; ECF No. 29-3 at 7–10. The Code also prohibits retaliation against an individual who reports discrimination in good faith, assists another in making a report, cooperates in a harassment investigation, or files an administrative claim with a government agency. ECF No. 29-3 at 10. The Code requires all reports of discrimination and harassment to be investigated. *Id.*

at 8. Moreover, Carta has a whistleblower policy ("Whistleblower Policy") to protect employees from unlawful discrimination and retaliation for reporting Code violations. *Id.* at 25. The Whistleblower Policy instructs Carta employees to report Code violations if they feel safe in doing so, including violations in the form of discrimination and harassment. *Id.* But Talton alleges that in practice, Carta fails to promptly investigate reports of violations. Instead, complaints are often downplayed and buried. SACC ¶ 75.

## II.      Talton's Account of Discrimination and Harassment at Carta

Talton began working at Carta in September 2018 as the Director of Engineering for Data & Machine Learning. SACC ¶ 35. By November 2020, Talton had assumed the position of Chief Technology Officer on account of his contributions to Carta. *Id.* ¶ 42. During his tenure, Talton redesigned the engineering hiring, leveling, and promotion process to increase transparency and reduce bias, and he built a diverse leadership team. *Id.* ¶ 48. Talton represents that he felt a strong sense of personal ownership in the success of the Company, and accordingly promoted ownership and equity and prioritized candid communication. *Id.* ¶ 49.

Talton alleges that his respected reputation at Carta led to many informal reports from employees about various issues, including discrimination and harassment. *Id.* ¶¶ 76–79. These reports include an alleged incident where a Carta employee was being condescending and dismissive toward a job candidate who was a woman of color, and others where women were being significantly underpaid compared to their male counterparts. *Id.* ¶¶ 77–79. Talton also alleges witnessing several instances of discrimination and harassment. *Id.* ¶¶ 81–87. These incidents reflected further on the pay disparity, and also included times when women were excluded from leadership decisions, berated, verbally abused to the point of tears, spoken about in a vulgar and sexual way, and gaslit and denigrated. *Id.* Talton alleges that a particular Carta

executive's behavior was so egregious that a former manager would physically place his body in front of a targeted woman to protect her from the executive's abuse. *Id.* ¶ 88.

At or near the time of these incidents, Talton expressed his concern about them to Ward and other employees. *Id.* ¶¶ 80–88. Specifically, Talton raised the issue of pay disparity with Ward, Carta's Chief Financial Officer, Head of Compensation, and Chief People Officer. *Id.* ¶¶ 77–80, 82. Talton also reported offensive discriminatory conduct to Human Resources and the Head of Corporate Coverage. *Id.* ¶¶ 81, 85. Talton confronted Ward about the mistreatment of women at Carta, and told Ward he was "uncomfortable" with the unfair treatment. *Id.* ¶¶ 83–84, 87. In reporting an incident of verbal assault to Human Resources, Talton described it "as one of the most disgusting professional episodes he ever witnessed." *Id.* ¶ 87.

Talton alleges that although Carta did increase some women's pay after reports of pay disparities, little was done about the mistreatment. *Id.* ¶¶ 78, 79, 82, 83, 85, 86, 88. Some misconduct was not investigated. *Id.* ¶ 81. Officers were reported for mistreatment but received no admonition. *Id.* ¶ 85. Talton alleges that Ward instead approved of grossly sexist behavior. *Id.* ¶ 88. Talton also alleges that Ward suggested "that Talton's continuous attempts to call attention to problems would not be 'tolerated.'" *Id.* ¶ 83. According to Talton, Ward also ignored other employees' reports of misconduct. *Id.*

### III.    Heidi Johnson's Termination and Talton's Involvement

Heidi Johnson was Carta's Chief Product Officer. *Id.* ¶ 3. She was one of the women whom Talton learned was being significantly underpaid compared to her male counterparts. *Id.* ¶ 78. On September 2, 2022, Ward fired Johnson. *Id.* ¶ 89. Before being fired, Johnson had reported at least fourteen incidents of sexual harassment or inappropriate behavior toward female Carta employees to Ward and other executives. *Id.*

Talton alleges that on September 6, Ward admitted to Talton that Johnson's firing had nothing to do with her performance. *Id.* ¶ 90. On the same day, Ward assured Talton that his performance as CTO was "great," that he had "no concerns" about Talton, and that with Johnson gone Ward would rely on Talton more. *Id.* Talton consulted with the Chief People Officer that he feared Ward had retaliated against Johnson and the same might happen to other women. *Id.* ¶ 91. Talton also consulted with Carta's General Counsel, April Lindauer. *Id.* ¶ 92. According to Talton, Lindauer saw Ward's behavior as problematic, and that firing Johnson was reckless and not sensible given Johnson's widely admired performance. *Id.* ¶ 93.

Several weeks later, Talton consulted a Human Resources business partner about whether Johnson's termination was illegal. *Id.* ¶ 94. In this conversation, Talton described a pattern of competent female executives being fired because Ward took offense when women did not placate or flatter him. *Id.* Days after this, Talton again spoke with Lindauer and asked if he should file a whistleblower complaint. *Id.* ¶ 95. Talton believes that Lindauer hoped to discourage him. *Id.* According to Talton, Lindauer feared that backing Johnson would mean losing her own job. *Id.* On September 30, 2022, Talton discussed with Johnson the views of other executives that her termination was discriminatory. *Id.* ¶ 96.

Talton decided to take matters to the Carta Board of Directors. On September 26, 2022, Talton met with independent Board member Barbara Byrne to discuss Ward's performance as CEO. *Id.* ¶ 98. Byrne acknowledged that other Board members were concerned about Ward's leadership and Carta's climate of sexual harassment. *Id.* ¶ 98. On September 29, 2022, Ward texted Talton that he knew about the meeting with Byrne, that Talton should have gone directly to Ward, and that reporting problems to the Board was extreme. *Id.* ¶ 99. Ward threatened Talton that he should never do anything at Carta without first making sure it was aligned with Ward's

interests. *Id.* Days later, Talton nonetheless met with Board member Joe Osnoss, and said Talton had four executives who would be willing to discuss Ward's mismanagement so long as Osnoss could protect them from Ward's retaliation. *Id.* ¶¶ 100–01. According to Talton, Osnoss declined to hear those four names because Osnoss was unable to protect them. *Id.* ¶ 101.

On October 7, 2022, Talton sent a letter to the Board (the "Board Letter") detailing the discrimination and harassment problems at Carta, including Carta's failure to respond adequately to complaints, misconduct by executives, and Johnson's termination. *Id.* ¶ 102. The Board Letter also detailed Ward's mismanagement, favoritism, and abuse of power. *Id.* ¶ 103. Ward, a member of Carta's Board, received a copy of the Board Letter. *Id.* ¶ 102.

On October 11, 2022, Carta placed Talton alone on paid administrative leave to execute an independent investigation of the Board Letter allegations. *Id.* ¶ 104. Carta retained Paul Weiss for this investigation. *Id.* ¶ 107. Paul Weiss interviewed Talton, who offered to provide Paul Weiss with all Carta documents in his possession, as well as copies of tape recordings he had made of conversations with Carta executives. *Id.* ¶¶ 109–10. Paul Weiss declined, completing its investigation without those papers and providing its findings directly to Ward and the Board. *Id.* ¶¶ 110–11. Talton asserts, upon information and belief, that Ward and Lindauer were actively involved and aware of the scope of the Paul Weiss investigation. *Id.* ¶ 112.

On or about October 11, 2022, Johnson wrote a pre-suit letter to Carta expressing her intent to initiate discrimination, retaliation, and wrongful termination claims. *Id.* ¶ 113. About a month later, Johnson had a mediation with Carta in an effort to resolve these claims. *Id.* ¶ 114. The morning of the mediation, Talton sent Johnson an email containing a transcript of a September 27 conversation with Lindauer that Talton believed would be helpful to Johnson's position. *Id.* ¶ 114. Talon copied Lindauer on the email. *Id.* Several days later, Lindauer

acknowledged receipt of the email and asserted the transcript was protected by attorney-client privilege because she had been speaking to Talton in her capacity as Chief Legal Officer. *Id.* ¶ 116. Talton, through counsel, asserts that the conversation with Lindauer was not protected by attorney-client privilege. *Id.* ¶ 117.

## IV.    Talton's Termination and Cancelled Stock Options

On December 23, 2022, about one week after Paul Weiss interviewed Talton for the Board Letter investigation, Carta terminated Talton through correspondence sent from California to Talton's home in New York. *Id.* ¶¶ 108, 119. The decision to terminate Talton was made by Ward in California. *Id.* ¶ 120. The Termination Letter cited predominantly to Talton's "unauthorized use and/or disclosure of information to unauthorized third parties." *Id.* ¶ 121 (cleaned up).

As a Carta employee, Talton participated in a stock plan which provided a range of Stock Awards to eligible employees. *Id.* ¶ 36; ECF No. 29-6 (the "Stock Plan"). Carta's Board had the power to determine how each Stock Award was granted and provided, to interpret the Stock Plan, and to amend and revoke its rules and regulations. SACC ¶ 37. The Board was required to make all determinations, interpretations, and constructions of the Stock Plan in good faith. *Id.* Section 5(k) of the Stock Plan states:

> **Termination for Cause.** Except as explicitly provided otherwise in a Participant's Stock Award Agreement or other individual written agreement between [Carta] or any Affiliate and the Participant, if a Participant's Continuous Service is terminated for Cause, the Option or SAR will terminate immediately upon such Participant's termination of Continuous Service, and the Participant will be prohibited from exercising his or her Option or SAR from and after such termination of Continuous Services.

ECF No. 29-6 at 8. Section 13(d) of the Stock Plan states:

> **"Cause"** will have the meaning ascribed to such term in any written agreement between the Participant and the Company defining such term and, in the absence of such

agreement, such term means, with respect to a Participant, the occurrence of any of the following events: (i) Such Participant's commission of a felony or any crime involving fraud, dishonesty or moral turpitude under the laws of the United States or any state thereof; (ii) such Participant's attempted commission of, or participation in, a fraud, or act of dishonesty against the Company; (iii) such Participant's intentional, material violation of any contract or agreement between the Participant and the Company or any statutory duty owed to the Company; (iv) such Participant's authorized disclosure of the Company's confidential information or trade secrets; or (v) such Participant's gross misconduct. The determination that a termination of the Participant's Services either for Cause or without Cause will be made by the Company, in its sole discretion. Any determination by the Company that the Continuous Service of a Participant was terminated with or without Cause for the purposes of outstanding Stock Awards held by such Participant will have no effect upon any determination of the rights or obligations of the Company or such Participant for any other purpose.

*Id.* at 16. During Talton's tenure at Carta, he was awarded a total of 592,794 stock options and 98,784 Restricted Stock Units ("RSUs"). SACC ¶ 45. Upon Talton's termination, Carta declared that his termination was "for cause" as defined in the Stock Plan. *Id.* ¶ 122. Carta thus cancelled 214,066 vested stock options, as well as 176,206 unvested stock options and 98,784 RSUs. *Id.*

## V.    Carta's Subsequent Complaint and Ward's Medium Article

Talton alleges that though the termination left him "shocked and upset, he had begun to determine which [Carta] documents in his possession he should return . . . ." *Id.* ¶ 123. But seven days later, Carta filed the instant action. ECF No. 1 (the "Complaint"). Talton alleges that the decision to file suit was made by Ward in California. SACC ¶ 123.

Talton characterizes the Complaint as going "out of its way to slur Talton by publicizing private messages he had sent to consenting sexual and romantic partners from his personal iCloud account but which were captured by Carta's systems." *Id.* ¶ 124. Though the Complaint alleges that Talton violated Carta's sexual harassment and anti-discrimination policies through these messages, Carta's harassment and discrimination policies do not apply to an employee's private consensual relationships with non-employees. *Id.* The Complaint also contains other allegations that Talton characterizes as defamatory. *Id.* ¶ 128. These allegations regarding Talton

were republished in national and industry-wide publications such as TechCrunch, Business Insider, and Fortune. *Id.* ¶ 126 & n.15. They have also been published on various social media platforms. *Id.* ¶ 130.

On May 3, 2023, Carta filed its First Amended Complaint realleging sexual discrimination and harassment, drug abuse, and intellectual property theft against Talton. *Id.* ¶ 131; ECF No. 20. On July 25, 2023, Carta filed a Second Amended Complaint withdrawing allegations on sexual discrimination and harassment but maintaining the other allegations. SACC ¶ 132; ECF No. 29-8.

On January 23, 2023, Talton appeared under subpoena for a deposition in Emily Kramer's gender discrimination and retaliation lawsuit against Carta. SACC ¶ 147. During the deposition, Talton detailed reports he had made to Carta executives about misconduct at Carta. *Id.* Several days after Talton's deposition, Carta and Kramer settled. *Id.* ¶ 157. Meanwhile, the Montana Bureau for Human Rights interviewed Talton about Johnson's discrimination and retaliation claims against Carta, and found reasonable cause to believe that Carta had in fact retaliated against Johnson. *Id.* ¶¶ 148–49.

After these events, on October 25, 2023, Ward published an article on his personal Medium account titled "What I Tell Employees About Negative Press" (the "Medium Article"). *Id.* ¶ 135. Ward did so "in case it's helpful for other CEOs thinking through similar problems." *Id.* Ward's article claimed that Talton was "inappropriate with women," "abused his position as CTO," and that he was "a racist and misogynist." *Id.* ¶ 137. It also contained a link to Carta's original, unamended, and superseded complaint containing the later withdrawn discrimination and harassment claims. *Id.* ¶ 138.

This article was publicly accessible. *Id.* ¶ 135. Ward's Medium account had over 12,000 followers at the time Talton filed the Counterclaim. *Id.* ¶ 136. Upon publication, the article was shared with more than 10,000 of Ward's followers on X. *Id.* ¶ 139. Ward also continued to retweet posts containing links to the Medium Article. *Id.* Ward further circulated the article to all Carta employees and customers, which Talton alleges comprises nearly all of his potential employers. *Id.* ¶ 140. Carta's sales team was also directed to circulate the article. *Id.* ¶ 142. Talton alleges the decisions to circulate the article were made from California. *Id.* ¶ 141. Tech Crunch subsequently republished the article. *Id.* ¶ 144.

Talton represents that as of the filing of the Counterclaim, he remained unemployed. *Id.* ¶ 133. Talton also represents that he has been diagnosed with generalized anxiety disorder and adjustment disorder, and has been prescribed medication for PTSD-induced night terrors and panic attacks. *Id.* ¶ 134.

## VI.    Procedural History

On January 12, 2024, Talton filed the Counterclaim against Carta and Ward on the basis of the aforementioned facts. ECF No. 54. On April 19, 2024, with leave of the Court, Talton filed his Second Amended Counterclaim, the operative document. ECF Nos. 80, 87. Talton asserts claims for defamation, false light, publication of private fact, intentional infliction of emotional distress, breach of contract, wrongful termination, and retaliation under federal law and California, Delaware, New York, and Illinois state law, as well as New York City law. SACC ¶¶ 168–426. Carta and Ward seek redactions to the Counterclaim and related filings. *See* ECF Nos. 90, 95, 99, 109.

On March 29, 2024, the Court granted in part and denied in part Talton's motion to dismiss Carta's Second Amended Complaint. ECF No. 82. Specifically, the Court found that

Carta had stated a plausible claim under the Defendant Trade Secrets Act, but failed to state a claim under New York law for misappropriation of trade secrets, for conversion, and for faithless servant. *Id*. at 8.

On May 17, 2024, Carta and Ward filed motions to dismiss and to strike the Counterclaim. ECF No. 96; ECF Nos. 97, 100 ("Mot."). Talton opposes. ECF Nos. 103, 104 ("Opp.").

Since then, Carta has sought leave to file a Third Amended Complaint to assert new California Invasion of Privacy Act claims. ECF Nos. 123, 124 ("TAC Mot."). Talton opposes. ECF No. 128 ("TAC Opp.").

The parties have also filed various discovery disputes. This Order addresses two outstanding issues. The first is whether the common interest doctrine shields communications between Talton, Heidi Johnson, and MacAllister Olivarius. ECF No. 132 ("CID Brief"). The second is whether Talton must produce communications between himself and individuals who are not Carta employees containing discriminatory and offensive language toward women. ECF Nos. 145, 147 ("MTCD"). Carta and Ward seek to seal and redact filings related to both issues. ECF Nos. 135, 146.

## DISCUSSION

This discussion proceeds in five parts. First, the Court addresses the motion to dismiss and denies the motion on all claims except for the claim for publication of private fact. Second, the Court reviews the motions to redact and grants limited redactions. Third, the Court denies the motion to strike. Fourth, the Court resolves the discovery disputes, finding that the common interest doctrine applies to certain categories of contested communications but not others, and finding that the request for communications on Talton's inappropriate commentary toward

women is overbroad. Finally, the Court grants Carta leave to file its Third Amended Complaint and denies Talton's motion for costs.

### I. Motion to Dismiss

Carta and Ward seek to dismiss claims for defamation, false light, publication of private fact, intentional infliction of emotional distress ("IIED"), breach of contract, breach of the implied covenant of good faith, and retaliation, which are altogether asserted under a combination of federal law and California, New York, Delaware, and Illinois state law, and New York City law. Mot. at 4–5; SACC ¶¶ 168–426. The Court examines the seventeen[1] causes of action in the preceding order. Claims for defamation, false light, IIED, breach of contract, breach of the implied covenant, and retaliation under federal, California, Delaware, and New York laws survive, but the claim for publication of private fact is dismissed.

#### A. Legal Standard for a Motion to Dismiss Counterclaim

Motions to dismiss counterclaims proceed under the same legal standard as motions to dismiss complaints. *Zurich Am. Life Ins. Co. v. Nagel*, 571 F. Supp. 3d 168, 175 (S.D.N.Y. 2021). Thus, the Court must construe the filing "liberally, accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008) (internal citation omitted). A claim will survive a Rule 12(b)(6) motion only if the plaintiff alleges facts sufficient "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[1] Talton has since withdrawn his claim for wrongful discharge under California law. Opp. at 2 n.1.

678 (2009) (citing *Twombly*, 550 U.S. at 556). This examination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. at 678. If allegations do not state a plausible basis for relief, the claim must be dismissed. *Id*. at 679.

### B.  Illinois Tort Claims

Talton alleges that he suffered defamation, the publication of false statements about himself, the publication of private facts, and the intentional infliction of emotional distress based on Carta's filing of the Complaint and Carta and Ward's publication and circulation of the Medium Article. SACC ¶¶ 327–401. Talton seeks relief for his injuries under Illinois law. As preliminary matters, Carta and Ward contend that these claims should have been brought under New York law and that the litigation privilege bars these claims. Carta and Ward also challenge the substantive adequacy of each claim. Mot. at 6–8. The Court first examines these two preliminary issues before analyzing the substantive adequacy of the four claims.

#### 1.  Illinois Law Applies Under a Choice of Law Analysis

"In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." *Martin Hilti Fam. Tr. v. Knoedler Gallery*, LLC, 386 F. Supp. 3d 319, 350 (S.D.N.Y. 2019) (internal citation omitted); *see* SACC ¶ 27. Here in New York, the first step in a choice of law analysis is to determine "whether an actual conflict exists between the laws of the jurisdictions involved." *Forest Park Pictures v. Universal Tel. Network, Inc*., 683 F.3d 424, 433 (2d Cir. 2012) (citing *In re Allstate Ins. Co. (Stolarz)*, 81 N.Y.2d 219, 223 (1993)). If so, New York courts usually apply "the law of the jurisdiction with the most significant interest in, or relationship to, the dispute."

*Martin Hilti Fam. Tr.*, 386 F. Supp. 3d at 350 (citing *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997)).

In determining which jurisdiction has the most significant interest in the dispute, courts "look chiefly to the parties' domiciles and the locus of the tort." *Condit v. Dunne,* 317 F. Supp. 2d 344, 352 (S.D.N.Y. 2004) (citing *Lee v. Bankers Tr. Co.*, 166 F.3d 540, 545 (2d Cir. 1999)) (cleaned up). "The locus of a tort is generally determined by the place where the plaintiff suffered injury." *Id.* at 353 (internal citation omitted). Where publication of the challenged statements is made nationwide, "the tort essentially lacks a locus, but rather injures plaintiff everywhere at once. In such cases, determining which state has the most significant relationship to the litigation requires a more comprehensive analysis." *Id.* This analysis balances factors such as where the plaintiff suffered the greatest injury, where the statements emanated and were broadcast, where the activities to which the allegedly defamatory statements refer took place, and the policy interests of the states whose law might apply. *Id.* at 353–54.

Carta and Ward contend that the Illinois claims must be dismissed because they should have been brought under New York law. Mot. at 6. For most of Talton's claims, the laws of New York and Illinois do not conflict. The state laws with respect to defamation, IIED, and the litigation privilege are generally in agreement, as evidenced by citations in Carta and Ward's briefing. *See* Mot. at 7–8, 14. However, whereas Illinois recognizes independent claims for false light and publication of private facts, New York law does not. *See Henry v. Fox News Network LLC*, 629 F. Supp. 3d 136, 151 (S.D.N.Y. 2022). For these claims, the Court must determine whether New York or Illinois has the greatest interest in the dispute.

Applying the *Condit* factors, the Court finds Illinois law applicable. First, it appears that Talton suffered the greatest injury in the state of Illinois. Although Talton resided in New York at

the time of the Complaint's filing, Talton moved to Illinois a little over two months later and has since resided there. SACC ¶¶ 23, 328–29. Moreover, the Medium Article was published and widely circulated when Talton was living in Illinois. *Id.* ¶¶ 332–36. Throughout his Illinois residency, Talton alleges that he has been unable to obtain employment as a result of the defamatory statements. *Id.* ¶ 133. For the second factor, the statements are alleged to have emanated in California, and for the third factor, it appears that the activities upon which the statements were based took place between California and New York. *See id.* ¶¶ 123, 131, 323, 328–29, 332. Nonetheless, the fourth factor on the policy interests of the states calls for the application of Illinois law. No party advocated for California law to apply here. And although New York may have some interest "in establishing a standard of fault" for those who issue the defamatory statements, this interest is outweighed by Illinois's substantial interest in protecting its citizens from defamation. *Machleder v. Diaz*, 538 F. Supp. 1364, 1370 (S.D.N.Y. 1982)

### 2. The Litigation Privilege Does Not Bar All Claims

Illinois law applies the litigation privilege to all statements made by an attorney or party if those statements pertain to proposed or pending litigation. *See O'Callaghan v. Satherlie*, 36 N.E.3d 999, 1008 (Ill. App. Ct. 2015). This privilege exists for three reasons: to (1) provide attorneys with "the utmost freedom in their efforts to secure justice for their clients," (2) "further[] an attorney's need to fully and fearlessly communicate with his client," and (3) promote "the free flow of truthful information to the courts." *Id.* (internal citations omitted).

"The privilege is limited, however, to instances where the administration of justice and public service require immunity." *Id.* (citing *Kurczaba v. Pollock*, 742 N.E.2d 425, 441 (Ill. App. Ct. 2000)). Thus, the privilege is available only when the publication "was made in a judicial proceeding; had some connection or logical relation to the action; was made to achieve the

objects of the litigation; and involved litigants or other participants authorized by law." *Kurczaba,* 742 N.E.2d at 438 (internal citation omitted). Illinois courts do not extend this privilege to communications with third parties unconnected to the litigation. *See Black v. Wrigley*, No. 17-C-101 (MFK), 2017 WL 8186996, at *5 (N.D. Ill. Dec. 8, 2017) (declining application of the privilege for out-of-court communications between parties and unrelated actors); *see also August v. Hanlon*, 975 N.E.2d 1234, 1247–48 (Ill. App. Ct. 2012) (finding that statements made by an attorney to a reporter were outside the judicial proceeding and thus not covered by the litigation privilege); *Thompson v. Frank*, 730 N.E.2d 143, 145–46 (Ill. App. Ct. 2000) (finding that statements between an attorney and the spouse of the opposing party were not covered by the privilege).

Here, Carta's Complaint falls squarely within the scope of the privilege as a core document in this proceeding. Its allegations cannot form the basis of a tort action. However, Ward's Medium Article is not covered by the privilege. Not only was Ward a non-litigant third party at the time he published the article, but, more critically, the article was not "made to achieve the objects of the litigation." *Kurczaba*, 742 N.E.2d at 438. Instead, Ward's article states it is meant to be "helpful for other CEOs thinking through similar problems." SACC ¶ 135. The article was not a statement made in a judicial proceeding and had no relevant connection to this proceeding (other than the claims that now derive from it). As such, all statements contained in Ward's article may form the basis of a tort action.

### 3.  Talton Has Stated a Defamation Claim

A defamatory statement is one that "cause[s] such harm to [a person's] reputation that it lowers the person in the eyes of the community or deters the community from associating with him." *Kolegas v. Heftel Broadcasting Corp.*, 607 N.E.2d 201 (Ill. 1992). "To state a defamation

claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused damages." *Solaia Tech., LLC v. Specialty Pub. Co.*, 852 N.E.2d 825, 839 (Ill. 2006). "An Illinois defamation action may state a claim either for defamation *per se* (statements so harmful to reputation that damages are presumed) or defamation *per quod* (statements requiring extrinsic facts to show their defamatory meaning)." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). If the defamation claim arises from statements that are not defamatory *per se*, special damages too must be pleaded. *Id.* at 927. Illinois considers several categories of statements to be defamation *per se*, including "words that impute a person is unable to perform or lacks integrity in performing her or his employment duties" and "words that impute a person lacks ability or otherwise prejudices that person in her or his profession." *Solaia Tech., LLC*, 852 N.E.2d at 839; *see also Bryson v. News Am. Publications, Inc.*, 672 N.E.2d 1207, 1214–15 (Ill. 1996).

Truth is an absolute defense to defamation. *Andrews v. At World Properties, LLC*, 236 N.E.3d 540, 548 (Ill. App. Ct. 2023). Only "substantial truth" is required, meaning the defendant must show that "the heart of the matter in question—hurtfulness of the utterance—" is true. *Id.* at 549 (citing *Vachet v. Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987)). Moreover, the First Amendment protects the expression of opinions, meaning that an actionable statement must be factual. *Solaia Tech., LLC*, 852 N.E.2d at 840. However, "the test to determine whether a defamatory statement is constitutionally protected is a restrictive one." *Bryson*, 672 N.E.2d at 1220. The protection only applies if the statement "cannot be reasonably interpreted as stating actual facts." *Id.* (internal citation omitted) (collecting cases). Illinois courts consider several factors in this analysis: "whether the statement has a precise and readily understood meaning;

whether the statement is verifiable; and whether the statement's literary or social context signals that it has factual content." *Solaia Tech., LLC*, 852 N.E.2d at 840 (collecting cases).

Talton specifies several statements made in Ward's Medium Article that could constitute defamation *per se*. The article states that Talton "was inappropriate with women and abused his position as CTO" and that Talton was "a misogynist and racist." SACC ¶ 332. In the context of an article about employee impact on company performance, these qualify as "words that impute a person . . . lacks integrity in performing . . . his employment duties" and as "words that . . . prejudices [a] person in . . . his profession." *Solaia Tech., LLC*, 852 N.E.2d at 839. Moreover, Talton has alleged the defamatory effect of these statements included lowering his professional standing and extending his period of unemployment. SACC ¶¶ 133, 145.

Carta and Ward, however, raise truth as an absolute defense. Their arguments are unavailing at this stage. Talton has alleged that these statements are false, and the 12(b)(6) standard requires the Court presume the truth of these allegations. SACC ¶ 333; *see Goldstein v. Pataki*, 516 F.3d 50, 56 (2d Cir. 2008).

Carta and Ward also argue that these statements are constitutionally protected opinions. But this is also unavailing. As discussed above, Illinois law categorizes such statements about Talton's lack of integrity at work and statements prejudicing him in employment to be defamation *per se*. *See Solaia Tech., LLC*, 852 N.E.2d at 839. Moreover, even if the Complaint referenced in the Medium Article fell under the litigation privilege, Ward's incorporation of a legal complaint into the Medium Article has a tendency to imply that his accusations of abuse, impropriety, and misogyny are based on fact and thus unprotected by the First Amendment. *See Dubinsky v. United Airlines Master Executive Council*, 708 N.E.2d 441, 448 (Ill. App. Ct. 1999) (noting that "expressions of opinion may often imply an assertion of objective fact and, in such

cases, would be considered actionable"); *Berkos v. National Broadcasting Co.,* 515 N.E.2d 668, 675 (Ill. App. Ct. 1987) ("It is well established that statements made in the form of insinuation . . . may be considered as defamatory as positive and direct assertions of fact."). Talton has stated a defamation claim under Illinois law, and because the statements alleged constitute defamation *per se*, Talton need not plead special damages.

### 4.  Talton Has Stated a False Light Claim

A false light claim under Illinois law requires a plaintiff to plead and prove that (1) the plaintiff was placed in a false light before the public as a result of the defendant's actions; (2) the false light would be highly offensive to a reasonable person; and (3) the defendant acted with actual malice. *Pope v. Chron. Pub. Co.,* 95 F.3d 607, 616 (7th Cir. 1996) (citing *Kolegas*, 607 N.E.2d at 209–10). Carta and Ward argue that Talton's claim fails to meet these requirements because he has failed to state a cause of action for defamation *per se*, because the statements at issue are substantially true, and because the statements are Ward's constitutionally protected opinion. Mot. at 19–20. The Court has already determined in the discussion on the defamation claim that none of these arguments have merit at this juncture.

In reply to Talton's opposition, Carta and Ward additionally argue that there was no actual malice because Ward believed his remarks in the Medium Article to be truthful. ECF No. 110 ("Reply") at 5. But Talton has alleged that Ward knowingly stated false facts. SACC ¶ 366. This dispute is likewise inappropriate to adjudicate at the motion to dismiss stage.

Talton has adequately alleged that he was placed in a false light as a result of Ward's Medium Article and Ward and Carta's subsequent circulation, that the nature of the statements were highly offensive as defamation *per se*, and that Ward and Carta acted with malice. SACC ¶¶ 357–72. He has stated a false light claim.

### 5. Talton Has Not Stated a Publication of Private Fact Claim

To state a claim for the public disclosure of private facts, a plaintiff must show that "(1) the defendant gave publicity (2) to the plaintiff's private and not public life (3) and that the matter made public was highly offensive and (4) not of legitimate public concern." *People v. Austin*, 155 N.E.3d 439, 460 (Ill. 2019).

The basis for Talton's public disclosure claim is the circulation of the Medium Article, which contained a link to Carta's original Complaint, which in turn contained text messages about Talton's personal life. *See* SACC ¶¶ 378–91. However, although these private text messages constitute matters that are highly offensive and matters that are, as alleged, about Talton's private and not public life, it cannot be said that Ward and Carta "gave publicity" to them under tort law. As discussed in the preceding Section I(B)(2), the litigation privilege prohibits the Complaint and the references therein from forming the basis of a tort action. Because Talton's text messages were made public through the filing of the Complaint, Ward and Carta's circulation of a public document cannot render them liable for public disclosure of private fact. Indeed, once the Complaint was filed, the public inhered a right to access it. Talton's claim for publication of private fact is dismissed.

### 6. Talton Has Stated an IIED Claim

Illinois law requires three elements to state an IIED claim. *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citing *McGrath v. Fahey*, 533 N.E.2d 806, 809 (1988)). First, the conduct involved must be extreme and outrageous, such that it goes "beyond all bounds of decency and be considered intolerable in a civilized community." *Id.* Second, "the actor must have intended for their conduct to inflict severe emotional distress, or must have known there

was at least a high probability their conduct would cause severe emotional distress." *Id.* Finally, the conduct must in fact cause severe emotional distress.

"Under Illinois law, defamatory statements, if sufficiently extreme and outrageous, can support an IIED claim." *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 922 (N.D. Ill. 2007) (collecting cases); *see also Sun v. Xu*, No. 19-CV-2242 (EIL), 2020 WL 12815227, at *5 (C.D. Ill. May 6, 2020) (noting that "courts have repeatedly held that IIED claims can solely rely on defamatory statements"). If a defamatory statement is sufficiently extreme and outrageous, a court need not dismiss the IIED claim for duplicativeness. *See Flentye*, 485 F. Supp. 2d at 920–22. Moreover, if the statement is sufficiently extreme, a plaintiff is "not required to allege facts sufficient to support each element" of an IIED claim. *Id.* at 921–22 (internal citation omitted). In evaluating whether an allegedly defamatory statement meets this bar, an important factor is whether "the defendant's abuse of some position . . . [gave] him actual or apparent authority over the plaintiff or the power to affect the plaintiff's interests." *Kolegas v. Heftel Broad. Corp.,* 607 N.E.2d 201, 211 (1992) (citing *McGrath*, 533 N.E.2d at 810); *see also Fox v. Hayes*, 600 F.3d 819, 842 (7th Cir. 2010); *Huon v. Breaking Media, LLC*, 75 F. Supp. 3d 747, 773 (N.D. Ill. 2014), *aff'd in part, rev'd in part on other grounds sub nom. Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016).

Non-defamatory acts can also form the basis of an IIED complaint. That is because "[u]nlike a defamation claim, a claim of intentional infliction of emotional distress does not include falsity as an element." *Love v. Simmons* (SCS), No. 23-CV-2392, 2024 WL 809107, at *12 (N.D. Ill. Feb. 27, 2024). For this reason, even statements that cast depictions of truth can give rise to an IIED claim—such as broadcasting or publicizing the private details of a plaintiff's life, or deeply personal moments of intimacy or trauma. *See id.* at *13. "If anything, sometimes

22

depicting the truth can be more harmful and more extreme than giving a falsehood, because it deprives the victim of the satisfaction of a denial." *Id.*

Talton's allegations meet the "extreme and outrageous" bar of an IIED claim. First, Talton has alleged that the Medium Article's defamatory statements were an abuse of power, widely casting Talton as an unemployable individual to the entire pool of his prospective employers. *See* SACC ¶¶ 136, 139–40. To be sure, when Illinois courts have found defamatory statements alone to support an IIED claim, the statements themselves are usually of a more extreme nature. *See Goldstein v. Kinney Shoe Corp.,* 931 F. Supp. 595, 599 (N.D. Ill. 1996) (finding defamatory statements that plaintiff had engaged in "criminal sexual conduct" sufficient to support an IIED claim); *Dawson v. New York Life Ins. Co.,* 932 F. Supp. 1509, 1545–46 (N.D. Ill. 1996) (finding defamatory statements that depicted plaintiff as engaging in forgery and fraud sufficient to support an IIED claim). However, Talton has alleged that he suffered more harm than just the publication of the defamation statements: the circulation of the Medium Article, with its link to the Complaint and private texts contained therein, also exposed Talton's private life to more widespread scrutiny than the uncirculated filing of the original Complaint. SACC ¶¶ 378–81. Again, the filing of the Complaint cannot form the basis for the IIED claim. However, the act of contextualizing and circulating that Complaint via the Medium Article does contribute to whether the publication and circulation of the Medium Article forms an IIED claim.

Taking all facts together, the Court finds that Talton narrowly alleges "extreme and outrageous" conduct based on the publication and circulation of the Medium Article. Though there remains a question about whether this is sufficiently extreme conduct for an IIED claim to succeed, "this sort of detailed fact-parsing and distinguishing of factual records is not properly

done in this case under a Rule 12(b)(6) analysis." *Flentye v. Kathrein*, 485 F. Supp. 2d 903, 922 (N.D. Ill. 2007).

Talton has also met the second and third requirements of stating an IIED claim. Talton has alleged that Ward and Carta acted with intent to retaliate against Talton. *Id.* ¶¶ 168–326, 400. Talton has described the acts' devastating effects on his career prospects. *Id.* ¶¶ 136, 140, 145. And Talton has also described the impact on his mental, emotional, and psychological wellbeing, which includes mental health diagnoses and PTSD. *Id.* ¶¶ 134, 146. The IIED claim survives.

### C. Breach of Contract & Implied Covenant of Good Faith

Talton alleges breach of contract under Delaware law, as well as breach of the implied covenant of good faith and fair dealing. Talton has adequately pled both claims.

#### 1. Breach of Contract

To state a claim for breach of contract under Delaware law, a plaintiff must show: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 883 (Del. Ch. 2009). In analyzing the contract, any "[c]lear and unambiguous language found in the contract is to be given its ordinary and usual meaning." *Templeton v. EmCare, Inc.*, 868 F. Supp. 2d 333, 339 (D. Del. 2012) (internal citation omitted). However, at the motion to dismiss stage, a court "cannot choose between two differing reasonable interpretations of ambiguous provisions." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 615 (Del. 2003). "Dismissal, pursuant to Rule 12(b)(6), is proper only if the defendants' interpretation is the *only* reasonable construction as a matter of law." *Id.*

The key disagreement between the parties lies with the second and third elements: whether there was a breach of an obligation imposed by a contract that resulted in damages to

24

Talton. The contract at issue here is the Stock Plan, which Carta and Ward do not dispute is a binding document. Talton identifies three provisions of the Stock Plan that he alleges have been breached:

(1) Section 2(b)(ii), which states that Carta has the power to "construe and interpret [the Stock Plan] . . . and to establish, amend and revoke rules and regulations for administration of [the Stock Plan]" (ECF No. 29-6 at 1);

(2) Section 2(b)(iii), which states that Carta has the power to "settle all controversies regarding [the Stock Plan]" (*id.* at 2); and

(3) Section 2(e), which states that "[a]ll determinations, interpretations and constructions made by the Board in good faith will not be subject to review by any person and will be final, binding and conclusive on all persons" (*id.* at 4).

SACC ¶¶ 407. Specifically, Talton alleges that these terms were breached when Carta failed to exercise its power to establish rules and regulations for the proper administration of the Stock Plan, failed to exercise its power to settle controversies, and failed to act in good faith when construing and applying the Stock Plan. *Id.*

To the contrary, Carta and Ward contend that the three named provisions of the Stock Plan only confer power to the Board, and do not impose any obligation on it. Mot. at 21–23. Carta and Ward argue that the Board rightfully exercised its power under these terms when Talton was terminated for cause. *Id.*

The Court finds some merit in both parties' positions. On one hand, the first two provisions that Talton highlights unambiguously read as conferring exclusive power to the Board. Within that sweeping grant conceivably rests the power *not* to act—in other words, not to establish rules and regulations for the proper administration of the Stock Plan.

On the other hand, and dispositively, Section 2(e)'s discussion of good faith implies that the Board may not make any determinations, interpretations, or constructions of the Stock Plan in bad faith. The facts alleged in Talton's Counterclaim, read in the light most favorable to him, plausibly suggest that the Board made a bad faith decision. Specifically, Talton has alleged that his termination was not for appropriate cause, that one of the retaliatory consequences was the loss of his stock options, and that this decision to terminate him and his stock options was not made in good faith. SACC ¶¶ 407–10. Accordingly, because Section 2(e) may suggest an obligation to engage in good faith, which Talton adequately alleges that Carta failed to do, Talton has stated a claim for breach of contract.

### 2. Breach of the Implied Covenant of Good Faith

To state a claim for breach of the implied covenant of good faith and fair dealing, a plaintiff must allege a specific implied contractual obligation, a breach of that obligation, and resulting damages. *Light Years Ahead, Inc. v. Valve Acquisition, LLC*, No. CV N20C-12-181 (DJB), 2021 WL 6068215, at *9 (Del. Super. Ct. Dec. 22, 2021). A court is to "imply contract terms when a contracting party acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected." *Id.* (cleaned up). The parties' reasonable expectations are "assessed at the time of contracting." *Id.* (internal citation omitted). However, "the implied covenant will not infer language that contradicts a clear exercise of an express contractual right." *Nemec v. Shrader*, 991 A.2d 1120, 1127 (Del. 2010).

Talton alleges that Carta violated the implied covenant of good faith and fair dealing when Carta wrongfully determined that Talton's termination was "for Cause." SACC ¶¶ 420–24. Under the terms of the Stock Plan, such a determination permitted Carta to cancel Talton's stock options. *Id.* ¶ 425; Stock Plan § 5(k). The applicable provision of the Stock Plan states: "The

determination that a termination of the Participant's Continuous Services is either for Cause or without Cause will be made by Carta, in its sole discretion." SACC ¶ 417 (cleaned up). Carta, in opposition, emphasizes that the Stock Plan's vesting of "sole discretion" to Carta is an express contractual right that makes no room for an implied covenant of good faith. Mot. at 23–25.

The Court disagrees with Carta's position for two reasons. First, the express language of the Stock Plan in fact implies some duty of good faith—or at minimum, states that bad faith acts are subject to review. *See supra*, Discussion Section I(C)(1).

Second, Delaware courts have regularly determined that the vesting of "sole discretion" as an express contractual term "[does] not relieve the Board of its obligation to use that discretion consistently with an implied covenant of good faith and fair dealing." *Miller v. HCP Trumpet Inv., LLC*, 194 A.3d 908, 2018 WL 4600818, at *1 (Del. Sept. 20, 2018); *see also Charlotte Broad., LLC v. Davis Broad. of Atlanta, L.L.C.*, No. 13C-04-143 (WCC), 2015 WL 3863245, at *7 (Del. Super. Ct. June 10, 2015) (concluding that where a contract permitted either party "in its sole discretion" to terminate the agreement, the implied covenant still required parties to exercise that discretion in good faith); *Chamison v. HealthTrust, Inc.*, 735 A.2d 912, 922–23 (Del. Ch. 1999) (finding that the defendant still breached the implied covenant when exercising express "broad discretion"), *aff'd* 748 A.2d 407 (Del. 2000); *Bay Ctr. Apartments Owner, LLC v. Emery Bay PKI, LLC*, 2009 WL 1124451, at *7–8 (Del. Ch. Apr. 20, 2009) (applying the implied covenant even where an agreement gave the defendant "broad authority"). Taking these two considerations together, it is certainly plausible that the Stock Plan carried an implied covenant of good faith and fair dealing.

Talton has sufficiently alleged that Carta breached the implied covenant of good faith by wrongfully determining that his termination was "for Cause," and that this determination resulted in the wrongful cancellation of his stock options. This claim survives.

### D. Retaliation

Talton brings retaliation claims under Title VII of the Civil Rights Act of 1964 ("Title VII"), the California Fair Employment and Housing Act (the "FEHA"), the New York State Human Rights Law, (the "NYSHRL"), and the New York City Human Rights Law (the "NYCHRL"). Carta and Ward challenge the viability of these claims for three primary reasons: (1) California law claims are duplicative and extraterritorial; (2) New York law claims cannot apply to some post-termination acts because Talton moved out of New York; and (3) under all laws, Talton has failed to plead a prima facie case of retaliation. None of these three arguments have merit.

#### 1. FEHA Claims Survive

Carta and Ward argue that Talton's FEHA claims are duplicative of Talton's New York claims and that FEHA cannot apply extraterritorially. The Court disagrees.

First, Carta and Ward cite to no case law that prohibits a plaintiff from bringing FEHA claims alongside NYSHRL and NYCHRL claims. To the contrary, courts in this Circuit have considered actions raising both states' claims without dismissing either for duplicativeness. *See Payne v. JetBlue Airways Corp.*, No. 20-CV-00101 (NRM) (PK), 2024 WL 3360381, at *1 (E.D.N.Y. July 9, 2024) (granting summary judgment for plaintiff on NYSHRL claims and one NYCHRL claim while permitting Title VII, FEHA, and other NYCHRL claims to go to trial); *Mazzuchelli v. Immutable PTY. LTD*, No. 23-CV-7885 (NSR), 2024 WL 4817535, at *9 (S.D.N.Y. Nov. 18, 2024) (considering the merits of NYSHRL, FEHA, and Title VII claims, and

dismissing FEHA claims without prejudice, but not for duplicativeness); *Sheng v. M&TBank Corp.*, 848 F.3d 78, 83 (2d Cir. 2017) (recognizing that both FEHA and NYSHRL claims had gone to trial).

Second, the facts as alleged in Talton's Counterclaim fall within the coverage of FEHA as interpreted by California courts. In determining FEHA's extraterritorial reach, the California Court of Appeals examined the statute's language and legislative history, and held that "FEHA was not intended to apply to non-residents where . . . the tortious conduct took place out of [California's] territorial boundaries." *Campbell v. Arco Marine, Inc.*, 42 Cal. App. 4th 1850, 1852 (Cal. Ct. App. 1996). In rejecting the application of FEHA to the case before it, the California Court of Appeals emphasized both the plaintiff's non-residency status and the fact that the acts giving rise to the action took place outside of California, and so the relationship with California was "slight." *See id.* at 1858. Courts interpreting *Campbell*'s construction of FEHA's coverage have reiterated the importance of these factors. *See Gonsalves v. Infosys Technologies, LTD.*, No. 09-CV-4112 (MHP), 2010 WL 1854146, at *5 (N.D. Cal. May 6, 2010) (finding that a plaintiff is "required to plead at a minimum that he was either employed in California or that the discriminatory conduct occurred in California" to state a FEHA claim); *Paparella v. Plume Design, Inc.*, No. 22-CV-01295 (WHO), 2022 WL 2915706, at *3 (N.D. Cal. July 25, 2022) (citing the same interpretation of *Campbell* in *Gonsalves*); *Davis v. Inmar, Inc.*, No. 21-CV-03779 SBA, 2022 WL 3722122, at *4 (N.D. Cal. Aug. 29, 2022) (same).

In applying this standard, California courts have lent weight to the operative "or"—that is, a plaintiff need not plead both that he was working in California and that the underlying conduct occurred in California. *See Stovall v. Align Tech., Inc.*, No. 18-CV-7540 (EJD), 2020 WL 264402, at *3 (N.D. Cal. Jan. 17, 2020) (finding that a non-resident employee sufficiently pled

29

FEHA claim when "the ultimate discriminatory action—Plaintiff's termination—was 'directed, overs[een], and ratified' by [defendant's HR employee] from California" even though majority of alleged discriminatory conduct took place outside California); *Sims v. Worldpac Inc.*, No. 12-CV-05275 (JSW), 2013 WL 663277, at *3–4 (N.D. Cal. Feb. 22, 2013) (finding that FEHA applied to wrongful termination claim where non-resident plaintiff alleged decision to terminate was made in California). Indeed, some California courts have placed dispositive weight on the location of underlying conduct. *See Eng. v. Gen. Dynamics Mission Sys., Inc.,* No. 18-CV-908 (JGB), 2019 WL 2619658, at *7 (C.D. Cal. May 8, 2019), *aff'd*, 808 F. App'x 529 (9th Cir. 2020) ("Under California law, the relevant inquiry for whether a state law is being applied extraterritorially is not the location of employment, but rather whether the conduct which gives rise to liability occurs in California.'") (cleaned up) (citing *Leibman v. Prupes*, No. 14-CV-09003 (CAS), 2015 WL 3823954, at *7 (C.D. Cal. June 18, 2015) and *Diamond Multimedia Sys., Inc. v. Superior Court*, 19 Cal. 4th 1036, 1059 (Cal. Ct. App. 1999)).

Where California courts have dismissed FEHA claims despite allegations that the tortious conduct occurred in California, it usually has been for lack of specificity in pleading. *See Loza v. Intel Americas, Inc.,* No. C 20-06705 (WHA), 2020 WL 7625480, at *4 (N.D. Cal. Dec. 22, 2020) (dismissing a complaint for extraterritoriality that "spares the details concerning who fired him, and where that person was when they did it"); *Gonsalves*, 2010 WL 1854146, at *5 (dismissing FEHA claims brought by a non-resident because the allegations showing coverage were "extremely general in nature"). To meet the specificity of pleading requirement, a plaintiff should allege "(1) who was responsible for demoting and firing [the plaintiff], (2) where those individuals were located when they engaged in such conduct [and] (3) where [the plaintiff] was located when he was allegedly discriminated against." *Paparella v. Plume Design, Inc.*, No. 22-

CV-1295 (WHO), 2022 WL 2915706, at *4 (N.D. Cal. July 25, 2022) (citing *Gonsalves*, 2010 WL 1854146, at *5).

Under this framework, Talton has sufficiently pled the applicability of FEHA. Although Talton was residing in New York or in Illinois at the time of the allegedly retaliatory actions, Talton has specified that the decision to take those actions were made in California. SACC ¶¶ 120, 123, 141, 142, 207, 224, 241, 249. Just as California courts have found these allegations to be sufficient to plead FEHA applicability, *see Stovall,* 2020 WL 264402, at *3 *and Sims*, 2013 WL 663277, at *1, so too does this Court.

### 2. New York State and City Post-Termination Claims Survive

Carta and Ward contend that Talton's post-termination retaliation claims, specifically based upon the publication and circulation of the Medium Article on October 20, 2023, must be dismissed because Talton moved to Illinois on March 5, 2023. Mot. at 29–30. New York case law compels the contrary.

"In order for a nonresident to invoke the protections of the NYSHRL and NYCHRL, [they] must show that the discriminatory act had an impact within the boundaries of the State and City, respectively." *E.E.O.C. v. Bloomberg L.P.*, 967 F. Supp. 2d 816, 865 (S.D.N.Y. 2013) (citing *Hoffman v. Parade Publ'ns*, 15 N.Y.3d 285, 288 (2010)). In 2023, the Second Circuit considered how this standard applied to a plaintiff who did not live in New York, but sought employment within the state. *See Syeed v. Bloomberg L.P.*, 58 F.4th 64 (2d Cir. Jan. 23, 2023). The Court noted that while in some cases, the impact requirement "turned primarily on the plaintiff's physical location at the time of the alleged discriminatory acts," it also observed that many state and district courts have "more broadly" commented that a plaintiff may also allege the requisite impact "if he or she can show that the discriminatory acts affected the terms,

conditions, or extent of his or her employment within the boundaries of New York." *Id.* at 69 (cleaned up). Thus, given these differences in approach, the Circuit in *Syeed* certified to the New York Court of Appeals whether a nonresident plaintiff could satisfy the impact requirement when their only asserted geographical connection to New York was that they had been denied employment in New York. *Id.* at 71.

The New York Court of Appeals said yes. *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 452–53 (2024). Specifically, the Court explained that "[t]he prospective employee personally feels the impact of a discriminatory refusal to promote or hire in New York City or State, because that is where the person wished to work (and perhaps relocate) and where they were denied the chance to do so." *Id.* at 453. Thus, "[w]hen applying the required liberal construction of [the NYSHRL and NYCHRL], a prospective inhabitant or employee, who was denied a job opportunity because of discriminatory conduct, fits comfortably within the Human Rights Laws' protection." *Id.*

Talton's claims are distinguishable from *Syeed* because he is asserting retaliation, not discrimination. But this distinction does not warrant deviating from *Syeed*'s principle, which is premised on the general liberal and protective construction of the NYSHRL and NYCHRL. *See id.* The Court is satisfied that Talton has pled that as "a prospective inhabitant or employee," he was "denied a job opportunity" in New York. *Id.* He has alleged that his attempts to find employment in New York were frustrated by Ward's retaliatory publication of the article. SACC ¶¶ 295, 324. Moreover, Talton's connection to New York does not end there—Talton previously lived in New York up until some months after his termination from Carta, lending weight to his position that Carta and Ward's acts frustrated his genuine desire to return to New York. SACC ¶¶ 23, 328–29. These facts are sufficient to invoke NYSHRL and NYCHRL coverage.

### 3.   Talton Has Pled a Prima Facie Case of Retaliation

To state a prima facie case of retaliation under Title VII, the NYSHRL, and FEHA, a plaintiff must show that "(1) he was engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." *Mitchell v. State Univ. of New York Upstate Med. Univ.*, 723 F. App'x 62, 63 (2d Cir. 2018) (citing the Title VII prima facie retaliation standard); *Summa v. Hofstra Univ.*, 708 F.3d 115, 125 (2d Cir. 2013) (applying the same standard to NYSHRL retaliation claims); *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000) (applying the same standard to FEHA retaliation claims). The NYCHRL retaliation standard is slightly different. Under New York City law, the "causal connection" of the prima facie standard can be satisfied simply "if [the employer] was motivated at least in part by an impermissible motive." *Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 334 n.8 (S.D.N.Y. 2020) (citing *Kia Song Tang v. Glocap Search LLC*, No. 14-CV-1108 (JMF), 2015 WL 1344788, at *5 (S.D.N.Y. Mar. 24, 2015)). Because the NYCHRL retaliation standard is lower than its federal and state counterpart, where a plaintiff has shown a prima facie case of retaliation under Title VII and the NYSHRL, the NYCHRL dictates the same result. *Id.* at 334.

To be clear, a plaintiff is not required to plead each element of a prima facie case to defeat a motion to dismiss. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015); *see also Hicks v. Netflix, Inc.,* 472 F. Supp. 3d 763, 771 (C.D. Cal. 2020). Instead, "the allegations in the complaint need only give plausible support to the reduced prima facie requirements that arise under *McDonnell Douglas*." *Littlejohn v. City of New York*, 795 F.3d 297, 316 (2d Cir. 2015); *see also Hicks v. Netflix, Inc.,* 472 F. Supp. 3d 763, 771 (C.D. Cal. 2020) (noting that while a plaintiff need not plead a prima facie case on a motion to dismiss, courts may

"still look to the elements of the prima facie case to decide, in light of judicial experience and common sense, whether the challenged complaint contains sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face") (internal citation and quotation marks omitted). Thus, while a court at this stage should still proceed through the prima facie analysis, it should apply the requirements leniently. *See Littlejohn*, 795 F.3d at 315–16.

Carta and Ward challenge Talton's retaliation claims on two bases: that Talton has not shown engagement in a protected activity and that Talton has not alleged any retaliatory act. The Court addresses each argument in turn.

### i. Protected Activity

A plaintiff engages in a protected activity when he "participate[s] in any manner in an investigation, proceeding, or hearing under [the anti-discrimination statute]" or when he "oppose[s] any practice made unlawful by [the anti-discrimination statute]." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 48 (2d Cir. 2012) (quoting 42 U.S.C. § 2000e–3(a)). While participation in a formal proceeding is one form of protected activity, so too are informal oppositions to discriminatory employment practices. *Risco v. McHugh*, 868 F. Supp. 2d 75, 110 (S.D.N.Y. 2012). These informal protected activities include, for example, "making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Sumner v. U.S. Postal Serv.,* 899 F.2d 203, 209 (2d Cir. 1990). This conduct qualifies as protected activity under Title VII, the NYSHRL, the NYCHRL, and FEHA. *See id.; Benzinger v. Lukoil Pan Americas*, LLC, 447 F. Supp. 3d 99, 124 (S.D.N.Y. 2020) (reiterating that under both Title VII and the NYSHRL, an employee "engages in a protected activity when she complains of an employment practice that she reasonably believes violates the law") (internal citation omitted);

34

*Mihalik v. Credit Agricole Cheuvreux N. Am., Inc*., 715 F.3d 102, 108 (2d Cir. 2013) (noting that the NYCHRL's protected activities include "oppos[ing] any practice forbidden under [the NYCHRL]") (internal citation omitted); *Kelley v. Corr. Corp. of Am*., 750 F. Supp. 2d 1132, 1144 (E.D. Cal. 2010) (finding that "protected activity" under FEHA "involves some level of opposition to the employer's actions based on the employee's reasonable belief that some act or practice of the employer is unlawful").

For an informal opposition to constitute protected activity, the opposition must be "sufficiently specific to make it clear that the employee is complaining about conduct prohibited by [the anti-discrimination statute]. Generalized complaints about a supervisor's treatment are insufficient." *Risco*, 868 F. Supp. 2d at 110 (citing *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 108 (2d Cir. 2011)). "The content of the communication is the primary consideration, as an employee's communication to management qualifies as a protected activity only where the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Medina v. AAM 15 Mgmt. LLC*, 750 F. Supp. 3d 332, 350 (S.D.N.Y. 2024) (cleaned up).

Talton's allegations reflect several acts prior to his termination that qualify as protected activities. Talton identifies three categories: (1) participating in Johnson's mediation of her discrimination, retaliation, and wrongful termination claims; (2) opposing unlawful discriminatory conduct through reports to Ward, Carta executives, Carta board members, and Paul Weiss; and (3) submitting the October 7, 2022 letter to Carta's Board identifying discriminatory and unlawful behavior. Opp. at 31. Carta and Ward argue that neither the involvement with Johnson's mediation nor participation in the Paul Weiss investigation

constitutes protected activity. The Court will first address these two issues of contention before turning to the remaining activities.

First, Talton's participation in Johnson's mediation is protected activity because it is opposition to unlawful behavior through support of a co-worker threatening formal charges. *See Sumner,* 899 F.2d at 209. Talton alleges that in early October 2022, Johnson served Carta with a pre-suit letter detailing an intent to initiate formal claims or file a charge relating to discrimination and retaliation. SACC ¶ 113. Then, on November 1, 2022, Johnson's termination became effective. *Id.* ¶ 96. It appears from the Counterclaim that the mediation on November 8, 2022 was thus an adversarial proceeding intended to resolve an ex-employee Johnson's threat of litigation, and not, as Carta and Ward claim, an internal investigation. *See id.* ¶ 114; Mot. at 32–33. Talton alleges that he assisted in this external proceeding by sending a pre-mediation email to Johnson with a transcript of information indicating Ward had wrongfully fired Johnson. SACC ¶ 114. Talton also copied Carta's General Counsel on this email. *Id.* For such an informal complaint to qualify as a protected activity, it must be one where "the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Medina*, 750 F. Supp. 3d at 350. Here, Talton has alleged sufficient facts to show that his email was made upon a good faith belief—indeed, upon alleged admissions in a recording—that Carta and Ward had violated anti-discrimination and retaliation laws.

Second, Talton's participation in the Paul Weiss investigation is also protected activity as an act of opposition. To be sure, "participation in an internal employer investigation not connected with a formal EEOC proceeding does not qualify as protected activity under the *participation* clause [of Title VII]." *Townsend v. Benjamin Enterprises, Inc.*, 679 F.3d 41, 49 (2d Cir. 2012) (emphasis added). But, as previously explained, protected activity through

participation is different from protected activity through opposition. The Second Circuit's holding in *Townsend* was strictly limited to whether internal employer investigations qualify as protected activity through participation. Indeed, as the Second Circuit has subsequently recognized, "if an employee . . . actively supports other employees in asserting their Title VII rights or personally complains or is critical about the discriminatory employment practices of her employer [related to an internal investigation], that employee has engaged in a protected activity under [Title VII's] opposition clause." *Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015) (cleaned up). Here, Talton alleges that he opposed Carta and Ward's allegedly unlawful conduct leading up to and throughout the Paul Weiss investigation. SACC ¶¶ 89–103. He has also alleged sufficient facts to show that his opposition was made upon reasonable belief that Carta and Ward were engaging in unlawful conduct. *See, e.g.*, SACC ¶¶ 94, 98, 103. Talton meets the requirements for pleading a protected activity.

Finally, the Court notes that Talton's remaining acts also qualify as protected activity. These acts include repeated reports to Ward and Carta executives of discriminatory and unlawful behavior, as well as the Board letter detailing such acts. Talton has sufficiently alleged that he made these complaints upon the reasonable belief that his employer was acting in violation of discrimination and retaliation law. *See id.* For the avoidance of doubt, Talton's post-termination participation in Emily Kramer's gender discrimination lawsuit and in Johnson's Montana Bureau for Human Rights investigation are also protected activities, which Carta and Ward do not dispute.

### ii.  Adverse Act & Causal Connection

There appears to be no dispute that Carta and Ward were aware of Talton's involvement in the Johnson mediation, reports regarding their conduct, letter to the Board, participation in the

Paul Weiss activity, participation in the Kramer lawsuit, and participation in the Johnson Montana investigation. Talton also alleges that Carta and Ward terminated him, cancelled his stock options, and published the Medium Article to hamper his job prospects.

Talton has more than sufficiently alleged adverse actions. The loss of his job and stock options easily qualify as actions that are "materially adverse to a reasonable employee." *Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 71 (2006). The post-termination acts, including the Medium Article, also satisfy this prong. *See Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 178–79 (2d Cir. 2005) (concluding that a former employee's retaliation claim was actionable where the defendant-employer gave the former employee a false negative job reference after that employee volunteered to provide testimony in a co-worker's discrimination lawsuit); *Wanamaker v. Columbian Rope Co*., 108 F.3d 462, 466 (2d Cir. 1997) (finding that post-termination claims can state adverse employment actions for retaliation because a "terminated employee . . . may have tangible *future* employment objectives, for which he must maintain a wholesome reputation"). Thus, to make out a prima facie retaliation case, what remains is for Talton to allege that there was a causal connection between his protected activity and the adverse actions taken by Carta and Ward. *Mitchell*, 723 F. App'x at 63.

To establish this causal connection, a "plaintiff must plausibly allege that the retaliation was a 'but-for' cause of the employer's adverse action." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90–91 (2d Cir. 2015). "It is not enough that retaliation was a 'substantial' or 'motivating' factor in the employer's decision." *Id.* (internal citation omitted). However, this causation "does not require proof that retaliation was the only cause of the employer's action . . . only [that] the adverse action would not have occurred in the absence of the retaliatory motive." *Zann Kwan v. Andalex Grp.* LLC, 737 F.3d 834, 846 (2d Cir. 2013). Such a connection "can be

established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal citation omitted). Though there is no "bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [the Second Circuit has] previously held that five months is not too long to find the causal relationship." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010).

At this stage, Talton has sufficiently alleged a causal connection between his protected activity and the actions taken by Carta and Ward. The Court examines Talton's pre-termination activities (reports to Ward and executives, the Board letter, participation in Johnson's mediation, and participation in the Paul Weiss investigation) and post-termination activities (participation in the Kramer lawsuit and Johnson's Montana investigation).

First, regarding the pre-termination activities, Talton has alleged a temporal relationship between these activities and his termination and the filing of the Complaint. Specifically, Talton has alleged that he submitted the Board letter to Carta and Ward on October 7, 2022, and that four days later, he was placed on administrative leave. SACC ¶¶ 102, 104. He has alleged that he then participated in the Johnson mediation on November 8, 2022 and in the Paul Weiss investigation on December 14, 2022. *Id.* ¶¶ 108, 114. Less than ten days after the Paul Weiss interview, Talton was fired. *Id.* ¶ 119. And one week later, Carta filed the original Complaint. *Id.* ¶ 123. In addition to this temporal relationship, Talton has alleged that Carta and Ward had previously taken adverse employment action in retaliation against other employees. *Id.* ¶¶ 151–66. Talton has further alleged that Carta and Ward lacked cause to terminate Talton for performance-based reasons, and instead fired him for the "unauthorized use and/or disclosure" of

information (referring to Talton's participation in the Johnson mediation) and help to Emily Kramer. *See id.* ¶¶ 90, 118, 121.

Second, regarding the post-termination protected activities, Talton has alleged a causal connection between the post-termination activities and adverse actions. Specifically, Talton has alleged that he participated in the Montana investigation on August 2, 2023, which resulted in a finding against Carta on August 29, 2023. *Id.* ¶¶ 148, 149. His participation occurred less than three months before Ward published the Medium Article. *See id.* ¶ 135. Carta and Ward do not dispute a causal connection here. Although Talton's participation in the Kramer lawsuit was temporally removed from the publication of the Medium Article by ten months, *see id.* ¶¶ 135, 147, Talton has alleged other facts to show a causal connection. Namely, the content of the post (on Carta's bad press in light of discrimination lawsuits) is conceivably related to the Kramer lawsuit. At this stage, Talton has sufficiently stated that his participation in the Kramer suit led to retaliation.

Carta and Ward's arguments to the contrary are unavailing at this stage. Carta and Ward contend that the facts reflect a lack of retaliatory motive, but at a motion to dismiss, the Court is solely concerned with the adequacy of the pleadings and must construe the allegations in Talton's favor. *Goldstein*, 516 F.3d at 56. Whether a non-retaliatory motive exists is a matter for summary judgment.

Carta and Ward also contend that a meritorious lawsuit cannot form the basis of a retaliation claim. Mot. at 36–37. While this district has held this to be true, Carta withdrew its claims for violation of Carta's sexual discrimination and harassment policies, and this Court dismissed Carta's claims for misappropriation of trade secrets under New York common law, for conversion, and for faithless servant. *See* ECF No. 29-8; ECF No. 82 at 8. With this in mind, the

Court cannot categorize the totality of the original Complaint as a "meritorious lawsuit." Indeed, "[n]o litigant has the right to file a baseless *claim*. If the potentially meritorious claim is truly the tail wagging the dog or if the lawsuit would never have been filed based on the potentially meritorious claim alone, then there may be a basis to consider the lawsuit as a whole a 'sham.'" *Robinson v. De Niro*, 739 F. Supp. 3d 33, 95 (S.D.N.Y. 2023) (emphasis added). Talton has sufficiently stated that the Complaint was filed for retaliatory purpose.

## II.    Motions to Redact

Carta and Ward have moved to redact portions of the SACC and related documents, ECF Nos. 90, 95, 99, 109, as well as portions of discovery dispute items and exhibits, ECF Nos. 112, 116, 135, 146. Talton opposes, for the most part. ECF Nos. 91, 102, 105, 114, 141.

### A.  Legal Standard for Sealing

"The common law right of public access to judicial documents is firmly rooted in our nation's history." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006). "The presumption of access is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Id*. (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). "[M]otions to seal documents must be 'carefully and skeptically reviewed . . . to ensure that there really is an extraordinary circumstance or compelling need' to seal the documents from public inspection." *Bernsten v. O'Reilly*, 307 F. Supp. 3d 161, 165 (S.D.N.Y. 2018) (quoting *Video Software Dealers Ass'n v. Orion Pictures*, 21 F.3d 24, 27 (2d Cir. 1994)). "The burden of demonstrating that a document submitted to a court should be sealed rests on the party seeking such action." *DiRussa v. Dean Witter Reynolds Inc.*, 121 F.3d 818, 826 (2d Cir. 1997).

The Second Circuit has articulated a three-part test for determining whether the common law right of public access attaches. *Lugosch*, 435 F.3d at 119–20. First, a court must determine whether the documents at issue are "judicial documents" to which a presumption of access attaches. *Id*. at 119. Second, if the documents are judicial documents, a court must determine the weight of the presumption of access. *Id*. Third, a court must balance "competing considerations" against the weight of the presumption of access. *Id.* at 120. In performing this balancing test, courts should consider the "nature and degree of injury" that may result from disclosure, the "reliability of the information," and "whether the nature of the materials is such that there is a fair opportunity for the subject to respond to any accusations contained therein." *Amodeo*, 71 F.3d at 1051. "If such factors outweigh the value to the public of accessing the document at issue, then that document should be sealed." *Matter of Upper Brook Cos.*, No. 22-MC-97 (PKC), 2023 WL 172003, at *1 (S.D.N.Y. Jan. 12, 2023).

**B. Application**

The materials for which Carta and Ward seek redactions are undoubtedly a part of judicial documents entitled to a presumption of public access. *Bernstein v. Bernstein Litowitz Berger & Grossmann LLP*, 814 F.3d 132, 140 (2d Cir. 2016) (finding that complaints are judicial documents). Thus, the Court must balance the weight of this presumption of public access against competing considerations. *Lugosch*, 425 F.3d at 120. Carta and Ward propose competing considerations for three categories of information, which the Court addresses in turn: (1) the names and identifying information of non-parties; (2) attorney-client privileged information; and (3) highly sensitive internal Carta business information.

**1. Names and Identifying Information of Non-Parties Shall Be Selectively Redacted**

"[T]he privacy interests of innocent third parties should weigh heavily in a court's balancing equation." *United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) (cleaned up) (citing *In re Newsday, Inc.*, 895 F.2d 74, 79 (2d Cir. 1990)). "Such interests, while not always fitting comfortably under the rubric 'privacy,' are a venerable common law exception to the presumption of access." *Id.* at 1051. As such, courts have regularly allowed the narrow redaction of names and identifying information of non-parties where privacy interests outweigh access concerns. *See Desarrolladora La Ribera, S. de R.L. de C.V. v. Anderson*, No. 24-CV-67 (LAK) (BCM), 2024 WL 2049413, at *3 (S.D.N.Y. May 6, 2024) (redacting non-party name where the non-party "is not affiliated with any party, is not accused of any wrongdoing, and did not ask to be involved in this lawsuit"); *Sec. & Exch. Comm'n v. Ripple Labs, Inc.,* No. 20-CV-10832 (AT), 2023 WL 3477552, at *2 (S.D.N.Y. May 16, 2023) (permitting redactions of non-party identities given concerns about the increased "likelihood of future threatening behavior, implicating concerns of witness safety and the danger of impairing judicial efficiency") (internal citation omitted); *Kelly v. City of New York*, No. 01-CV-8906 (AGSDF), 2003 WL 548400, at *6 (S.D.N.Y. Feb. 24, 2003) (redacting non-party identities because "public access to this information would be intrusive of [their] personal privacy, and that privacy should be protected, if this can be done in a manner consistent with the public's reasonable interest in access to evidence relating to [a claim]").

Under this guidance, the Court finds that most, but not all, of the relevant individuals lack the requisite privacy interests to overcome the presumption of public access.

First, regarding the Paul Weiss attorneys, Carta and Ward have failed to articulate any applicable privacy interest.

Second, certain Carta-affiliated individuals lack an outweighing privacy interest because their names and identities have already been previously publicized—namely, Heidi Johnson, Preeti Kaur, Alexandra Rogers, Emily Kramer, Lisa Whittaker, Jeff Perry, David Kim, and Adrian Facini. *See Grossberg v. Fox Corp.*, No. 23-CV-2368 (JMF), 2023 WL 2612262, at *1 (S.D.N.Y. Mar. 23, 2023) (noting that "courts routinely deny sealing requests where, as here, the information to be sealed is already publicly available") (collecting cases).

Third, to the extent that other unpublicized Carta affiliates have any privacy interests, these interests do not outweigh the public's interest in disclosure if the acts and omissions of these individuals form the basis for any potential liability or lack thereof. *See Anderson*, 2024 WL 2049413, at *3. This applies to all of Carta's board members as representatives of Carta. This also applies to Carta's officers and board members who allegedly received reports of wrongdoing from Talton, because the acts and omissions of these officers affect Carta's liability for Talton's retaliation claim.

That said, some non-party individuals do hold an outweighing privacy interest. These include non-party, unpublicized individuals who have reported alleged wrongdoing or were the victims of alleged wrongdoing. These also include non-party, unpublicized individuals who have been accused of harassment and discrimination, but not of retaliation. The names of these individuals shall be redacted, but may be unredacted should they later become witnesses in this case. Redactions to identifying information shall be narrowly tailored such that the underlying facts of the allegation are still accessible to the public.

### 2. Limited Redactions for Attorney-Client Privilege

The protection of attorney-client privilege outweighs the presumption of public access. *Brown v. Maxwell*, 929 F.3d 41, 47 n.13 (2d Cir. 2019). "The attorney-client privilege protects

communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011). "In order to balance this protection of confidentiality with the competing value of public disclosure, however, courts apply the privilege only where necessary to achieve its purpose and construe the privilege narrowly because it renders relevant information undiscoverable." *Id.* (cleaned up).

The attorney-client privilege belongs solely to the client and may only be waived by him. *In re von Bulow*, 828 F.2d 94, 100 (2d Cir. 1987). A corporation can be a protected client, just as an individual. *Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985). "The power to assert or waive a corporation's attorney-client privilege generally rests with the corporation's management and is exercised by its officers and directors." *MacKenzie-Childs LLC v. MacKenzie-Childs*, 262 F.R.D. 241, 248 (W.D.N.Y. 2009) (citing *Weintraub*, 471 U.S. at 349). The party asserting the privilege, in this case Carta and Ward, bears the burden of establishing its essential elements. *Mejia*, 655 F.3d at 132 (citing *von Bulow ex rel. Auersperg v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987)).

Carta and Ward contend that several categories of allegations from the SACC fall under the attorney-client privilege. These are: allegations regarding Talton's communications with the Paul Weiss investigation team (Paragraphs 5, 6, 108, 110); allegations regarding Ward's statements about legal matters (Paragraph 17); allegations about Talton's positive acts as a manager (Paragraph 47); allegations about Ward's failure to comply with regulations (Paragraph 56); allegations about statements made to and by General Counsel Lindauer (Paragraphs 83, 92, 93, 95, 96, 114, 163); allegations about statements made for a deposition (Paragraph 147); and allegations about complaints made to Carta's legal officers involving executives' misconduct

(Paragraphs 158, 162, 165). In support of this argument, Carta's General Counsel April Lindauer submits a declaration stating that "[b]ased on [her] professional judgment and over 20 years' experience, the information contained in these paragraphs . . . is protected by the attorney-client privilege." ECF No. 98 ¶ 6. Lindauer also asserts that "Carta . . . has not waived, and unequivocally does not waive, its attorney-client privilege over the information contained in those paragraphs." *Id.* ¶ 8.

The Court now finds that while some of these allegations fall within the scope of the privilege, others do not.

First, Talton's communications with the Paul Weiss team do not fall under the attorney client privilege because it fails to meet the first requirement: that the statements be between a client and his attorney. Talton was not Paul Weiss's client. Neither does it appear that Talton was acting in his official capacity as a representative of Carta when speaking with Paul Weiss. Indeed, taking Talton's allegations as true, the investigation by Paul Weiss was for Carta and against Talton in his individual capacity, for the retaliatory purpose of terminating Talton.

Second, allegations regarding Ward's statements about legal matters in Paragraph 17 also fail to meet the requirements to assert privilege. Carta and Ward do not meet their burden of showing that the statements about FINRA were made between Ward and their attorney. Although the final sentence of the paragraph reflects a series of statements made by Ward to Carta's compliance officer, Carta and Ward do not show that these statements were made for the purpose of obtaining legal advice. Rather, it appears from the content of these statements that Ward was scorning legal advice.

Third, regarding Paragraph 47, allegations about Talton's actions as a manager do not fall under the scope of the privilege.

Fourth, allegations regarding Ward's failure to comply with regulations similarly fail to qualify as communications between an attorney and his client.

Fifth, some allegations made to Lindauer are not privileged, but others are. Specifically, communications between Lindauer and Talton in his individual capacity are not protected by the privilege because they do not qualify as communications between an attorney and her client. At this stage, taking Talton's pleadings to be true, the Court must conclude that Talton was speaking in his individual capacity to Lindauer.

However, the allegations do contain reference to statements made between Lindauer and other Carta employees and executives. Lindauer's declaration asserts that all such statements are covered by privilege as attorney-client communications. Where these communications relate to legal matters and advice, they are protected. As such, the final sentence of Paragraph 83, beginning with "[o]n information and belief," is redacted. Paragraph 163 is also redacted.

Sixth, allegations about statements made at a deposition are not privileged.

Finally, allegations about complaints made to Carta's legal officers involving executives' misconduct are not privileged communications. Carta has not demonstrated that these complaints were made by those acting in a representative capacity for Carta for the purpose of soliciting legal advice. However, communications from Carta's legal team examining the substance of or proposing responses to the complaints are protected by the attorney client privilege. The second to last sentence of Paragraph 158, beginning with "Elovic's" and ending with "Ward" is redacted. The first sentence of Paragraph 162 is redacted.

### 3. No Redactions for Allegedly Highly Sensitive Internal Business Information

Carta claims a significant interest in protecting proprietary and non-public information about internal corporate decision-making, business strategy, and related analysis. ECF No. 90 at

6. Certainly, "[t]he demonstration of a valid need to protect the confidentiality of proprietary business information, such as internal analyses, business strategies, or customer negotiations, may be a legitimate basis to rebut the public's presumption of access to judicial documents." *Sec. & Exch. Comm'n v. Telegram Grp. Inc.*, No. 19-CV-9439 (PKC), 2020 WL 3264264, at *3 (S.D.N.Y. June 17, 2020). Such a valid need has moved courts to seal, for example, "internal corporate documents that govern investment strategies, information regarding proprietary modeling assumptions, and more generally, customer names, account numbers, and pricing information." *Dodona I, LLC v. Goldman, Sachs & Co*., 119 F. Supp. 3d 152, 156 (S.D.N.Y. 2015).

But Carta fails to show that the SACC and related filings revealed proprietary business information that warrants protection. Carta seeks to seal four Paragraphs under this argument, none of which actually contain "highly sensitive internal business information" that a court should protect. Paragraph 47 describes Talton's positive management contributions and efforts to equitize Carta's stock compensation. Paragraphs 56 and 57 allege that Ward acted without integrity in making particular management decisions. Paragraph 73 describes a reporting system under the Whistleblower Policy. These allegations do not reflect "internal analyses, business strategies, or customer negotiations." *Telegram Grp. Inc.*, 2020 WL 3264264, at *3. To the contrary, it appears that Carta and Ward simply seek to redact facts that cast them in an unfavorable light. This portion of the motions is denied.

### 4. Talton's Medical Information Shall Be Redacted

Parties jointly seek to seal certain information relating to Talton's prescribed medications. ECF Nos. 135, 141. "Courts regularly seal medical information despite a presumption of the right to public access because an individual's privacy interest in their own medical information is

a compelling countervailing interest." *Deide v. Day*, 2023 WL 8602879, at *2 (S.D.N.Y. Dec. 11, 2023) (cleaned up). This portion of the motions is granted.

## III.    Motion to Strike

Carta and Ward move to strike numerous paragraphs of the SACC under Federal Rule of Civil Procedure 12(f), which authorizes a court to "strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter." Mot. at 40–43. Specifically, Carta and Ward contend that certain paragraphs are wholly unrelated to Talton's claims, while others contain information protected by the attorney-client privilege.

### A.  Legal Standard for a Motion to Strike

"Motions to strike are generally disfavored, and should be granted only when there is a strong reason for doing so." *Winfield v. Citibank, N.A.,* 842 F. Supp. 2d 560, 573 (S.D.N.Y. 2012) (quoting *In re Tronox Sec. Litig.*, No. 09-CV-6220 (SAS), 2010 WL 2835545, at *4 (S.D.N.Y. June 28, 2010)); *see also Emilio v. Sprint Spectrum L.P.*, 68 F. Supp. 3d 509, 514 (S.D.N.Y. 2014) (noting that motions to strike are "infrequently granted") (citing *In re Merrill Lynch & Co., Rsch. Reps. Sec. Litig.*, 218 F.R.D. 76, 78 (S.D.N.Y. 2003)). "The movant must demonstrate that no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the case, and that to permit the allegations to stand would result in prejudice to the movant." *Dixon v. Reid*, No. 23-CV-9878 (VEC), 2024 WL 3794452, at *6 (S.D.N.Y. Aug. 13, 2024) (cleaned up) (citing *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 642 (S.D.N.Y. 2001)). In considering such a motion, a court "must deem the non-moving party's well-pleaded facts to be admitted, draw all reasonable inferences in the pleader's favor, and resolve all doubts in favor of denying the motion to strike[.]" *Id.* (citing *Diesel Props*

*S.r.L. v. Greystone Bus. Credit II LLC*, No. 07-CV-9580 (HB), 2008 WL 4833001, at *4 (S.D.N.Y. Nov. 5, 2008)) (cleaned up).

### B.  Talton's Allegations Are Not Wholly Unrelated to Claims

Talton's factual allegations do not meet this rigorous bar as being wholly unrelated to his claims. Rather, the paragraphs specified in the Motion to Strike are particularly relevant to Talton's breach of contract, breach of the implied covenant of good faith, and retaliation claims. As discussed *supra* in Discussion Section 1(C)(1)–(2), Talton's breach of contract and implied covenant claims require proof of bad faith behavior, including proof that his termination was not for an appropriate cause. And Talton's retaliation claims require proof that he participated in a protected activity, alongside either direct or circumstantial proof of a retaliatory motive. *Sumner*, 899 F.2d at 208–09. Talton's factual allegations in Paragraphs 17, 21, 53–62, and 93, concerning Carta's culture and Ward's management, reflect on whether their decisions under the Stock Plan were in good faith and on whether Talton in fact had reasonable basis to believe he was opposing unlawful discrimination. Talton's factual allegations in Paragraphs 106, 152–57, 158–60, and 161–66 also bolster Talton's claim that Talton was engaging in protected activity and tend to show that Carta and Ward's adverse acts were with retaliatory motive.

Carta and Ward's arguments to the contrary are unavailing. First, at this juncture, the Court cannot say that "no evidence in support of the allegations would be admissible." Mot. at 42 (citing *Bryce Corp. v. XL Ins. Am.*, No. 23-CV-1814 (KPF), 2023 WL 9004039, at *7 (S.D.N.Y. Dec. 28, 2023)). *See Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976) ("Evidentiary questions, such as the one present in this case, should especially be avoided at such a preliminary stage of the proceedings. Usually the questions of relevancy and admissibility in general require the context of an ongoing and unfolding trial in which to be properly decided.").

Second, although the language of some allegations may toe the line of fact and fancy, this is not sufficient to meet the high bar for striking. *See Nungesser v. Columbia Univ.*, No. 15-CV-3216 (GHW), 2017 WL 1102661, at *2 (S.D.N.Y. Mar. 23, 2017) (refusing to grant motion to strike a complaint even though it contained "arguments, a gender-swapping hypothetical, descriptions of social science articles, citations to case law and agency guidance, rhetorical questions, Greek chorus-style commentary, and even outright polemics"). Finally, prejudice to a party is not grounds to strike an allegation where the allegation serves a relevant purpose, as Talton's allegations do here. *See Dixon*, 2024 WL 3794452, at *6.

### C. Privileged Statements Will Be Sealed, But Not Stricken

Given that the Court is redacting statements protected by the attorney-client privilege, the motion to strike these statements is denied. While the protection of the privilege warrants denying public access to covered communications, the statements do have relevance to this case and do not meet the high bar for striking. *See Dixon*, 2024 WL 3794452, at *6.

## IV.    Discovery Disputes

Carta and Ward seek to compel production of: (1) communications that Talton withholds under an assertion of the common interest doctrine and (2) documents and communications discussing, without limitation, language that is inappropriate toward women.

### A. The Common Interest Doctrine Applies, But Only to Certain Communications

The common interest doctrine "is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege." *Fox News Network, LLC v. U.S. Dep't of The Treasury*, 739 F. Supp. 2d 515, 563 (S.D.N.Y. 2010) (internal citation omitted). For this doctrine to apply, the party asserting privilege must show that (1) the communications were made in the course of a join defense effort or that the clients share a common legal interest; (2) the statements were designed to further the common interest; and

(3) the privilege has not been waived. *See id.* (citing *Strougo v. BEA Assocs.,* 199 F.R.D. 515, 525 (S.D.N.Y. 2001)).

The nature of a common legal interest must be "identical, not similar, and be legal, not solely commercial." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 284 F.R.D. 132, 139 (S.D.N.Y. 2012) (internal citation omitted). "For courts to find such a common legal interest, the parties must have come to an agreement, though not necessarily in writing, embodying a cooperative and common enterprise towards an identical legal strategy." *Id.* (internal citations and quotation marks omitted). The interest also exists where "the parties have been, or may potentially become, co-parties to a litigation[,] or have formulated a coordinated legal strategy." *Fox News Network, LLC*, 739 F. Supp. 2d at 563 (cleaned up) (citing *In re Subpoena Duces Tecum Served on N.Y. Marine & Gen. Ins. Co.*, No. M 8–85 (MHD), 1997 WL 599399, at *4 (S.D.N.Y. 1997)).

"Privileges should be narrowly construed and expansions cautiously extended." *United States v. Weissman*, 195 F.3d 96, 100 (2d Cir. 1999). The party asserting that a privilege exists by virtue of the common interest doctrine bears the burden of establishing each element necessary to demonstrate its applicability. *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D. 466, 472 (S.D.N.Y. 2003). "Such a showing must be based on competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence." *Id.*

Talton asserts the common interest doctrine over communications between Talton and Johnson, between Talton and Johnson and McAllister Olivarius ("McO"), between Talton and McO and lawyers for Kramer, and between any such aforementioned parties that include additional third parties.

Talton has shown that that a common legal interest exists between himself and Johnson. Not only did both parties participate in proceedings for retaliation in violation of gender discrimination laws against Carta, but it appears that the parties did so based on a significant overlap of factual allegations. *See generally* SACC. Moreover, Johnson and Talton entered into a written agreement "jointly ask[ing] McAllister Olivarius to (1) examine their potential legal claims against Carta and (2) help [Johnson and Talton] prepare a letter to Carta's Board setting out [McO's] criticisms of Ward's behavior, including any legal claims that are relevant." ECF No. 132-1 ¶ 5. The agreement provided that Johnson and Talton could engage McO "in a further capacity" at a later stage. *Id.* ¶ 6. Johnson and Talton's mutual representation by McO lasted from between September 12, 2022 and February 20, 2023—from when both had executed the agreement to when Johnson terminated her relationship with McO. *Id.* ¶¶ 4, 11. During this time, Talton and Johnson shared a common legal interest that may invoke the common interest doctrine. *Id.* ¶ 17.

Contrary to Carta and Ward's assertions, Talton did not waive any applicable privilege by placing his legal communications with Johnson "at issue." The doctrine of at-issue waiver only applies when a party relies on privileged advice or work product to make his claim or defense. *See In re Cnty. of Erie*, 546 F.3d 222, 229 (2d Cir. 2008). Talton's claims rely on the acts that he took to support Johnson's mediation and subsequent Montana investigation. These acts are not privileged advice or work product. There is no "at issue" waiver.

Carta and Ward also unsuccessfully contend that the crime-fraud exception applies to communications between Talton, Johnson, and McO. "[A] party seeking to invoke the crime-fraud exception must at least demonstrate that there is probable cause to believe that a crime or fraud has been attempted or committed and that the communications were in furtherance

thereof." *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir. 1995). The exception "does not apply simply because privileged communications would provide an adversary with evidence of a crime or fraud. If it did, the privilege would be virtually worthless because a client could not freely give, or an attorney request, evidence that might support a finding of culpability." *Id.* Moreover, the Court must have "probable cause to believe that the particular communication with counsel or attorney work product was intended in some way to facilitate or to conceal the criminal activity." *Id.* While Carta and Ward offer speculative theories for how Talton, Johnson, and McO may have communicated under privilege in furtherance of some crime or fraud, Carta and Ward fail to offer evidence sufficient to show probable cause. *See* ECF No. 136 at 14–15; ECF No. 136-1.

Accordingly, communications between Talton and Johnson, or between Talton and Johnson and McO, on the dates between September 12, 2022 and February 20, 2023, are protected by the common interest doctrine if the statements were designed to further the common interest and the underlying privilege has not been waived. *See Fox News Network, LLC*, 739 F. Supp. 2d at 563. In other words:

- Such communications that were not designed to further the common legal interest are not protected by any privilege and must be produced. It shall be presumed that all communications between Talton and Johnson in the presence of counsel were in furtherance of the common legal interest.

- Communications between Talton and Johnson without counsel, even where counsel may have been cc'd in an email but did not engage, are not entitled to such a presumption.

- Such communications that were made in the presence of additional third parties are not confidential under the attorney-client privilege, because Talton has not shown that any additional third parties are covered by the common interest doctrine. The attorney-client privilege does not apply to protect these communications.

- Such communications made in the presence of additional third parties that constitute work product, however, are still privileged. *See Williams v. Bridgeport Music, Inc*., 300 F.R.D. 120, 123 (S.D.N.Y. 2014) (noting that "work-product protection is . . . waived by disclosure to third parties. . . only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information") (internal citation omitted).

- Communications between Johnson and Talton, without the presence of counsel, occurring before September 12, 2022 are not protected and must be produced.

- Communications between Johnson and Talton, without the presence of counsel, occurring after February 20, 2023, are protected only if these communications pertain to privileged communications during the course of their mutual representation and were designed to further the common legal interest.

For the avoidance of doubt, communications between Talton, McO, and Kramer and her attorneys qualify as communications made in the presence of third parties and must be work product to be privileged. *See* ECF No. 139 at 13–15 (discussing communications with Kramer's attorneys under the section heading for "Communications . . . With Third Parties").

Talton shall produce all communications that are not privileged in a manner consistent with this Order. To the extent there are documents Talton continues to withhold and that the

parties continue to dispute (again, consistent with this Order), Talton shall provide those documents to the Court for an *in camera* review. The parties have until May 1, 2025 to confer and for Talton to provide to the Court any documents where a dispute remains.

### B. The Request for Communications Discussing Language Inappropriate Toward Women Is Overbroad

Carta and Ward seek to compel "documents and communications discussing, without limitation, language that tends to denigrate, insult, and/or objectify women, and language or images reflecting rape and/or sexual violence towards women." ECF No. 147 at 2. The purpose for this discovery, they assert, is to show the truth of the Medium Article's statements that Talton was "inappropriate with women," was a "misogynist and a racist," and that he sent or received "offensive, discriminatory and harassing messages." *Id.* In support of their argument, Carta and Ward highlight that truth is an absolute defense to a defamation claim. *Id.*

This argument is inapplicable to the breadth of discovery that Carta and Ward seek. While truth is indeed an absolute defense, *see Andrews v. At World Properties, LLC*, 236 N.E.3d 540, 548 (Ill. App. Ct. 2023), what Talton alleges is the core misrepresentation of the Medium Article is its framing of Talton as an unemployable person who is inappropriate toward women *at work*. SACC ¶¶ 138, 144, 145. Indeed, the article's hyperlink to the original Complaint (alleging violation of Carta's discrimination and sexual harassment policies) and the nature of the article (advice for other CEOs facing bad press cycles) suggest that the basis for the allegedly defamatory statements is Talton's work-related behavior. *Id.* ¶¶ 135, 138. Thus, even if Talton is inappropriate toward women generally, this fact would not aid Carta and Ward in stating a truth defense to the defamation claim. Carta and Ward may not, under the guise of seeking truth, compel Talton's private messages regarding women who are not affiliated with Carta. Carta and

Ward are only entitled to documents and communications indicating that Talton was inappropriate with women in a professional setting.

## V.    Motion for Leave to Amend Is Granted

Carta seeks leave to file its Third Amended Complaint ("TAC") pursuant to Federal Rule of Civil Procedure 15(a)(2) to assert California Invasion of Privacy Act ("CIPA") claims against Talton based on his repeated recording of Carta employees. ECF Nos. 123, 124. The proposed TAC alleges that during discovery for this case, Talton produced "at least 10 surreptitiously recorded workplace conversations with Carta executives residing in California." ECF No. 124-1 ("TAC") ¶ 9. The TAC also alleges that Talton produced a total of 39 "surreptitious" recordings with 26 Carta employees. *Id.* ¶ 60. According to Carta, none of the recorded individuals ever consented to or had any knowledge of Talton's recordings. *Id.* ¶ 62.

Under Rule 15(a)(2), a court "should freely give leave [to amend] when justice so requires." The Second Circuit interprets Rule 15 of the Federal Rules of Civil Procedure liberally "consistent with [its] strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) (internal quotation marks and citation omitted); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."). But "[l]eave may be denied for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss[.]" *Lucente v. IBM*, 310 F.3d 243, 258 (2d Cir. 2002).

Talton argues that the Court should deny leave to amend because amendment would be futile. ECF No. 128 ("MTA Opp.") at 3–8. The Court sets forth the applicable law under CIPA and determines that the proposed TAC would adequately plead a claim.

CIPA creates a civil cause of action for against any "person who, intentionally and without the consent of all parties to a confidential communication, uses any electronic amplifying or recording device to eavesdrop upon or record the confidential communication." CAL. PEN. CODE §§ 632(a); 637.2. The key dispute, as Talton puts forth, is whether the recordings at issue contain "confidential communication." MTA Opp. at 3–8. CIPA defines a "confidential communication" as:

> any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive, or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded.

Cal. Pen. Code § 632(c). A conversation is confidential under CIPA "if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 41 P.3d 575, 576–77 (Cal. 2002). Notably, the California Supreme Court has explained that "[t]he purpose of [CIPA] [is] to protect the right to privacy by, among other things, requiring that all parties consent to a recording of their conversation." *Id.* at 577. In a situation involving privacy disclosures, a court can find consent on a motion to dismiss if the disclosures explicitly notify users of the practice at issue. *Turner v. Nuance Commc'ns, Inc.*, 735 F. Supp. 3d 1169, 1181 (N.D. Cal. 2024).

Talton contends that Carta employees lacked a reasonable expectation of privacy. Specifically, Talton points to Carta's employee handbook, which states, "You may never have an expectation of privacy while using Carta equipment or while working on company time." MTA

Opp. at 7; ECF No. 124-1 § VII(F). The handbook also states that "an employee cannot expect privacy rights to extend to work-related conduct or the use of equipment and supplies by or on behalf of Carta." *Id.* However, nowhere in the handbook does it explicitly state that conversations shall be subject to recording. Thus, while the language in the handbook may raise doubt about whether Carta employees had a reasonable expectation of privacy regarding their conversations, this fact-based inquiry is one that the Court cannot settle at this stage. Carta has leave to file its TAC.

Talton further requests that if leave is granted, the Court should exercise its discretion to award Talton his costs and fees needed to prepare his responsive pleading. TAC Opp. at 8. Courts may grant a motion to amend while imposing conditions, such as costs being paid by the moving party. *See, e.g.*, *Xpressions Footwear Corp. v. Peters,* No. 94-CV-6136, 1995 WL 758761, at *5–6 (S.D.N.Y. Dec. 22, 1995) (collecting cases). But that is inappropriate here because the amendment is based upon information gained during recent discovery. TAC ¶¶ 8–9; *see, e.g.*, *Naylor v. Rotech Healthcare, Inc*., 679 F. Supp. 2d 505, 510 (D. Vt. 2009) (declining to assign costs when amendment was based on a recent disclosure of facts). Talton's motion for fees and costs is denied.

## CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED with respect to Talton's claim for publication of private fact, but DENIED with respect to all other claims.

The motions to redact are GRANTED IN PART. Parties shall confer and file copies of all affected documents with redactions in accordance with the Court's ruling by **May 1, 2025**. If there are any disputes regarding the application of the Court's ruling, parties shall detail their

positions in a letter submitted simultaneously with the proposed redactions. The Court will then make a final determination.

The motion to strike is DENIED.

The motion to compel production of communications over which Talton asserts privilege is GRANTED IN PART. Parties shall confer regarding the scope of production in accordance with the Court's ruling. If disputes remain, the Court will conduct *in camera* review of the disputed documents.

The motion to compel Talton's communications discussing language that is inappropriate toward women is DENIED, and discovery of such communications shall be limited as described in the Court's ruling.

The motion for leave to file the Third Amended Complaint is GRANTED without the imposition of costs.

The Clerk of Court is directed to terminate ECF Nos. 96, 99, 109, 123, 135, 145, and 147.


Dated:  March 27, 2025
        New York, New York


                                        SO ORDERED.

                                        *Jessica Clarke*
                                        _____

                                        JESSICA G. L. CLARKE
                                        United States District Judge